## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

**UNION MUTUAL FIRE INSURANCE COMPANY,**

**Plaintiff,**

**Case _____**

**v.**

**LIAKAS LAW, P.C.; DEAN N. LIAKAS;
JOHN DOE NOS. 1-25;
PRIME CASE, LLC, XYZ CORPORATION NOS. 1-25;
ORTHOPAEDICS SPINE & SPORTS MEDICINE,
LLC, s/d/b/a TOTAL ORTHOPAEDICS & SPORTS
MEDICINE; VADIM LERMAN, D.O.; DANTE
LEVEN, D.O.;
MCCULLOCH ORTHOPAEDIC SURGICAL
SERVICES, P.L.L.C. s/d/b/a NEW YORK SPORTS
AND JOINTS ORTHOPAEDIC SPECIALISTS;
KENNETH McCULLOCH-OTERO, M.D.; DAVID R.
CAPIOLA, M.D.;
GOTHAM NEUROSURGERY, P.L.L.C.; ANDERS
COHEN, D.O.;
NJMHMC, LLC d/b/a HUDSON REGIONAL
HOSPITAL; YAN MOSHE;
ACCELERATE RADIOLOGY, P.C. d/b/a PRECISION
ACCELERAD; SIDDHARTH PRAKASH, M.D.;
RADNET, INC. s/d/b/a LENOX HILL RADIOLOGY;
MICHAEL GREENE, M.D.;
PAIN PHYSICIANS OF NEW YORK, P.C.;
BOLESLAV KOSHARSKYY, M.D.; LEONID
REYFMAN, M.D.; BL PAIN MANAGEMENT, P.L.L.C.
d/b/a PAIN MANAGEMENT NYC;
PHYSICAL MEDICINE & REHABILITATION, P.C.;
GUATAM KHAKHAR, M.D.; and, JEAN PAUL
ERROL TOUSSAINT, M.D.,**

**Defendants.**

## COMPLAINT

COMPLAINT                                                                    1

Plaintiff UNION MUTUAL FIRE INSURANCE COMPANY (hereinafter referred to as "Union") by and through their attorneys THE WILLIS LAW GROUP, PLLC, allege as follows:

## I.     JURISDICTION AND VENUE

1.     This is a civil action arising out of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, and 28 U.S.C. § 1331 in that certain of the claims arise under the laws of the United States and over other claims herein under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.     Venue is proper in this District under and pursuant to 18 U.S.C. § 1965, and pursuant to 28 U.S.C. § 1391, in that numerous of the acts, practices, and events giving rise to the claims alleged in this Complaint occurred in this District, and many of the Defendants reside in this District.

## II.     PARTIES

### A.     Plaintiff

3.     UNION MUTUAL FIRE INSURANCE COMPANY is an insurance company duly organized and existing under the laws of the State of Vermont and maintains its office in that state.

### B.     Defendants

#### i.     Legal Service Defendants

4.     Defendant LIAKAS LAW P.C. ("Liakas Firm") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, the Liakas Firm maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

5.     Upon information and belief, Defendant DEAN N. LIAKAS ("Dean Liakas") resides in and is a citizen of the State of New York. He is also the managing partner of Liakas

COMPLAINT                                                                                              2

Firm. At all times relevant, Dean Liakas was licensed or otherwise authorized to practice law in the State of New York.

6.      Liakas Firm and Dean Liakas are collectively referred to herein as the "Liakas Defendants" or the "Legal Service Defendants."

        ii.   Runner Defendants

7.      Defendants JOHN DOE NOS. 1-25 (collectively "Runner Defendants") are persons of unknown citizenship who participated in the fraudulent scheme described below by recruiting potential claimants into staging and/or perpetuating fake trip and fall accidents at various sites throughout New York.

8.      Similar to the scheme set forth in *United States v. Rainford et al.*, 110 F.4th 455 (2d Cir. 2024), Runner Defendants typically have their own claims, which may be presented before, after, or in conjunction with their recruiting activities.

9.      Upon information and belief, defendant Liakas Firm employs or has employed at least two individuals purportedly as "paralegals" or employees retained to perform "client relations" who were in fact tasked with recruiting potential claimants in order to further the fraudulent scheme.

10.     The Liakas Firm further conspired with another law firm ("Co-Conspirator Firm 1"), Co-Conspirator Firm 1's investigator, and Co-Conspirator Firm 1's paralegal, to recruit potential claimants in order to further the fraudulent scheme, and further split the proceeds from such scheme through payments disguised as referral fees, "trial counsel" fee arrangements, and as case-related expenses.

11.     Co-Conspirator Firm 1 and its investigator are related to several similar schemes utilizing additional affiliated law firms.

COMPLAINT                                                                    3

iii.  Funding Defendants

12.     Defendant PRIME CASE LLC ("Prime") is a Delaware limited liability company. At all times relevant herein, Prime was authorized to and does/did conduct business in New York. Prime provides cash advances to personal injury plaintiffs in the form of payments to medical providers for procedures and as direct advances to personal injury plaintiffs. At all times relevant herein, Prime also operated through affiliated entities with the same business purpose, under shared ownership, management, and control.

13.     Defendants XYZ CORPORATION NOS. 1-25 (collectively, the "Funding Defendants") are business entities of unknown organization that participated in the fraudulent scheme described below by providing funds directly and/or indirectly to the Legal Service Defendants, the Runner Defendants, the Claimants (defined below) and/or the Medical Provider Defendants.

iv.  Medical Provider Defendants

14.     Defendant ORTHOPAEDICS SPINE & SPORTS MEDICINE, LLC a/k/a Total Orthopaedics & Sports Medicine ("Total Ortho") is a limited liability company apparently organized and existing under the laws of the State of New York in conjunction with Total Ortho Management Services, LLC and possibly as a successor to the defunct Total Orthopaedics & Sports Medicine LLP whose authorization was revoked in 2013. At all times relevant herein, Total Ortho maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

15.     Defendant VADIM LERMAN, D.O. ("Lerman" and together with Total Ortho, the "Total Ortho Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Lerman has been licensed or otherwise authorized to practice medicine in the State of New York and was the operator, officer, director and/or employee of Total Ortho.

COMPLAINT                                                                                         4

16.    Defendant DANTE LEVEN, D.O. ("Leven" and together with Lerman and Total Ortho, the "Total Ortho Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Lerman has been licensed or otherwise authorized to practice medicine in the State of New York and was the operator, officer, director and/or employee of Total Ortho.

17.    Defendant MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C. s/d/b/a NEW YORK SPORTS AND JOINTS ORTHOPAEDIC SPECIALISTS ("McCulloch Ortho" or "NY S&J" when utilizing the alias) is a professional service limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, McCulloch Ortho maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

18.    Defendant KENNETH McCULLOCH-OTERO, M.D. ("McCulloch") resides in and is a citizen of the State of New York. At all relevant times herein, McCulloch has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of McCulloch Ortho and NY S&J.

19.    Defendant DAVID R. CAPIOLA, M.D. ("Capiola" and together with McCulloch Ortho and McCulloch, the "McCulloch Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Capiola has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of McCulloch Ortho and NY S&J.

20.    Defendant GOTHAM NEUROSURGERY, P.L.L.C. ("Gotham Neurosurgery") is a professional service corporation organized and existing under the laws of the State of New York. At all times relevant herein, Gotham Neurosurgery maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

21.     Defendant ANDERS COHEN, D.O. ("Cohen" and together with Gotham Neurosurgery, the "Gotham Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Cohen has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Gotham Neurosurgery.

22.     Defendant NJMHMC, LLC d/b/a HUDSON REGIONAL HOSPITAL ("Hudson Regional") is a limited liability company duly organized and existing under the laws of the State of New Jersey. At all times relevant herein, Hudson Regional transacted significant business in the State of New York, including soliciting physicians, patients, and lawyers to utilize its services, providing and arranging transportation for New York patients, soliciting and receiving referrals from New York-based medical practices, and billing New York-based policies and insurers.

23.     Defendant YAN MOSHE ("Moshe" and together with Hudson Regional, the "Hudson Regional Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Moshe was the owner, operator, officer, director and/or employee of Hudson Regional.

24.     Defendant ACCELERATE RADIOLOGY, P.C. d/b/a PRECISION ACCELERAD ("AcceleRad") is a professional service corporation organized and existing under the laws of the State of New York. At all times relevant herein, Precision Pain maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

25.     Defendant SIDDHARTH PRAKASH, M.D. ("Prakash" and together with AcceleRad, the "AcceleRad Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Prakash has been licensed or otherwise authorized to practice medicine

in the State of New York and was the owner, operator, officer, director and/or employee of AcceleRad.

26.    Defendant RADNET, INC. s/d/b/a LENOX HILL RADIOLOGY ("RadNet") is a publicly traded corporation organized and existing under the laws of the State of Delaware. RadNet operates the "Lenox Hill" imaging centers in the New York area, including the Hewlett, New York location (itself a former Doshi Diagnostics facility shuttered following an illegal referral scheme prosecution).

27.    Defendant MICHAEL GREENE, M.D. ("Greene" and together with RadNet, the "RadNet Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Prakash has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of RadNet.

28.    Defendant PAIN PHYSICIANS OF NEW YORK ("Pain Physicians NY") is a professional service corporation organized and existing under the laws of the State of New York. At all times relevant herein, Pain Physicians NY maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

29.    Defendant BOLESLAV KOSHARSKYY, M.D. ("Kosharskyy") resides in and is a citizen of the State of New York. At all relevant times herein, Kosharskyy has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Pain Physicians NY.

30.    Defendant LEONID REYFMAN, M.D. ("Reyfman," and together with Pain Physicians NY and Kosharskyy, the "PPNY Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Reyfman has been licensed or otherwise authorized to

COMPLAINT                                                                                      7

practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Pain Physicians NY.

31.    Defendant BL PAIN MANAGEMENT, P.L.L.C. d/b/a PAIN MANAGEMENT NYC is a professional limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, BL PAIN MANAGEMENT, P.L.L.C. d/b/a PAIN MANAGEMENT NYC functions as an alternative billing entity for Pain Physicians NY, and/or otherwise as an alter ego of the PPNY Defendants.

32.    Defendant PHYSICAL MEDICINE & REHABILITATION, P.C. ("Physical Rehab") is a professional service corporation organized and existing under the laws of the State of New York. At all times relevant herein, Physical Rehab maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

33.    Defendant JEAN PAUL ERROL TOUSSAINT, M.D. ("Toussaint") resides in and is a citizen of the State of New York. At all relevant times herein, Toussaint has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Physical Rehab.

34.    Defendant GUATAM KHAKHAR, M.D. ("Khakhar," and together with Physical Rehab and Toussaint, the "PMR Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Toussaint has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Physical Rehab.

35.    The Total Ortho Defendants, McCulloch Defendants, Gotham Defendants, Hudson Regional Defendants, AcceleRad Defendants, RadNet Defendants, PPNY Defendants, and the PMR Defendants are collectively referred to herein as the "Medical Provider Defendants."

36.     The Liakas Firm has employed individuals as "Medical Coordinators," who would arrange for Claimants to treat with the Medical Provider Defendants. Further, the Liakas Firm has employed individuals in this capacity who are direct relatives of the Medical Provider Defendants.

37.     The Legal Service Defendants, the Runner Defendants, the Funding Defendants, and the Medical Provider Defendants are collectively referred to herein as "Defendants."

## III.   FACTUAL BACKGROUND

### A.   **Fraud Scheme**

38.     From at least 2018 to the present, with a marked escalation since 2020, Defendants, together with others known and unknown, for their financial benefit, orchestrated a widespread fraud scheme to defraud Plaintiffs and others by (i) fraudulently misrepresenting pre-existing and degenerative conditions as acute trauma, transforming legitimate minor or localized injuries into lucrative full-body claims, and otherwise manufacturing purported injuries from whole cloth; (ii) preparing and collecting documentation as well as submitting, filing, prosecuting and asserting fraudulent personal injury lawsuits on behalf of Claimants, frequently directly related and within short temporal proximity; (iii) providing or alleging to have provided medically unnecessary and excessive healthcare services to such Claimants; (iv) providing monies directly or indirectly to Defendants and to Claimants to fund the fraud scheme; and/or (v) using the fraudulent diagnoses and medically unnecessary and excessive healthcare services to inflate or manufacture settlement value (the "Fraud Scheme").

39.     The conspiracy shares many structural elements similar to those found in *United States v. Rainford*, *supra*, as summarized by the Second Circuit Court of Appeals in its recent decision affirming criminal convictions:

> The scheme involved recruiting poor and homeless people to fake accidents at properties around the New York area. The recruit would stage an accident and then seek unnecessary medical treatment—

> sometimes including surgery—from doctors who were part of the scheme. The organizers of the scheme would then refer the recruit to a lawyer, who would sue the property owner or the owner's insurance company for damages. The proceeds from the lawsuits, which often settled, were then divided among the co-conspirators, with the recruits receiving relatively little.

*United States v. Rainford et al.*, 110 F.4th at 468 (2d Cir. 2024)

40.    The Defendants together constituted an association-in-fact enterprise generally structured as depicted below in Figure 1.

**Figure 1.**



**Figure 2.**



41.     Generally, as part of the Fraud Scheme, individuals known as "runners" ("Runners"), including the Runner Defendants, under the direction of the Liakas Defendants and in furtherance of and as a necessary step for the execution of the Fraud Scheme, recruited claimants ("Claimants") into staging and/or perpetuating fake trip and fall accidents at various locations throughout New York.

42.     Claimants were told that the amount of their ultimate economic recoveries would increase if they had surgeries or rehabilitation, and that funding was available so long as they continued to participate in the treatment protocol predetermined by Defendants.

43.     Regardless of any actual bodily injury stemming from the purported accidents, these Claimants were instructed by the Runners, under the direction of the Legal Service Defendants and on behalf of the Defendants, to fake and claim certain bodily injuries that purportedly resulted from such accidents and to seek medical treatment from providers who would provide treatment in furtherance of the scheme.

44.     The Runners then referred and/or transported these Claimants to Liakas Firm, where attorneys and/or other employees of Liakas Firm met with these Claimants.

45.     The Liakas Defendants represented the Claimants in personal injury lawsuits against the various landlord and tenant parties for purported injuries that resulted from alleged accidents.

46.     In order to inflate potential settlement value and thereby effectuate higher profit for the Defendants, Liakas Defendants, directly and/or indirectly through the Runner Defendants and/or others under their control including employed Medical Coordinators, directed the Claimants to seek medical diagnosis and treatment from certain associated medical providers with which the Defendants had an agreement or understanding as to the fraud scheme, including the Medical

COMPLAINT                                                                                    12

Provider Defendants, who provide a variety of services (radiology, physical therapy, pain management and orthopedic surgery) at facilities located in or to patients from multiple states, including New York and New Jersey.

47.     In this respect, the scheme bears striking similarity not only to *Rainford, supra*, but to the scheme as set forth in *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59 (2d Cir. 2024), in which certain medical service providers "conduct initial examinations of patients at the gatekeeper clinics that are not intended to diagnose and treat patients' conditions but rather are predetermined to find various injuries requiring extensive treatment." *Id* at 73.

48.     Here too, following initial evaluation of the Claimants by gatekeeper clinic personnel, the associated medical service providers (usually internists and PAs) referred Claimants to physical therapy, injections, and to orthopedic and neurology consultations from associated medical service providers, including the Medical Provider Defendants, involved in the fraudulent scheme.

49.     A number of Medical Provider Defendants have utilized different corporate identities to at least partially hide what amounts to circles of self-referrals, such as wherein personnel from McCulloch will selectively use the NY S&J identity, or when personnel from Pain Physicians NY will bill for services through BL Pain to achieve the same purpose.

50.     As in *State Farm v. Tri-Borough*, implementation of the fraudulent treatment protocol requires that Medical Provider Defendants "routinely order unnecessary diagnostic tests for patients that do not affect their treatment, and that some of those tests are duplicative of information already obtained…" 120 F.4th at 74.

COMPLAINT                                                                                                13

51.     Here, the associated medical service providers routinely ordered a variety of imaging services in every single case – and in virtually every instance, MRIs of the cervical and lumbar spine, shoulders and knees – from certain radiologists involved in the fraudulent scheme, whose reports contain findings that routinely deviate from the claimants' conditions as set forth by the imaging studies themselves.

52.     Then, the associated medical service providers used these fraudulent imaging reports, but not the underlying imaging studies that either show degenerative conditions or fail to show any evidence of an acute injury, to help justify months of physical therapy sessions and injections for Claimants, which were then represented as being a course of allegedly failed conservative treatment in order to justify back and neck surgeries, shoulder surgeries, knee arthroscopies, etc.

53.     Despite the fact that the New York State Surgical and Invasive Procedure Protocol has long provided that "[t]he surgeon is responsible for assessing what films/images are appropriate for viewing before and during the surgery" (September 2006, at 8, available online at https://www.health.ny.gov/professionals/protocols_and_guidelines/surgical_and_invasive_procedure/docs/protocol.pdf, last accessed January 13, 2025), the associated medical service providers routinely did not consult the MRI films themselves, but relied upon reports calculated to misrepresent the claimants' conditions as causally related to the alleged incidents, so that the otherwise unnecessary procedures would present with the patina of legitimacy. While the specific body arts at issue may vary amongst the claimants, the underlying scheme remained the same.

54.     The rote protocol treatment of the gatekeeper clinics (PPNY and PMR), in addition to the fraudulent imaging reports (AcceleRad), would then be used to justify pre-determined protocol surgeries by the Total Ortho, Gotham, and McCulloch Defendants.

COMPLAINT                                                                                                 14

55.     Claimant A (Freeport resident, claimed fall from standing height on a cracked sidewalk in Queens in November 2020, went to Wyckoff hospital in Brooklyn even further away, approximately 30 miles from his residence), retained Liakas on or about three (3) days after his fall. Claimant A first treated nine (9) days after the fall at NY S&J, on a lien (*i.e.,* to be paid for through proceeds of a claim). Within two weeks he saw McCulloch Ortho and Total Ortho. Claimant A ultimately had surgery with both. Claimant A was provided funding through Prime. Both of his brothers, and his cousin, all Freeport residents, purportedly have trip and falls from standing height on cracked sidewalks in December 2020 (in Brooklyn, surgeries with McCulloch and Total Ortho), January 2021 (in Queens, with Prime Case LLC funding, treatment unknown), and April 2021 (in Brooklyn, with Golden Pear Funding, also treated with McCulloch and Total Ortho) – all are represented by Liakas.

56.     Claimant A cycled through the PMR, PPNY, RadNet, AcceleRad, McCulloch, and Total Ortho Defendants, ultimately receiving a spinal fusion in May 2021, listed in all records as an L5-S1 fusion (which never had any findings) except Leven's copy of the operative report (with no notation of change, indicating the surgery was L4-5), purportedly dictated and transmitted a month after the date of surgery.

57.     **Leven's operative report used is an identical, verbatim copy-paste job used in no less than seventeen (17) other cases** – and that is just from what is publicly available. **These reports are provided in favor of just three firms – one of which is Defendant Liakas Firm, and another being a law firm run by the principals' cousins.**

58.     **One such report is from his Claimant A's brother's surgery, two (2) days after his own.**

COMPLAINT                                                                                                                    15

59.    Claimant A ultimately required a corrective lumbar surgery following this unnecessary procedure.

60.    Claimant A and his brother also both get right shoulder surgeries within two (2) weeks of each other.

61.    Even if the justification-providing Medical Defendants were unable to perfectly line up, the surgical Medical Defendants would simply proceed under false pretenses.

62.    For example, Claimant B (who lives in Freeport, purportedly fell from standing height due to uneven sidewalk in Brooklyn some 30 miles away, presents to Jamaica hospital in the company of Runner 1, and gives the hospital the email address for Co-Conspirator Firm 1's paralegal) initially reported injuries to his right shoulder, lower back, and right knee. Each body part demonstrates normal range of motion and no objective indicia of injury is observed beyond subjective complaints of pain. Imaging at the hospital is utterly negative for any issues in these body parts except for demonstrating endplate osteophytes – a degenerative change which takes time to develop – at the L3-4 level. He is discharged with the suggestion he take Motrin. Claimant B retains Liakas Firm and secures funding through Prime Case LLC.

63.    MRIS taken and read approximately three (3) months after the "accident," and three (3) months prior to surgery, by an MRI facility not named herein as a Defendant and is not part of the Fraud Scheme, revealed no meniscal tear of the right knee, but identified a "surface irregularity" of the ACL.

64.    Within the same breath, first summarizing the MRI report then providing a treatment plan, Capiola noted the surface irregularity as a "partial tear of the ACL" and characterized chondromalacia (the softening and degeneration of the cartilage on the underside of the kneecap) as "traumatic" (which the MRI report did not) while not referencing the meniscus at

all; **then promptly provided an assessment of a "clinically occult meniscal tear," and a plan for surgery**:

> An MRI of the right knee from 3/31/2021 demonstrates synovitis, traumatic chondromalacia, partial tear of the ACL, soft tissue swelling, PCL sprain, patellofemoral chondromalacia
>
> **ASSESSMENT AND PLAN:**
> Status post fall on an uneven sidewalk on 12/13/2021
> 1. Right knee traumatic chondromalacia, multiple ligament sprains, clinical occult meniscal tear, worsening buckling, mechanical instability, pain, swelling, weakness
>
> With respect to the RIGHT KNEE, various options were discussed. Due to the persistence of the patient's symptoms, the physical exam and MRI findings, and failure of conservative treatment including physical therapy, activity modification, and medication, options discussed included continued conservative intervention versus corticosteroid injection for likely temporary relief versus surgical intervention. The patient does wish for surgical intervention. Pros

65.    An "occult meniscal tear" has been defined in National Institute of Health studies and peer-reviewed orthopedic journals as "an <u>operatively reported</u> meniscal tear that was not visible on the MRI images, even when the MRI images were retrospectively reviewed." [1]

66.    *I.e.*, a meniscal tear discovered <u>during</u> a surgery unrelated to a meniscal tear, which was unknown prior to surgery and not visible even upon later review. By definition, an occult tear is not a *pre*-operative diagnosis.

67.    Undeterred, Capiola performed an arthroscopy on Claimant B based upon a single pre-operative diagnosis which was unsupported by any imaging or clinical findings:

> PREOPERATIVE DIAGNOSIS:  Right knee meniscal tear and synovitis.

68.    Notably, the "partial tear of the ACL" Capiola intuited from a "surface irregularity" was nowhere to be found:

> The ACL was probed in its entirety and was found to be intact.

---

[1] Iowa Orthop J. 2020; <u>40(2):30–36</u>; *citing* Laundre BJ, Collins MS, Bond JR, Dahm DL, Stuart MJ, Mandrekar JN. MRI accuracy for tears of the posterior horn of the lateral meniscus in patients with acute anterior cruciate ligament injury and the clinical relevance of missed tears. AJR Am J Roentgenol. 2009;193:515–523. doi: 10.2214/AJR.08.2146.

69.    Later independent review of the pre-surgical MRI films confirmed that there were

no tears present, and the structures of the knee were demonstrated as intact:

The MRI of the right knee performed on 03/31/2021 reveals no evidence of recent fracture or dislocation. The bone marrow signal is within normal limits. There is no bone marrow edema or contusion. There is no osteochondral lesion. The articular cartilage is intact in all three compartments. There is no chondromalacia patella. The medial and lateral menisci are intact. The anterior and posterior cruciate ligaments are intact. The medial and lateral collateral ligaments are intact. The iliotibial band is intact. There is no evidence of posterolateral corner injury. The gastrocnemius, popliteus, and biceps femoris tendons are intact. There is no evidence of patellar subluxation injury. The patellar retinaculum is intact. The quadriceps and patellar tendons are intact. There is no joint effusion or hemarthrosis. There is no intra-articular loose body. The superficial and popliteal fossa soft tissues are intact.

In conclusion, the MRI of the right knee performed on 03/31/2021 reveals no recent traumatic injury or internal derangement.

70.    Similarly, the right shoulder MRI performed on Claimant B at the same non-

Defendant facility found "superficial erosion" of the labrum. There were no tears noted in the MRI

report of the labrum or the rotator cuff.

71.    Regardless, on the first visit post-knee arthroscopy, Capiola determined a right

shoulder arthroscopy was warranted and proceeded with the following:

PROCEDURE PERFORMED:
1.    Right shoulder examination under anesthesia, right shoulder arthroscopy, extensive debridement of anterior and superior labrum.
2.    Rotator cuff subscapularis side-to-side repair with 2 FiberWire sutures.
3.    Lysis of adhesions.
4.    Subacromial decompression.
5.    Complete synovectomy.

72.    While inconsistent with the MRI, the procedure, operative report, date, and location

are *identical* to Capiola's procedure on Claimant "D," detailed below.

73.    In other instances, still, bodily areas that were not indicated for any injury based on

the alleged accident and complaints initially reported in the emergency room.

74.    Claimant F presented to the emergency room with complaints regarding the right

shoulder, hip, and knee, following a purported standing height fall due to uneven sidewalk. Full

range of motion was found for all body parts and the only objective observation of any trauma

whatsoever was a "superficial abrasion" on the right knee. No neck complaints were made, and the hospital felt the need to **bold** the following:

> Comments: **No obvious signs of trauma, ecchymosis, erythema, rash or edema to the back. No cervical, thoracic or lumbar spinal point tenderness. No CVA or flank tenderness. Full ROM of the cervical spine with no nuchal rigidity.**

75.     He was given Motrin and discharged with instructions to follow up with his PCP. The Liakas Firm was retained within 24 hours.

76.     Six (6) days after being seen with no objective findings except a "superficial abrasion" of the knee, PMR and Toussaint were consulted, who issued a finding of **total disability**. Once again, there was **no reference to any neck complaints**.

77.     Three (3) days after being seen at PMR with no neck complaints, and nine (9) days after the purported accident and hospital visit with no neck complaints, Claimant F consulted with a neurosurgeon, Cohen at Gotham Neuro, regarding a chief complaint of neck and low back pain. Clinical examination was entirely absent of any findings at C3-4. Claimant F was sent to AcceleRad for MRIs of the cervical spine and lumbar spine. While the lumbar MRI purportedly displayed disc bulges, the cervical results of that MRI from August 2, 2022 were as follows:

> ...ation of the disc spaces demonstrates:
> At C2-C3, there is no disc bulge or herniation and the facet joints are normal.
> At C3-C4, there is no disc bulge or herniation and the facet joints are normal.
> At C4-C5, there is no disc bulge or herniation and the facet joints are normal.
> At C5-C6, there is no disc bulge or herniation and the facet joints are normal.
> At C6-C7, there is no disc bulge or herniation and the facet joints are normal.
> At C7-T1, there is no disc bulge or herniation and the facet joints are normal.
> IMPRESSION:

78.     After primarily treating Claimant F for his back, with discussion of intervention limited to the L5-S1 level, on March 23, 2023, Cohen, without elaboration, decided Claimant F was a candidate for C3-4 surgery and sent Claimant F for a medical clearance referral along with new MRIs at AcceleRad, who attempted to accommodate the request for justification with a disc bulge finding at C4-5:

At C2-C3, there is no disc bulge or herniation and the facet joints are normal.

At C3-C4, there is no disc bulge or herniation and the facet joints are normal.

At C4-C5, there is a 1 mm sagittal disc bulge indenting the thecal sac.

At C5-C6, there is no disc bulge or herniation and the facet joints are normal.

At C6-C7, there is no disc bulge or herniation and the facet joints are normal.

79.     On April 20, 2023, while noting that Claimant F already secured the surgical clearance prior to this visit which is pretextually to review the MRIs from the day before, Cohen made findings entirely unsupported by the diagnostic studies.



80.     Within eleven (11) days of the X-rays finding nothing wrong with C3-C4, ten (10) days of the second MRI found which nothing wrong at C3-4, Claimant F was nonetheless sent to Hudson Regional to undergo neck surgery with hardware implants at C3-4. The justification for surgery provided by Cohen in the Hudson Regional pre-operative documentation was fictional:

COMPLAINT                                                                                                  20

| Name of Primary Surgeon: | Assistant Name: |
|---|---|
| A. COHEN | W. VANDERWALD    ☐ No Assistant |

**PREOPERATIVE DIAGNOSIS:**

*Cervical Disc HNP C3/4*

**PROCEDURE:**

*Anterior Cervical Discectomy*
*& Fusion C3/4*

81. There was never a finding of a herniation in any reports, even Cohen's own. The operative report was already written before the surgery. The *verbatim, word-for-word* operative report by Cohen shows up on at least four (4) other cases, purportedly performed on other patients, on publicly available documents alone. Three (3) of them pre-date Claimant F's surgery. Two of those three (2/3) are for Liakas Firm clients.

82. Claimant F, with no observable loss in range of motion and no observable injury on date of accident, also treated with the McCulloch Defendants. He was sent out for an MRI at AcceleRad which stated the following:

**No rotator cuff tear is noted.**

**IMPRESSION:**
1. SLAP tear. Posterior inferior labral tear.
2. Mild diffuse rotator cuff tendinosis.
3. Acromioclavicular capsular hypertrophy minimally abutting the underlying subacromial space.

83. Capiola performed an arthroscopy on August 17, 2023. The pre- and post-op diagnosis were flatly at odds with the MRI findings, and even the notes, findings, and plans set forth in McCulloch Defendants' records.

COMPLAINT                                                                                     21

PREOPERATIVE DIAGNOSIS:  Right shoulder labral tear and partial rotator cuff tear and synovitis.

POSTOPERATIVE DIAGNOSIS:
1.  Right shoulder tear of anterior and superior labrum, partial rotator cuff tear, and biceps tendon partial tear.
2.  Adhesions.
3.  Synovitis.
4.  Impingement.

84.     These diagnoses were, however, consistent with the _four (4) other_ shoulder arthroscopies performed _that very day_ by Capiola – all for personal injury clientele with pending lawsuits.

85.     Claimant H, a Pennsylvania resident, purportedly fell on uneven sidewalk in Queens, 144 miles away, in October 2020. She presented to Jamaica Hospital with complaints of pain to her right knee and her right wrist; she specifically "denied any neck pain, back pain, hip pain or any other injury."

86.     Claimant H treated with PMR, McCulloch, and Gotham. Despite no back pain complaints at the hospital, she was sent for lumbar MRIs within the month. Claimant H ultimately received the same identical lumbar surgery as Claimant D, "detailed" in a copy pasted operative report by Cohen, as set forth in further detail below.

87.     Claimant C (a Freeport resident who purportedly fell 30 miles away on uneven sidewalk in Queens in April 2022) presented to the emergency room solely with complaints of pain to the left shoulder and left knee. EMS noted no deformities or swelling to any body part, solely pain upon palpation; these findings were consistent with the hospital's findings. There were no back complaints. He was discharged the same day, promptly retains the Liakas Firm, and obtained funding from an unknown source.

88.     Among other providers, including Advanced Orthopaedics, PLLC and Dov Berkowitz,[2] Claimant C treated with RadNet and Total Ortho. Berkowitz has Claimant C sent to RadNet for lumbar and cervical MRIs prior to their initial appointment regarding his shoulder and knee, and upon initial examination, noted complaints regarding shoulder, knee, and neck, but not the back. Three (3) months after the date of incident, Claimant C presented to Total Ortho complaining of neck and back pain.

89.     Berkowitz ultimately performed a left shoulder surgery on Claimant C. Lerman of Total Ortho performed a posterolateral fusion with hemilaminectomy, facetectomy, and foraminotomy with insertion of pedicle screws and insertion of a 45mm rod.

90.     The precise same operative report – *verbatim*, word for word, copy-pasted – **appears in no less than *twenty-five* (25) other cases, including a Liakas client who was 23 years old at the time Lerman jammed screws and a rod into a young man's spine, following a motor vehicle accident with no reported injuries and less than $1000 in damage to the vehicles.**

91.     **Independent review of the pre- and post-operative MRIs in that matter determined a) such surgery was wholly unjustified, and b) <u>post-operative imaging reports did not show any evidence of the operation claimed to have been performed by Lerman</u>:**

A second significant problem that I encountered during my review of Mr. ▇▇ imaging examinations is the lack of imaging findings to justify a surgical instrumented fusion at L5-S1 performed by Dr. Lerman. Dr. Lerman is a spine surgeon and therefore should be capable of reviewing MR images of the lumbar spine; the pre- and post- operative diagnoses provided by Dr. Lerman for the operation are "L5-S1 disc herniation" which is not present on the imaging. Even if a herniation were present, it is unclear why Mr. ▇▇, a relatively young patient, would require instrumented fusion rather than a single level microdiscectomy. Dr. Lerman reports having performed "bilateral hemilaminectomy, facetectomy, foraminotomy" which are not evident on the post-operative radiographs.

**Exhibit 10**.

---

[2] RICO Defendant under EDNY Docket #: 1:24-cv-08606-JRC.

92. The above was not a one-off occurrence. At least two other, different, independent peer medical reviewers, regarding two other, different, cases, have found Lerman's operative reports to be "unbelievable":

> ███████████████  ███████████████ In the operative report of
> 5/19/20 he describes a midline incision and hemilaminectomies
> on the left where he performs foraminotomy and states that he
> finds compression of both left L5 and S1 nerve roots by an
> extruded L5-S1 disc fragment. ██████████████████████
>
> ...
>
> ███████████████████████████ There is no objective evidence of
> injury to any part of the nervous system or spine. The
> reported radiographic findings of facet DJD and L5-S1 bulge
> have not been the cause of any symptoms nor are they the
> effects of any specific trauma. The reported EDS finding of
> prolonged H-reflex does not correlate with clinical or
> radiographic findings and should be disregarded. It is
> disconcerting to find what appears to be a surgical scar in
> right lower back that is nowhere near where Dr.Lerman claims
> to have performed surgery and found herniated extruded disc
> on the left that was not clinically or radiographically
> apparent to other consultants. His operative report is
> therefore quite unbelievable. █████████████████████

At your request, I have reviewed an MRI of the lumbar spine that was performed 7 ½ weeks following the date of loss. This is a normal study in this then-28-year-old. There are no disc herniations or fractures. There is no radiographic evidence of traumatic or causally-related injury to the lumbar spine. According to the Verified Bill of Particulars, the patient reportedly underwent left hemilaminectomy and facetectomy on 5/19/20. However, repeat MRIs performed on 6/8/21 and 1/16/23 appears normal and essentially unchanged. No post-surgical changes are appreciated at L5/S1 or any other level.

93. **In each of the above scenarios, the intended goal was the same, and it had nothing to do with patient care: get the Claimant into as many surgeries as possible, as fast as possible, and under any pretense available – fake it (the MRI readings, the conservative treatment, even the surgeries) if you have to. Hold up your end and the referrals will be "medically coordinated" your way.**

94. Upon information and belief, Liakas Defendants would provide personnel that sometimes consisted of Runners, employees, or outside personnel to accompany the Claimants to

COMPLAINT                                                                 24

all independent medical examinations under the guise of protecting the Claimants' interests, but who in reality were positioned to ensure that Claimants presented their injuries, treatment and even their residences to comport with the protocol and the narrative crafted by Defendants to justify same. This sometimes led to confusion when several relatives presented for identical complaints.

95.     Claimant D alleges to have tripped and fallen on uneven sidewalk in Brooklyn on January 24, 2021 – just like his brother, who allegedly fell on uneven sidewalk exactly one week prior on January 17, 2021, right around the corner, also represented by Liakas:



96.     Claimant D's brother presented two (2) days after the fact to Woodhull Hospital complaining of left shoulder, left knee, and lower back pain. Claimant D presented the day afterwards to Woodhull Hospital complaining of right shoulder, right knee, and lower back pain.

97.     Claimant D and his brother both treated at PMR. All of Claimant D's PMR records erroneously reflect his brother's date of accident, even from the first appointment of February 9, 2021. Both Claimant D and his brother are sent to AcceleRad for MRIs. These records are then used to justify multiple surgical interventions.

98.     Claimant D and his brother both treated with Gotham/Cohen. All of Claimant D's Gotham records reflect his brother's date of accident and not his own date of accident. Cohen, despite being the Director of Neurosurgery at Brooklyn Hospital Center and an affiliate of Weill

Cornell, performed surgery on both brothers – both specifically receive a "left decompression, discectomy, interbody cage fusion, postero-lateral fusion and stabilization" – at Hudson Regional, across state lines in New Jersey.

99.     **Claimant D's 2021 Total Ortho operative report is copied, word-for-word, and used as Claimant H's operative report in 2022. However, this operative report was written long before Claimant D's surgery. It is copy-pasted, *verbatim*, from another surgery in 2019, also by Cohen, also at Hudson Regional, *and also for another Liakas client* (who also had a meniscal repair by Capiola/McCulloch).**

100.    Claimant D, who secured funding through Prime, also treated with the McCulloch Defendants, and ultimately underwent an arthroscopy with meniscal repair by Capiola. The initial examination of Claimant D and the earlier Liakas client referenced above are both performed by Capiola, one at McCulloch Ortho (Claimant D) and one at NY S&J (earlier client), and have **entirely identical findings, down to the precise degrees of range of motion**. This time, at least, the claimed need for surgery does match the MRI report, issued by AcceleRad, which was for a lateral meniscal tear. The operative report is virtually identical to the procedure received by the same earlier Liakas client referenced above. Further, **Claimant D's McCulloch Ortho operative report is a carbon copy of Claimant B's McCulloch Ortho operative report, which is purportedly conducted <u>the same day</u>.**

101.    However, later independent review of the films themselves, not simply of the reports, revealed *there was no meniscal tear in the first instance*, with no evidence of trauma present on the MRI films:

**COMMENTS:**
I concur with the primary reader's findings of ganglion. I disagree with the primary reader's findings of abnormal anterior cruciate ligament and meniscal tear, as these findings are not present.

**CONCLUSION:**
MRI of the right knee performed one month following the date of the claimant's alleged injury demonstrates evidence degeneration of medial meniscus, which is chronic and not secondary to the alleged injury. Ganglion is evident, which is not secondary to the alleged injury. There are no findings on this exam causally related to the claimant's alleged injury.

102.    Many of the Claimants are undocumented immigrants who do not speak English, and the Claimants, as part of the Fraud Scheme, were instructed by the Runner Defendants to fake their injuries and to receive a myriad of healthcare services that were unnecessary, excessive, unjustified and costly and/or not causally related to the alleged accidents. The Liakas Defendants knew, were recklessly indifferent regarding, or reasonably should have known that the Claimants were faking their injuries and receiving medical services that were unnecessary, excessive, unwarranted and costly and/or not causally related to the alleged accident.

103.    Upon information and belief, as an incentive to attest to fraudulent accidents and injuries and to undergo unnecessary surgery and/or surgery not causally related to the alleged accident, the Liakas Defendants connected the Claimants to the Funding Defendants, including Prime, who offered high-interest litigation funding loans to Claimants. The Claimants received a portion of the high-interest funding loan proceeds and the high-interest funding loans were secured by the settlement payments anticipated from Claimants' personal injury lawsuits.

104.    The non-recourse nature of these payments, contingent on recovery, in conjunction with the snowballing interest, create intentional and manufactured upward pressure on case valuations and settlement demands needed to leave Claimants with anything of substance. Funding Defendants are the grease in the scheme's wheels, incentivizing surgeons with upfront payments for expensive surgeries which are not warranted, keep Claimants on the hook and induce them to

COMPLAINT                                                                                                    27

undergo such surgeries, and drive up the needed recoveries to the benefit of the Legal Defendants and their contingency fees, all while making otherwise usurious rates of return.

105.    Upon information and belief, the Runners, including the Runner Defendants, also received a portion of the illicit recoveries, some of which may have further been diverted to recompense organized criminal elements for arranging the unlawful immigration of claimants, whom they transported around the New York metropolitan area.

106.    As a result of the Runner recruitment efforts, cases generated by this scheme typically would occur in close temporal and geographic proximity to other claims raised by relatives and associates. By way of example, **Figure 3** that follows demonstrates just one such "pod" of cases:



- Former tenants of same apartment in Freeport.

107.    The Medical Provider Defendants provided false diagnoses, the use of their facilities and resources, and unnecessary, excessive, unwarranted, and costly medical services and/or medical services that were not causally related to the alleged accident, for which the Medical Provider Defendants received compensation through increased referral streams for these purposes, along with financial compensation through both Funding Defendants and *via* liens on Claimant files.

108.    Each of the Medical Provider Defendants understood and agreed that in turn for providing the false medical documentation needed for lengthier and more or invasive treatment and thereafter correspondingly higher settlement values, the Liakas Defendants would continue to funnel patients to their offices, with, upon information and belief, the ongoing assistance of the Runner Defendants.

109.    The die was cast as soon as the medical coordinators made the first consultation appointment: surgery was coming.

110.    The designed inflation of ultimate recovery in the tort action was twofold.

111.    Claims on which injections and surgeries were performed are conservatively calculated to result in an average recovery of $1.5 million on the low settlement side with the median settlement calculated to average $2 million per claim, thereby inflating the facial value of the claims.

112.    Armed with the fraudulently documented medical diagnoses and medical services allegedly related to the accident, the Liakas Defendants fraudulently inflated the settlement values of personal injury lawsuits in order to extract greater settlements, prolonging litigation and dramatically increasing defense costs to general liability carriers, including from Plaintiff Union.

**B.**    **Fraudulent Accident, Treatment and Claim/Lawsuit in Furtherance of Fraud Scheme**

113.    Defendants engaged in the Fraud Scheme resulting in a significant number of fraudulent claims being filed.

114.    As set forth above, on behalf of Defendants and in furtherance of and as a necessary step for the execution of the Fraud Scheme, the Liakas Defendants represented numerous individuals who were recruited by Runner Defendants and staged a trip and fall accident and/or claimed injuries unrelated to the alleged accident in lawsuits the Liakas Defendants knew were fraudulent, the Medical Provider Defendants provided unnecessary and excessive treatment unrelated to the claimed accident, and the Funding Defendants provided high-interest funding loans, the proceeds of which were redistributed to Defendants. The above-referenced individuals are just a fraction of the individuals who participated in the Fraud Scheme between 2018 and the present perpetrated by the Defendants and engaged in numerous predicate acts in connection with such individuals.

115.    Liakas Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by each Claimant for the release of each Claimant's medical records that Liakas Defendants knew, were recklessly indifferent regarding, or reasonably should have known were false, including the Complaints verified and filed in regards to each Claimant, and the Bill of Particulars served upon opposing counsel in relation to each Claimant's lawsuit.

C.    **Defendants' Participation in the Fraud Scheme**

116.    At all relevant times, Defendants constituted an association-in-fact enterprise and were engaged in, and the activities of which affected, interstate commerce, and each of the Defendants participated in the operation or management of the enterprise.

i.    Legal Service Defendants' Participation in the Fraud Scheme

117.    Since at least 2018, the Liakas Firm has been involved in thousands of lawsuits, the majority of which involved purported trip and fall injuries, covered by various insurers and reinsurers, including Plaintiff Union and others, in furtherance of and as a necessary step for the execution of the Fraud Scheme.

118.    At all times relevant. Liakas Defendants directed, authorized, coordinated, and controlled the conduct engaged in by the Runner to recruit individuals (*i.e.*, Claimants) to stage trip and fall accidents and/or falsely claim injuries unrelated to the alleged trip and fall accidents.

119.    At all times relevant, Liakas Defendants, in cooperation and mutual understanding with each other, represented Claimants in personal injury lawsuits and directed, authorized, coordinated, and controlled the prosecution of Claimants' lawsuits, assigning duties and responsibilities to attorneys/employees of Liakas Firm, and intentionally submitting or causing the filing of and submission of fraudulent assertions and medical documentation to various courts within the State of New York and all named parties in the personal injury lawsuit.

120.    Liakas Defendants, directly and through employed medical coordinators, paralegals and case managers, directed the Claimants to seek medical treatment from the Medical Provider Defendants specifically, knowing and understanding that the Medical Provider Defendants would provide the kind of false and misleading medical documentation needed for higher settlement values in exchange for continuing to funnel patients to the Medical Provider Defendants

COMPLAINT                                                                                              32

121.    Liakas Defendants knowingly transmitted and received by mail, facsimile, and/or email documents that contained assertions of legitimate trip and fall accidents, the existence of injuries, and the necessity of medical treatment that Liakas Defendants knew or reasonably should have known were false.

122.    This unlawful conduct worked to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation (and thus defense costs paid by Plaintiff) and inflating settlement value, and ultimately, Liakas Defendants' financial gain from the lawsuits.

ii.    <u>Runner Defendants' Participation in the Fraud Scheme</u>

123.    Upon information and belief, since at least 2018, the Runner Defendants have been involved in recruiting Claimants into stating and/or perpetuating fake trip and fall accidents at various sites throughout New York and/or otherwise instructing Claimants on how to successfully malinger a minor incident into surgeries with the knowing cooperation and substantial assistance of the Medical Provider Defendants, the Legal Defendants, and the Funding Defendants.

124.    Upon information and belief, the Runner Defendants communicated with the Claimants and Liakas Defendant through telephone calls, texts, emails and mail, and indirectly through the staff of Co-Conspirator Firm 1.

125.    The Runner Defendants, engaged in numerous acts in furtherance of and as a necessary step for the execution of the Fraud Scheme. Among other things, the Runner Defendants referred and/or transported Claimants to Liakas Defendants so that Claimants could retain Liakas Defendants to a) direct Claimants' medical treatment from Medical Provider Defendants; b) direct Claimants to obtain high-interest funding loans from Funding Defendants; c) direct, authorize, coordinate and control the prosecution of Claimants' personal injury lawsuit; and d) direct, authorize, coordinate and control the prosecution of Claimants' personal injury lawsuits.

COMPLAINT                                                                                      33

126.    Upon information and belief, the Runner Defendants participated in meetings with Claimants and Liakas Defendants in furtherance of and as a necessary step for the execution of the Fraud Scheme.

127.    Upon information and belief, Runner Defendants would typically be internally referred to as "investigators" or "brokers" for their roles in bringing in claimants and facilitating the initial phases of the Fraud Scheme, though other known descriptors include "paralegal" and "client services liaison," potentially in recognition of roles they serve in later phases of the Fraud Scheme.

iii.  Funding Defendants' Participation in the Fraud Scheme

128.    Upon information and belief, since at least 2019, the Funding Defendants have been involved in providing high-interest funding loans to Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

129.    Simply put, as part of the scheme, in concert and with the substantial assistance of the Legal Defendants, Funding Defendants gave Claimants money so as to secure their cooperation, in the form of high-interest litigation funding loans to Claimants to be secured by the settlement payments anticipated from Claimants' personal injury lawsuits. Funding Defendants often paid Medical Provider Defendants upfront for unnecessary and expensive surgeries, so as to secure their cooperation with the scheme; such funds would also be recouped along with high interest from settlement proceeds. Through securing cooperation of Claimants and Medical Provider Defendants, Funding Defendants astronomically increased the amount of their own recovery *via* astronomical interest and increased the amount of the Legal Defendants' contingency fees.

130.    Prime further and specifically required signed agreements which were transmitted *via* the mail and/or electronic mail. Prime further made use of the wires and/or mail in issuing and advances and receiving compensation upon case settlements and awards.

131.    Upon information and belief, Prime further provided funding to Claimants on a timeframe suggestive of a *quid pro quo* basis during or just prior to a lawsuit and/or unnecessary surgery.

132.    Upon information and belief, the Funding Defendants have received or have the right to receive the majority of, or significant part of, the Claimants' portion of the settlement proceeds from Claimants' personal injury lawsuits.

133.    In July 2019, Eastern Asset Funding purchased Prime after "successfully rehabilitating" "non-performing litigation assets" acquired from a hedge fund. Within eighteen (18) months, Prime tripled its originations. This timing is noticeably lockstep with the explosion of the Fraud Scheme detailed herein.

134.    While some providers follow the regulatory requirements to file UCC statements, as Prime did in at least some instances describe herein, which would make the existence of funding known, many others – such as Jumpstart Funding LLC – disregard such requirements while actively underwriting and issuing advances. The terms and conditions of the precise agreements, relationships with other actors, and extent of involvement cannot be ascertained absent discovery.

iv.   Total Defendants' Participation in the Fraud Scheme

135.    Since at least 2018, Total Ortho has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

136.    Defendant Lerman, as an orthopedic surgeon, controlled and directed the medical services provided to Claimants by Total Ortho, including evaluating and recommending surgeries

COMPLAINT                                                                                      35

that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident. This includes at least three (3) surgeries where duly affirmed independent physicians have testified the surgeries performed by Lerman were entirely unjustified and were not performed as described, if at all, and is further evidenced by the no less than twenty-five (25) *identical* operative reports issues regarding different patients, on different dates, all in favor of Liakas Defendants' clients and other similarly situated personal injury law firms.

137. Defendant Leven, as an orthopedic surgeon and a member of Total Ortho, controlled and directed the medical services provided to Claimants by Total Ortho, including evaluating, recommending and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident.  This includes at least seventeen (17) *identical* operative reports issues regarding different patients, on different dates, all in favor of Liakas Defendants' clients and other similarly situated personal injury law firms. As with Dr. Lerman, and inherent to the pattern and practice of Total Ortho, examples abound of independent review of surgeries finding the operative reports inaccurate, the MRIs upon which they are based misleading or flatly false, and generally, credibility entirely lacking:

Nonetheless, on September 29, 2020, Mr. ███ presented to the Ambulatory Surgery Center of the Mount Sinai South Nassau Hospital, where he underwent a posterior spinal fusion with instrumentation at L4-L5, hemilaminectomy at "L4-L5" which was performed by Dante Leven, D.O. Dr. Leven prefaced his operative report of September 29, 2020 with a generic statement that indicated Mr. ███ had "progressive lumbar radiculopathy with deficit consistent with his imaging," which was factually inaccurate. Dr. Dante's operative report to my read appears to be a boilerplate account of the procedure.  Dr. Leven stated that he performed a "hemilaminectomy," but did not indicate on which side this hemilaminectomy was performed.  Further, Dr. Leven claimed that he found and removed an extruded disc fragment, whereas no such disc extrusion had been demonstrated on Mr. ███'s preoperative imaging. Dr. Leven did not detail the anatomic location of this extruded fragment, nor did he describe its relationship to the thecal sac and nerve roots. Mr. ███'s small lumbar incisions were closed by plastic surgery, who was consulted for this purpose on the day of Mr. ███'s surgery.  There were no intraoperative or perioperative adverse events and Mr. ███ was discharged from the Mount Sinai South Nassau Hospital on the day of his surgery.

COMPLAINT                                                                                                      36

The lumbar surgery which Dr. Dante Leven performed on Mr. ████ in September 2020 was based on unsound and insecure indications. His report of that surgery was generic and like his office notes provided neither credible nor reliable information.

----

compression testing resulted in bilaterally positive results. Astonishingly, even though Mr. ████'s neurologic findings did not correlate with his clinical, radiologic or electrophysiologic findings to support anterior cervical discectomy and fusion at the C3-C4 level, Dr. Leven advised this surgical remedy without reconciling these substantial inconsistencies.

None of these several outpatient notes, which were written by Dr. Leven offered diagnostic or specific therapeutic remedies to address the lumbar complaints of Mr. ████, which he always referenced.

So, in June 2020, Mr. ████ presented to the Nassau University Medical Center, where Dr. Leven executed his operative plan. Interestingly, when Mr. ████ arrived at the Nassau University Medical Center he denied having pain.

Additionally, the manner in which ████ participate in this cervical surgery through a one-inch incision is difficult to conceive. Dr. Leven's operative report declared that at surgery he found a "large tear" in the posterior aspect of the annulus along with a "large piece of central herniated disc material within the spinal canal." These remarkable intraoperative findings were unsupported by the MRI imaging upon which Mr. ████'s surgery was predicated.

(Liakas client, a 24-year-old).

----

The visit report from Dante M. Leven DO, of 9/25/2020 does not describe either a mechanism of

injury or a single objective finding. It cites an MRI that shows mild degenerative changes.

The operative summary from Dante Leven, DO and Vadim Lerman DO of 5/18/21 does not

mention a single word that would suggest trauma.

----

It appears that the surgery performed on the claimant's cervical spine by Dr. Leven was done in an arbitrary fashion, and as such, the surgery does not appear to be causally-related to the subject accident of June 26, 2016.

Furthermore, review of the operative report prepared by Dr. Leven indicates that intraoperatively, he found a large foraminal disc herniation at the C5-6 level. However, this was not visualized in the preoperative MRI study. The objective MRI findings should be given more credence than what was reported by the surgeon, who reported this finding without oversight or a way to verify his reported finding.

138.    As part of the Fraud Scheme, Total Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Union and others involved in Claimants' personal injury lawsuits for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

139.    As part of the Fraud Scheme, Total Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

140.    As part of the Fraud Scheme, Total Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such claims and lawsuits.

141.    Total Defendants knowingly profited from reimbursements and upfront payments from the Funding Defendants for the alleged medical and diagnostic rendered by Defendants Lerman, Leven, and/or any other employee/agent of Total Ortho, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

142.    Total Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendants Lerman, Leven

and/or any other employee/agent of Total Ortho provided medical and diagnostic services and received reimbursement for such services.

v.  McCulloch Defendants' Participation in the Fraud Scheme

143.    Since at least 2018, McCulloch Ortho has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

144.    Since at least 2019, McCulloch Ortho, through selective use of NY S&J, has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

145.    Defendant McCulloch, as an orthopedic surgeon and a principal of McCulloch Ortho, controlled and directed the medical services provided to Claimants by McCulloch Ortho, including overseeing his employees in their evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

146.    Defendant Capiola, as an orthopedic surgeon and employee of McCulloch Ortho, controlled and directed the medical services provided to Claimants by McCulloch Ortho, including evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

147.    As part of the Fraud Scheme, McCulloch Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others involved in Claimants' personal injury lawsuits for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

COMPLAINT                                                                                           39

148.    As part of the Fraud Scheme, McCulloch Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

149.    As part of the Fraud Scheme, McCulloch Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such lawsuits.

150.    McCulloch Defendants knowingly profited from reimbursements and upfront payments from the Funding Defendants for the alleged medical and diagnostic services rendered by Defendants McCulloch, Capiola, and/or any other employee/agent of McCulloch Ortho, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme, including but not limited to their performance of, and receipt of compensation for, unnecessary surgeries upon Claimants A, B, D, E, F, G, and H.

151.    McCulloch Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme (at times with Caiola performing *at least five [5] surgeries in a day*), for whom Defendants McCulloch, Capiola, and/or any other employee/agent of McCulloch Ortho provided medical and diagnostic services and received reimbursement for such services.

vi.  Gotham Defendants' Participation in the Fraud Scheme

152.    Since at least 2018, Gotham Neurosurgery has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

153.    Defendant Cohen, as a neurosurgeon and a principal of Gotham Neurosurgery, controlled and directed the medical services provided to Claimants by Gotham Neurosurgery, including evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

154.    Cohen, despite being the head of neurosurgery at Brooklyn Hospital Center (located where the majority of the Claimants either lived or fell), and being affiliated with Weill Cornell (with facilities within New York City), chose to send Claimants to Hudson Regional to have surgeries performed, pursuant to, upon information and belief, a financial arrangement with Hudson Regional.

155.    The Liakas Firm employed a direct relative of Cohen as a Medical Coordinator as both an inducement and to facilitate the Fraud Scheme.

156.    As part of the Fraud Scheme, Gotham Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others involved in Claimants' personal injury lawsuits for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

157.    As part of the Fraud Scheme, Gotham Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical

services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

158.    As part of the Fraud Scheme, Gotham Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such lawsuits.

159.    Gotham Defendants knowingly profited from reimbursements and upfront payments from the Funding Defendants for the alleged medical and diagnostic services rendered by Defendant Cohen and/or any other employee/agent of Gotham Neurosurgery, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

160.    Gotham Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Cohen and/or any other employee/agent of Gotham Neurosurgery provided medical and diagnostic services and received reimbursement for such services.

vii.  <u>Hudson Regional Defendants' Participation in the Fraud Scheme</u>

161.    Since at least 2018, Hudson Regional has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

162.    Defendant Moshe, as principal of Hudson Regional, controlled and directed the medical services provided to Claimants by Hudson Regional, including providing facilities for, arranging and providing transportation for Claimants to and from, and compensating surgeons and related staff, for surgeries that were unnecessary, excessive, unwarranted, and/or costly and not

causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme; in particular, Cohen and Gotham.

163.    As part of the Fraud Scheme, Hudson Regional Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others involved in Claimants' personal injury lawsuits for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

164.    As part of the Fraud Scheme, Hudson Regional Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

165.    As part of the Fraud Scheme, Hudson Regional Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such lawsuits.

166.    Hudson Regional Defendants knowingly profited from reimbursements and direct payments from the Funding Defendants for the alleged medical, diagnostic, and surgical services caused  to be rendered, overseen, or permitted by Defendant Moshe and/or any other employee/agent of Hudson Regional, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

COMPLAINT                                                                                            43

167.    Hudson Regional Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Moshe and/or any other employee/agent of Hudson Regional provided medical, diagnostic, and surgical services and received reimbursement for such services.

viii.    PPNY Defendants' Participation in the Fraud Scheme

168.    Since at least 2018, PPNY has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries. PPNY serves to provide manufactured justification for surgeries, in furtherance of and as a necessary step for the execution of the Fraud Scheme.

169.    Defendant Reyfman, as a physician and a principal of PPNY, controlled and directed the medical services provided to Claimants by PPNY, including providing consultations, evaluating, diagnosing and performing injections and surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

170.    Notably, in Geico v. Mayzenberg, Geico established that there was no material fact in genuine dispute and was entitled as a matter of law to prevail on its fraud and RICO claims originating from Igor Dovman's use of shell companies to facilitate an illegal patient referral and kickback scheme in which Mayzenberg participated.[3] Presico Inc. was identified as one such company post-judgment, and Reyfman received a few of those checks during the relevant time period – which included checks made out to at least one Claimant who was ultimately represented by Liakas in their action:[4]

---

[3] See EDNY Docket #: 17-CV-2802, Doc #: 148.

[4] See EDNY Docket #: 17-CV-2802, Doc #: 201-4, pp. 53, 61, 81.

COMPLAINT                                                                                                    44

Check number: 1008  |  Amount: $4,000.00



Check number: 1057  |  Amount: $3,000.00




Check number: 1354  |  Amount: $4,000.00



171.    Defendant Bolesharskyy, as a physician and a principal of PPNY, controlled and directed the medical services provided to Claimants by PPNY, including providing consultations, evaluating, diagnosing and performing injections and surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

172.    As part of the Fraud Scheme, PPNY Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others involved in Claimants' claims for authorization and to seek reimbursement for medical

services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

173.    As part of the Fraud Scheme, PPNY Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

174.    As part of the Fraud Scheme, PPNY Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging inflating the settlement value of such lawsuits.

175.    PPNY Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Reyfman and Bolesharskyy and/or any other employee/agent of PPNY, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

176.    PPNY Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Reyfman and Bolesharskyy and/or any other employee/agent of Pain Physicians provided medical and diagnostic services and received reimbursement for such services.

ix.    PMR Defendants' Participation in the Fraud Scheme

177.    Since at least 2018, PMR has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

COMPLAINT                                                                                              46

178.    Defendant Khakhar, as a physician and a principal of PMR, controlled and directed the medical services provided to Claimants by PMR, including providing consultations, evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme. Defendant Khakhar further reaped benefits through the ultimate funnel to Empire State Ambulatory Surgical Center, where many of the McCulloch surgeries were performed, and where Defendant Khakhar is a co-owner.

179.    Defendant Toussaint, as a physician and a principal of PMR, controlled and directed the medical services provided to Claimants by PMR, including providing consultations, evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

180.    As part of the Fraud Scheme, PMR Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others involved in Claimants' claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

181.    As part of the Fraud Scheme, PMR Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

COMPLAINT                                                                                    47

182.    As part of the Fraud Scheme, PMR Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such lawsuits.

183.    PMR Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Khakhar and Toussaint and/or any other employee/agent of PMR, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

184.    PMR Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Khakhar and Toussaint and/or any other employee/agent of PMR provided medical and diagnostic services and received reimbursement for such services.

x.    Accelerad and RadNet Defendants' Participation in the Fraud Scheme

185.    Since at least 2018, AcceleRad and RadNet have been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

186.    Defendant Prakash, as a radiologist and a principal of AcceleRad, controlled and directed the medical services provided to Claimants, who were referred to AcceleRad by each of the Gotham, McCulloch, Total Ortho, PMR, and PPNY Defendants at various times, by providing radiological and imaging diagnostics and MRI reports identifying purported positive findings that are thereafter relied upon by treating providers to justify procedures irrespective of the fact that so-called "abnormal" findings were intentionally misleading, false, manufactured, or otherwise not consistent with the MRI films themselves.

COMPLAINT                                                                                     48

187.    Defendant Greene, as a radiologist and a principal of RadNet and/or Lenox Hill Radiology, controlled and directed the medical services provided to Claimants, who were referred to RadNet and/or Lenox Hill Radiology by each of the Gotham, McCulloch, Total Ortho, PMR, and PPNY Defendants at various times, by providing radiological and imaging diagnostics and MRI reports identifying purported positive findings that are thereafter relied upon by treating providers to justify procedures irrespective of the fact that so-called "abnormal" findings were intentionally misleading, false, manufactured, omitted material information, or otherwise not consistent with the MRI films themselves.

188.    As part of the Fraud Scheme, AcceleRad and RadNet Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Union and others to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

189.    As part of the Fraud Scheme, AcceleRad and RadNet Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such lawsuits.

190.    AcceleRad and RadNet Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Prakash, Greene and/or any other employee/agent of AcceleRad and RadNet, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

191.   AcceleRad and RadNet Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Prakash, Greene, and/or any other employee/agent of AcceleRad and RadNet provided medical and diagnostic services and received reimbursement for such services.

**D.    Defendants' Pattern of Racketeering Activity**

192.   The pattern of racketeering engaged in by Defendants involving a scheme to defraud and steal from Plaintiffs and others, began on or before 2018, and continues to the present day, and includes among others the following specific predicate acts:

i.   Claimant A

193.   As stated above, many of the medical services provided to Claimant A (redacted records attached as **Exhibit 1**) were unnecessary, excessive and/or not warranted and were not causally related to the alleged accident because the claimant's initial complaints of minor-appearing injuries do not correlate to any of the subsequent treatment rendered as part of the fraudulent treatment protocol. As such, each of the below identified medical documents and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire fraud), in furtherance of and as a necessary step for the execution of the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent:

194.   On or about March 15, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 and 1343, **Matthew Kerner** of the **Liakas Firm, upon the direction of the Firm and Dean Liakas,** served a Verified Bill of Particulars through the mail and/or email falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant A's injuries. As set forth *supra*, ¶¶ 57 *et seq*., medical

COMPLAINT                                                                                              50

care was rendered, by design and as a matter of intended course, with the Liakas Defendants' knowledge and agreement, according to pre-determined protocols bearing no relationship to any purported accident.

195.    On or about January 10, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 and 1343, **Matthew Kerner** of the **Liakas Firm, upon the direction of the Firm and Dean Liakas,** filed and served a Verified Bill of Particulars through the mail and/or email falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by injuries purportedly sustained by Claimant A's brother.

196.    A Verified Bill of Particulars was similarly served in the *other* brother of Claimant A's case, verified by **Salah Shawa of the Liakas Firm, upon the direction of the Firm and Dean Liakas,** falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant A's brother's injuries, including the identical spinal fusion, on or about January 20, 2023, in violation of 18 U.S.C. §§ 1341 and 1343.

197.    On or about January 10, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 and 1343, **Salah Shawa** of the **Liakas Firm, upon the direction of the Firm and Dean Liakas,** filed and served a Verified Complaint falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, injuries purportedly sustained by Claimant A's cousin.

COMPLAINT                                                                                     51

198.    On or about December 21, 2020, and continuing thereafter, Greene of RadNet created knowingly false and/or materially misleading records, otherwise containing material omissions, regarding Claimant A's treatment. These records were caused to be forwarded by RadNet *via* mail to the opposing counsel on Claimant A's lawsuit on April 12, 2022, and utilized to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. § 1341.

199.    On or about February 3, 2021, and continuing thereafter, Kosharskyy of PPNY created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant A's treatment. These records were forwarded by PPNY *via* mail and/or email to the Liakas Defendants and forwarded by mail to opposing counsel on Claimant A's lawsuit on March 15, 2022 in order to falsely justify continuing and escalating treatment, in violation of 18 U.S.C. §§ 1341 and 1343.

200.    On or about February 18, 2021, Capiola of McCulloch Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant A's shoulder surgery. These records were forwarded by McCulloch Ortho *via* mail and/or email to the Liakas Defendants and forwarded by mail to opposing counsel on Claimant A's lawsuit on March 15, 2022, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. §§ 1341 and 1343.

201.    On or about March 4, 2021, Prakash of AcceleRad created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant A's treatment. These records were forwarded by AcceleRad *via* mail on March 4, 2021 to the McCulloch Defendants in order to falsely justify continuing and escalating treatment, in violation of 18 U.S.C. § 1341.

COMPLAINT                                                                                    52

202.    On or about May 11, 2021, Leven of Total Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant A's spine surgery. These records were caused to be forwarded by Total Ortho *via* fax to the opposing counsel on Claimant A's lawsuit on May 5, 2023, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. § 1343.

203.    On dates unknown and unavailable through due diligence to the pleading party, Prime provided advances to Claimant A and compensation to McCulloch, Capiola, Leven, and Total Ortho for the unnecessary surgeries. On or about March 24, 2021, Prime filed a UCC statement with the New York State Department of State *via* the Department's online portal, making use of wire communication in furtherance of the scheme in violation of 18 U.S.C § 1343. (**Exhibit 11**, p.1).

ii.    Claimant B

204.    As stated above, many of the medical services provided to Claimant B (redacted records attached as **Exhibit 2**) were unnecessary, excessive and/or not warranted and were not causally related to the alleged accident because the claimant's initial complaints of minor-appearing injuries do not correlate to any of the subsequent treatment rendered as part of the fraudulent treatment protocol, which further necessitated material revisions to his account of alleged injury to justify the additional lucrative areas treated. As such, each of the below identified medical documents and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire fraud), in furtherance of and as a necessary step for the execution of the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent:

205.    On or about December 12, 2020, in furtherance of and as a necessary step for the execution of the Fraud Scheme, Claimant B was given instructions and accompanied to the hospital by a Runner Defendant.

206.    On or about March 27, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 and 1343, **Matthew Kerner of the Liakas Firm, upon the direction of the Firm and Dean Liakas**, served a Verified Bill of Particulars through the mail and/or email falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant B's injuries.

207.    On or about January 3, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 and 1343, **Dean Liakas** filed and served a Verified Complaint falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, injuries purportedly sustained by Claimant B's wife.

208.    On or about January 4, 2021, and continuing thereafter, RadNet created knowingly false and/or materially misleading records, and otherwise containing material omissions, regarding Claimant B's treatment, in order to falsely justify continuing and escalating treatment. These records were forwarded by RadNet *via* mail to opposing counsel in Claimant B's lawsuit on or about July 10, 2024, in violation of 18 U.S.C. § 1341.

209.    On or about June 3, 2021, Capiola of McCulloch Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant B's knee surgery. These records were forwarded by McCulloch Ortho *via* mail and/or email to the Liakas Defendants and forwarded by mail to

COMPLAINT                                                                                          54

opposing counsel on Claimant B's lawsuit on March 27, 2023, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. §§ 1341 and 1343.

210.    On or about September 16, 2021, Capiola of McCulloch Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant B's right shoulder surgery. These records were forwarded by McCulloch *via* mail and/or email to the Liakas Defendants and forwarded by mail to opposing counsel on Claimant B's lawsuit on March 27, 2023, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. §§ 1341 and 1343.

211.    On or about February 14, 2022, and continuing thereafter, Leven of Total Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant B's treatment. These records were forwarded by Total Ortho *via* mail and/or email to the Liakas Defendants and forwarded by mail to opposing counsel on Claimant B's lawsuit on March 27, 2023, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. §§ 1341 and 1343.

212.    On dates unknown and unavailable through due diligence to the pleading party, Prime provided advances to Claimant B and compensation to McCulloch, Capiola, Leven, and Total Ortho for the unnecessary surgeries. On or about August 25, 2022, Prime filed a UCC statement with the New York State Department of State *via* the Department's online portal, making use of wire communication in furtherance of the scheme in violation of 18 U.S.C § 1343. (Exhibit 11, p. 2).

213.    On or about October 15, 2021, Prime filed a UCC statement with the New York State Department of State *via* the Department's online portal regarding a lien over Claimant B's

wife's case, making use of wire communication in furtherance of the scheme in violation of 18 U.S.C § 1343. (Exhibit 11, p. 3).

           iii.    <u>Claimant C</u>

214.    As stated above, many of the medical services provided to Claimant C (redacted records attached as **Exhibit 3**) were unnecessary, excessive and/or not warranted and were not causally related to the alleged accident because the claimant's initial complaints of minor-appearing injuries do not correlate to any of the subsequent treatment rendered as part of the fraudulent treatment protocol, which further necessitated material revisions to his account of alleged injury to justify the additional lucrative areas treated. As such, each of the below identified medical documents and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire fraud), in furtherance of and as a necessary step for the execution of the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent:

215.    On or about October 2, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 and 1343, **Paul Generosa of the Liakas Firm, upon the direction of the Firm and Dean Liakas**, served a Verified Bill of Particulars through the mail and/or email falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant C's injuries.

216.    On or about May 15, 2022, and continuing thereafter, RadNet created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant C's treatment. These records were forwarded by RadNet *via* mail and/or email to Sports Medicine & Spine Rehabilitation on or about May 15, 2022 in

order to falsely justify continuing and escalating treatment, in violation of 18 U.S.C. §§ 1341 and 1343.

217.    On or about October 27, 2022, Lerman of Total Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant C's spinal surgery. These records were forwarded by Total Ortho *via* mail to opposing counsel on Claimant C's lawsuit *via* mail on April 11, 2024 in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. § 1341.

218.    On dates unknown and unavailable to the pleading party, upon information and belief, one or more Funding Defendants provided advances to Claimant C and financial remuneration to Lerman and Total Ortho for the unnecessary surgery.

iv.    Claimant D

219.    As stated above, many of the medical services provided to Claimant D (redacted records attached as **Exhibit 4**) were unnecessary, excessive and/or not warranted and were not causally related to the alleged accident because the claimant's initial complaints of minor-appearing injuries do not correlate to any of the subsequent treatment rendered as part of the fraudulent treatment protocol, which further necessitated material revisions to his account of alleged injury to justify the additional lucrative areas treated. As such, each of the below identified medical documents and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire fraud), in furtherance of and as a necessary step for the execution of the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent:

220.    On or about May 5, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 and 1343, **Salah Shawa of the Liakas Firm, upon the direction of the Firm and Dean Liakas**, served a Verified Bill of Particulars

COMPLAINT                                                                          57

through the mail and/or email falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant D's injuries.

221.    On or about December 27, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 and 1343, **Salah Shawa of the Liakas Firm, upon the direction of the Firm and Dean Liakas**, served a Verified Bill of Particulars through the mail and/or email falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant D's *brother's* injuries.

222.    On or about February 9, 2021, and continuing thereafter, including on or about July 27, 2021 and February 1, 2022, by Khakhar, PMR created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant D's treatment. These records were forwarded by PMR *via* mail and/or email to the Liakas Defendants and forwarded by mail to opposing counsel on Claimant D's lawsuit on May 5, 2023, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. §§ 1341 and 1343.

223.    On or about February 18, 2021, Prakash of AcceleRad created knowingly false and/or materially misleading records, otherwise containing material omissions and comprised of recycled language, regarding Claimant D's treatment, in order to falsely justify continuing and escalating treatment. These records were forwarded by AcceleRad *via* mail to opposing counsel in Claimant D's lawsuit on or about June 27, 2023, in violation of 18 U.S.C. § 1341.

224.    On or about August 3, 2021, RadNet created knowingly false and/or materially misleading records, otherwise containing material omissions and comprised of recycled language,

regarding Claimant D's treatment, in order to falsely justify continuing and escalating treatment. These records were forwarded by RadNet *via* mail to opposing counsel in Claimant D's lawsuit on or about June 29, 2023, in violation of 18 U.S.C. § 1341.

225.    On or about June 3, 2021, Capiola of McCulloch Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant D's knee surgery. These records were forwarded by McCulloch Ortho *via* mail and/or email to the Liakas Defendants and forwarded by mail to opposing counsel on Claimant D's lawsuit on May 5, 2023, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. §§ 1341 and 1343.

226.    On or about September 10, 2021, Cohen of Gotham created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant D's spinal surgery performed at Hudson Regional. These records were forwarded by Gotham Ortho *via* mail and/or email to the Liakas Defendants and forwarded by mail to opposing counsel on Claimant D's lawsuit on May 5, 2023, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. §§ 1341 and 1343.

227.    On or about June 28, 2023, Hudson Regional forwarded records *via* mail to opposing counsel on Claimant D's lawsuit in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. § 1341.

228.    On or about January 28, 2022, Cohen of Gotham created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant D's *brother's* identical spinal surgery performed at Hudson Regional. These records were forwarded by mail and/or email to the Liakas Defendants, provided

to opposing counsel in that matter *via* mail, email, or other electronic means utilizing wire communication, and utilized to manufacture or otherwise falsely inflate a claim for damages.

229.    On dates unknown and unavailable through due diligence to the pleading party, Prime provided advances to Claimant D and compensation to McCulloch, Capiola, Cohen, and Gotham for the unnecessary surgeries. On or about May 21, 2021, Prime filed a UCC statement with the New York State Department of State *via* the Department's online portal, making use of wire communication in furtherance of the scheme in violation of 18 U.S.C § 1343. (Exhibit 11, p. 4).

v.    <u>Claimant E</u>

230.    As stated above, many of the medical services provided to Claimant E (redacted records attached as **Exhibit 5**) were unnecessary, excessive and/or not warranted and were not causally related to the alleged accident because the claimant's initial complaints of minor-appearing injuries do not correlate to any of the subsequent treatment rendered as part of the fraudulent treatment protocol, which further necessitated material revisions to his account of alleged injury to justify the additional lucrative areas treated. As such, each of the below identified medical documents and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire fraud), in furtherance of and as a necessary step for the execution of the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent:

231.    On or about October 15, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 and 1343, Matthew Kerner of the Liakas Firm, upon the direction of the Firm and Dean Liakas, served a Verified Bill of Particulars through the mail and/or email falsely attesting to the truthfulness of the allegations set

forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant E's injuries.

232.   On or about November 13, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 and 1343, Matthew Kerner of the Liakas Firm, upon the direction of the Firm and Dean Liakas, served a Second Supplemental Verified Bill of Particulars through the mail and/or email falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant E's injuries.

233.   On or about April 23, 2020, and continuing thereafter, Toussaint of PMR created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant E's treatment. These records were forwarded by PMR via mail and/or email to the Liakas Defendants and forwarded by mail to opposing counsel on Claimant E's lawsuit on October 15, 2021, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. §§ 1341 and 1343.

234.   On or about October 7, 2021, Capiola of McCulloch Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant E's knee surgery. These records were forwarded by McCulloch Ortho via mail and/or email to the Liakas Defendants and forwarded by mail to opposing counsel on Claimant E's lawsuit on October 15, 2021, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. §§ 1341 and 1343.

235.   On or about September 17, 2021, Karen Avanesov, along with Leven, of Total Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant E's spinal surgery. As with the

other Total Ortho operative reports, this particular one has been utilized, *verbatim*, in no less than

seven (7) other matters based on publicly available documents alone. An invoice for these records

was mailed by Total Ortho to opposing counsel on Claimant E's lawsuit on November 9, 2021, in

violation of 18 U.S.C. § 1341.

236.    On dates unknown and unavailable to the pleading party, upon information and

belief, one or more Funding Defendants provided advances to Claimant E and financial

remuneration to McCulloch, Capiola, and Total Ortho for the unnecessary surgeries.

vi.    <u>Claimant F</u>

237.    As stated above, many of the medical services provided to Claimant F (redacted

records attached as **Exhibit 6**) were unnecessary, excessive and/or not warranted and were not

causally related to the alleged accident because the claimant's initial complaints of minor-

appearing injuries do not correlate to any of the subsequent treatment rendered as part of the

fraudulent treatment protocol, which further necessitated material revisions to his account of

alleged injury to justify the additional lucrative areas treated. As such, each of the below identified

medical documents and the case documents filed/provided in the personal injury action were

transmitted by mail or wire, in violation of 18 U.S.C. 1341 (mail fraud) or § 1343 (wire fraud),

in furtherance of and as a necessary step for the execution of the Fraud Scheme and/or contained

statements that Defendants knew or should have reasonably known were fraudulent:

238.    On or about November 22, 2023, in furtherance of and as a necessary step for the

execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 and 1343, Salah Shawa of

the Liakas Firm, upon the direction of the Firm and Dean Liakas, served a Verified Bill of

Particulars through the mail and/or email falsely attesting to the truthfulness of the allegations set

forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant F's injuries.

239.    On or about June 13, 2022, and continuing thereafter, Toussaint of PMR created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant F's treatment. These records were forwarded by PMR via mail and/or email to the Liakas Defendants and forwarded by mail to opposing counsel on Claimant F's lawsuit on November 22, 2023, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. §§ 1341 and 1343.

240.    On or about April 19, 2023, Prakash of AcceleRad created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant F's treatment. AcceleRad forwarded these records *via* main and/or email to Gotham Ortho on or about April 19, 2023. These records were forwarded by Accelerad via mail and/or email to the Liakas Defendants and forwarded by mail to opposing counsel on Claimant F's lawsuit on November 22, 2023, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. §§ 1341 and 1343.

241.    On or about April 18, 2023, Cohen of Gotham created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant F's spinal surgery performed at Hudson Regional. On January 13, 2024, Gotham mailed to opposing counsel in Claimant F's lawsuit a billing summary in furtherance of the scheme, in violation of 18 U.S.C. § 1341; on January 5, 2024, Gotham emailed a copy of the records, in violation of 18 U.S.C. § 1343.

COMPLAINT                                                                                        63

242. On or about January 12, 2024, Hudson Regional forwarded records via mail to opposing counsel on Claimant F's lawsuit in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. § 1341.

243. On or about August 17, 2023, Capiola of McCulloch Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant F's shoulder surgery. These records were forwarded by McCulloch Ortho via mail and/or email to the Liakas Defendants and forwarded by mail to opposing counsel on Claimant F's lawsuit on November 22, 2023, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. §§ 1341 and 1343.

244. On dates unknown and unavailable to the pleading party, upon information and belief, one or more Funding Defendants provided advances to Claimant F and financial remuneration to McCulloch, Capiola, Cohen, and Gotham for the unnecessary surgeries.

vii.    Claimant G

245. As stated above, many of the medical services provided to Claimant G (redacted records attached as **Exhibit 7**) were unnecessary, excessive and/or not warranted and were not causally related to the alleged accident because the claimant's initial complaints of minor-appearing injuries do not correlate to any of the subsequent treatment rendered as part of the fraudulent treatment protocol, which further necessitated material revisions to his account of alleged injury to justify the additional lucrative areas treated. As such, each of the below identified medical documents and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire fraud), in furtherance of and as a necessary step for the execution of the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent:

246.    On or about October 19, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 and 1343, Matthew Kerner of the Liakas Firm, upon the direction of the Firm and Dean Liakas, served a Verified Bill of Particulars through the mail and/or email falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant G's injuries.

247.    On or about March 13, 2020, and continuing thereafter, Toussaint of PMR created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant G's treatment. These records were forwarded by PMR *via* mail and/or email to the Liakas Defendants and forwarded by mail to opposing counsel on Claimant G's lawsuit on October 19, 2021, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. §§ 1341 and 1343.

248.    On or about March 23, 2020, and continuing thereafter, RadNet created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant G's treatment. These records were forwarded by RadNet *via* mail and/or email to Gotham Ortho on or about May 22, 2020, and to PMR on or about September 21, 2020, in order to falsely justify continuing and escalating treatment. These records were forwarded by RadNet *via* mail and/or email to the Liakas Defendants and forwarded by mail to opposing counsel on Claimant G's lawsuit on October 19, 2021, all in violation of 18 U.S.C. §§ 1341 and 1343. and in violation of 18 U.S.C. §§ 1341 and 1343.

249.    On or about November 5, 2020, Capiola of McCulloch Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant G's shoulder surgery. These records were forwarded by

email to opposing counsel on Claimant G's lawsuit on November 22, 2023 in furtherance of the scheme, and in violation of 18 U.S.C § 1343.

250.    On or about April 16, 2021, Cohen of Gotham created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant G's spinal surgery performed at Hudson Regional. These records, along with a purported billing statement, were forwarded by mail to opposing counsel on or about January 13, 2024 in furtherance of the scheme, and in violation of 18 U.S.C. §§ 1341.

251.    On dates unknown and unavailable through due diligence to the pleading party, Prime provided advances to Claimant G and financial remuneration to McCulloch, Capiola, Cohen, and Gotham for the unnecessary surgeries. On or about January 11, 2021, Prime filed a UCC statement with the New York State Department of State *via* the Department's online portal, making use of wire communication in furtherance of the scheme in violation of 18 U.S.C § 1343. (Exhibit 11, p. 5).

### viii.    Claimant H

252.    As stated above, many of the medical services provided to Claimant H (redacted records attached as **Exhibit 8**) were unnecessary, excessive and/or not warranted and were not causally related to the alleged accident because the claimant's initial complaints of minor-appearing injuries do not correlate to any of the subsequent treatment rendered as part of the fraudulent treatment protocol, which further necessitated material revisions to his account of alleged injury to justify the additional lucrative areas treated. As such, each of the below identified medical documents and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire fraud), in furtherance of and as a necessary step for the execution of the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent:

253.    On or about April 26, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 and 1343, Matthew Kerner of the Liakas Firm, upon the direction of the Firm and Dean Liakas, served a Verified Bill of Particulars through the mail and/or email falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant H's injuries.

254.    On or about November 5, 2020, and continuing thereafter, PMR created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant H's treatment. These records were forwarded by PMR *via* mail and/or email to the Liakas Defendants and forwarded by mail to opposing counsel on Claimant H's lawsuit on April 26, 2023, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. §§ 1341 and 1343.

255.    On or about November 21, 2020, and continuing thereafter, RadNet created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant H's treatment. In furtherance of the scheme, these records were forwarded by RadNet *via* mail to opposing counsel on Claimant H's lawsuit on or about April 4, 2024, in violation 18 U.S.C. § 1341.

256.    On or about May 5, 2022, Capiola of McCulloch Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant H's shoulder surgery. These records were forwarded by McCulloch Ortho *via* mail and/or email to the Liakas Defendants and forwarded by mail to opposing counsel on Claimant H's lawsuit on April 4, 2024, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. §§ 1341 and 1343.

257.    On or about June 24, 2021, Cohen of Gotham created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant H's spinal surgery performed at Hudson Regional. These records were forwarded by email in furtherance of the scheme to opposing counsel on Claimant H's lawsuit on November 15, 2023, in violation of 18 U.S.C. § 1343.

258.    On or about September 30, 2023, Hudson Regional forwarded records via mail to opposing counsel on Claimant H's lawsuit in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. § 1341.

259.    On dates unknown and unavailable to the pleading party, upon information and belief, one or more Funding Defendants provided advances to Claimant H and financial remuneration to McCulloch, Capiola, Cohen, and Gotham for the unnecessary surgeries.

260.    In each of the above matters, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 and 1343, Dean Liakas electronically filed and caused to be transmitted over the wires falsely Verified Complaints *via* the New York State Unified Court System E-Filing system, and further mailed such documents to Plaintiff and/or its agents, including on:

      a.    January 28, 2021 (Claimant A);

      b.    April 24, 2021 (Claimant G);

      c.    June 4, 2021 (Claimant E)

      d.    September 16, 2021 (Claimant D);

      e.    October 8, 2021 (Claimant B);

      f.    July 26, 2022 (Claimant H); and,

      g.    February 3, 2023 (Claimant C).

ix.  Additional Predicate Acts

261.    In addition to the acts set forth above, the predicate acts as alleged against the Liakas Firm, Dean Liakas, Total Ortho, Lerman, PPNY, Kosharskyy, McCulloch Ortho, NY S&J, McCulloch, Capiola, Cohen, and Gotham Defendants as set forth in EDNY Docket No. #25-cv-00300, Doc. #: 1, Roosevelt Road RE, LTD., *et. al.* v. Liakas Law, P.C., *et. al.* (attached as **Exhibit 9**) are incorporated by reference as if fully set forth herein.

262.    Further, several Defendants engaged in conduct amounting to violations of 18 U.S.C. § 1956. The ill-gotten gains of Defendants met the definition of proceeds of specified unlawful activity. With the intent to promote the carrying on the Fraud Scheme, knowing that the funds were the proceeds of such specified unlawful activity:

a.  Prime Case LLC engaged in securitizing its outstanding balances due, and used the funds to issue additional payments to Claimants and Medical Providers as inducements to the Fraud Scheme, creating an ever-larger Ferris Wheel of otherwise-usurious rate returns and increased fees for Legal Defendants;

b.  Hudson Regional (owned 99% by Moshe), in July 2020, provided a "loan" to an affiliate entity (owned 99% by Moshe) for $9 million dollars at below market rates and without principal payments for seven (7) months in order to effectuate a scheme to take over two (2) more hospitals in which to iterate the scheme (which has recently come to fruition); five (5) months later, with zero (0) principal payments having been made, the loan was *increased* by $1.8 million dollars with the interest-only period extended;

c.  The Liakas Firm opened their "Liakas Centro Comunitario," purportedly to provide free OSHA classes and community engagement, but in fact, to increase the recruitment efforts for Claimants into the Fraud Scheme; the Liakas Firm

further moved to an expanded office space to accommodate more attorneys and staff – then promptly doubled the space to scale.

d.  PPNY has expanded from two (2) locations to three (3);

e.  Total Ortho has expanded from six (6) locations to nine (9), and to eighteen (18) total locations inclusive of its branded "Spine Center" locations; and,

f.  McCulloch Orthopedics has expanded from two (2) locations to nine (9) locations.

263.    In each and every surgery performed by Cohen/Gotham Ortho detailed herein, Cohen/Gotham Ortho travelled from their residence in New York and into New Jersey to perform such fraudulent treatment at Hudson Reginal in New Jersey. Put another way, Cohen "travel[led] in interstate commerce… with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" of the Fraud Scheme, and in fact did so, with each such travelling fraudulent surgery amounting to violations of the Travel Act, 18 U.S.C. § 1952, including on:

a.  April 16, 2021;

b.  June 24, 2021;

c.  September 10, 2021;

d.  January 28, 2022; and,

e.  April 18, 2023.

## IV.    PLAINTIFFS' JUSTIFIABLE RELIANCE

264.    Plaintiff at no time knew or had reason to know in the exercise of due diligence or reasonable care that Defendants were engaged in misrepresentations, omissions, concealment of material facts, and fraudulent conduct.

265.    The mere filing of the subject Complaints in the State Courts mandated an actionable level of reliance – Plaintiff was forced to rely on the misrepresentation of the Defendants insofar as the retention of attorneys, investigators, and experts was necessary to avoid default judgments; these are actions Plaintiff would not have taken (or had to take) but for the knowing misrepresentations made by the Defendants.

266.    As to settlements made as a result of the Fraud Scheme, Plaintiff at all times comported with reasonable due diligence requirements through the retention of reputable defense firms, investigators, and experts. However, the Fraud Scheme was designed and implemented in order to circumvent these safeguards. Further, the protections under HIPAA and attorney-client privilege, along with New York's insulation of litigation financing disclosures, rendered the scheme unable to be detected through the use of ordinary due diligence. Any payments made were after Plaintiff had engaged in reasonable due diligence and were made in reasonably justified reliance.

## V.    DAMAGES

267.    Plaintiff is an insurance carrier which underwrites policies that cover the various claims and lawsuits filed and prosecuted by Claimants and the Legal Defendants, with the necessary and substantial assistance of the Medical Defendants, the Runner Defendants, and the Funding Defendants, as part of the Fraud Scheme.

268.    As a result of the Fraud Scheme, Plaintiff has incurred substantial damages. Such damages include the payments that Plaintiff made to Legal Defendants in the form of settlements due to Defendant's pattern of fraudulent conduct. Damages also include payments Plaintiff made as legal and investigative costs for defending fraudulent lawsuits and/or for reimbursement for payments made as part of settlement which were diverted to Defendant Medical Providers through

COMPLAINT                                                                                   71

liens for treatment predicated upon, in whole or in part, the fraudulent reports generated by Defendants.

269.    But for Defendants' perpetration of the Fraud Scheme, Plaintiff would not have incurred such damages. Each and every predicate act contributed to the damages incurred, as the scheme is designed reinforce itself, becoming more difficult to discern, more expensive to combat, and more effective generally upon each subsequent production of false statements and documents, effectuated through the use or mail and wire communication, and through reinvestment in the scheme and iteration, in an ever-escalating bootstrap; damages would have lessened or not incurred at all but for fraudulent scheme.

270.    In an April 2024 study, the New York Civil Justice Institute indicated that insurance costs in New York are higher than any other state and that insurance professionals warn that the market is headed toward a crisis that will have long term implications for consumers." *See* *https://acrobat.adobe.com/id/urn:aaid:sc:us:2de7b5f8-2913-4ed4-8ec4-625d1ca07466,* incorporated herein by reference, last accessed December 19, 2024.

271.    Further, Plaintiff's business operations include general liability services from underwriting through claims handling and subsequent administrative and legal actions, including effective handling of personal injury claims. As a direct and foreseeable result of the fraudulent scheme, Plaintiff was obligated to hire and retain additional personnel specifically to address fraudulent claims beyond the normal scope of business.

## VI.    CAUSES OF ACTION

**COUNT I**
**RICO Violation (§ 1962(c))**
**(Against All Defendants)**

272.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

273.    At all times relevant herein, Defendants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and legal entities associated in fact, which was engaged in, and the activities of which affected, interstate commerce, and foreign commerce. Each of the Defendants participated in the operation or management of the enterprise, which Liakas Firm orchestrated, coordinated and led.

274.    In addition to any legitimate transactions, the course of conduct of this enterprise included a pattern of racketeering activity carried out by Defendants. *See, supra*.

275.    Each of the Defendants knowingly and willfully associated with the association-in-fact enterprise and conducted and participated in the conduct of the enterprise's affairs, directly and indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

276.    The pattern of racketeering activity in which the Defendants engaged involved numerous specific acts and conducts as described in detail in this Complaint, constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), bribing a witness under New York law (NY Penal Code § 215), money laundering (18 U.S.C. § 1956) and violations of the Travel Act (18 U.S.C. § 1952) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

277.    The predicate acts of mail fraud, wire fraud, bribing a witness or victim, and money laundering, all involved the transmission and use of false and misleading documentation in furtherance of the Defendants' scheme to defraud Plaintiff in connection with submitting, filing, prosecuting and asserting claims and personal injury lawsuits arising out of fraudulent accidents.

278.    As a result of the pattern of racketeering activity, Plaintiff has suffered damage to their business and property.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, and each of them, jointly and severally, for:

    a.      An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

    b.      Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

    c.      Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

    d.      Such other relief as the Court deems just and proper.

## COUNT II
## RICO Violation (§ 1962(d))
## (Against All Defendants)

279.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

280.    From at least 2018 to the present, Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d).

281.    The pattern of racketeering activity in which the Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific acts and conducts as described in detail in this Complaint, constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343) bribing a witness under New York law (NY Penal Code § 215), and money laundering (18 U.S.C. § 1956) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

282.    The predicate acts of mail fraud, wire fraud, bribing a witness or victim, and money laundering also involved the transmission and use of false and misleading documentation in

COMPLAINT                74

furtherance of the Defendants' scheme to defraud Plaintiff in connection with submitting, filing, prosecuting and asserting claims and personal injury lawsuits arising out of fraudulent accidents.

283.    As a result of the pattern of racketeering activity, Plaintiff has suffered damage to their business and property.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, and each of them, jointly and severally, for:

      a.    An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

      b.    Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

      c.    Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

      d.    Such other relief as the Court deems just and proper.

**COUNT III**
**Common Law Fraud**
**(Against Legal Service Defendants and Medical Provider Defendants**
**(collectively, "Count III Defendants")**

284.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

285.    The Count III Defendants made misrepresentations of facts deliberately concealed, and omitted materials facts that they had a duty to disclose in connection with their claims for reimbursement and/or payment under New York law.

286.    These misrepresentations of fact by the Count III Defendants included, but were not limited to, the material misrepresentations of fact made in asserting the legitimacy of accidents, the existence of injuries and the necessity of treatment.

287.    The Count III Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

288.    The Count III Defendants made these misrepresentations with the intent they reach Plaintiff, and in furtherance of the scheme to defraud Plaintiff by submitting claims for payment of general liability insurance benefits.

289.    The Count III Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Plaintiff to make payments for claims that were not legitimate.

290.    Plaintiff reasonably and justifiably relied, to its detriment, on the truthfulness of the Count III Defendants' representations concerning their eligibility to receive payments of general liability insurance benefits, and without knowledge of the Count III Defendants' scheme and artifice to defraud them.

291.    The Count III Defendants knew, or should have known, that Plaintiff would rely on and intended that they so rely on their truthfulness.

292.    But for the Count III Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct, Plaintiff would not have paid general liability insurance benefits.

293.    Plaintiff at no time knew or had reason to know in the exercise of due diligence or reasonable care that the Count III Defendants were engaged in misrepresentations, omissions, and fraudulent conduct.

294.    As a direct and proximate cause of the Count III Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct by the Count III Defendants, Plaintiff has been damaged. Plaintiff's damages include, but are not necessarily

limited to, benefit payments, administration costs, investigative and defense costs paid by Plaintiff to the Count III Defendants or caused by the Count III Defendants.

295.    Because the Count III Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiff is entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff demands judgment against the Count III Defendants, and each of them, jointly and severally, for:

a.    An award of Plaintiff's actual and consequential damages to be established at trial;

b.    Plaintiff's costs, including, but not limited to, investigative costs incurred in the detection of the Count III Defendants' illegal conduct;

c.    Punitive damages to be established at trial; and,

d.    Such other relief as the Court deems just and proper.

**COUNT IV**
**Aiding and Abetting Fraud**
**(Against All Defendants)**

296.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

297.    All Defendants named herein had actual knowledge of the Fraud Scheme, and the common law fraud as set forth in Count III.

298.    As set forth in detail, *supra*, each Defendant provided substantial assistance to advance such fraud's commission.

299.    But for the substantial assistance of each Defendant, such Fraud Scheme would not have been possible.

300.    As a direct and proximate cause of the Defendants' aiding and abetting of the Fraud Scheme, Plaintiff has been damaged.

COMPLAINT                                                                              77

301.    Because the Count III Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiff is entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff demands judgment against all Defendants, and each of them, jointly and severally, for:

    a.    An award of Plaintiff's actual and consequential damages to be established at trial;

    b.    Plaintiff's costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct;

    c.    Punitive damages to be established at trial; and,

    d.    Such other relief as the Court deems just and proper.

### COUNT V
### Unjust Enrichment
### (Against Legal Service Defendants and
### Medical Provider Defendants (collectively, "Count V Defendants")

302.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

303.    As described above, the Count V Defendants conspired to induce Plaintiff to make or expend numerous and substantial payments to them or others.

304.    The Count V Defendants were never eligible to make claims or seek reimbursement under New York law because, at all relevant times, the accidents, injuries and treatment were fraudulent.

305.    When Plaintiff paid the Count V Defendants and others resulting from the Fraud Scheme, Plaintiff reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count V Defendants, or those persons working

COMPLAINT                                                                                                           78

under their control, made concerning the Count V Defendants' eligibility to make claims or seek reimbursement under New York law.

306.    Each and every payment that Plaintiff made or were caused to make to the Count V Defendants and others during the course of the Fraud Scheme constitutes a benefit that the Count V Defendants sought and voluntarily accepted.

307.    Throughout the course of their scheme, the Count V Defendants wrongfully obtained from Plaintiff benefit payments as a direct and proximate result of the unlawful conduct detailed above.

308.    Retention of those benefits by the Count V Defendants would violate fundamental principles of justice, equity, and good conscience.

**WHEREFORE**, Plaintiff demands judgment against the Count V Defendants, and each of them, jointly and severally, for:

    a.    An award of Plaintiff's actual and consequential damages to be established at trial; and

    b.    Such other relief as the Court deems just and proper.

**COUNT VI**
**General Business Law § 349**
**(Against Legal Service, Medical Provider, and Funding**
**Defendants (collectively, "Count VI Defendants"))**

309.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

310.    New York State General Business Law ("GBL") § 349 provides that (a) "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful," and (h) "any person who has been injured by

reason of any violation of this section may bring an action… to recover his actual damages... [and t]he Court may award reasonable attorney's fees to a prevailing plaintiff."

311.    It is well-established virtually all commercial activity which involves goods or services rendered to public consumers, including rendering legal and medical services, and providing loans and/or advances, are subject to the provisions of GBL § 349.

312.    It is equally well-established that a deceptive practice need not reach the level of common-law fraud to be actionable under § 349, and intent to defraud and justifiable reliance are not elements of a statutory claim.

313.    As set throughout this Complaint, *supra*, each of the Count VI Defendants have engaged in deceptive acts and practices in the conduct of their businesses; particularly, in the furtherance of the Fraud Scheme.

314.    GBL § 349 provides that any party which has been injured by such deceptive acts and practices may recover their actual damages thereto, [and t]he Court may award reasonable attorney's fees to a prevailing plaintiff.

315.    The alleged conduct of Defendants as set forth above and herein has dramatic and widespread effects on consumers extending far beyond the direct damages caused instant deceptive acts and practices in furtherance of the Fraud Scheme. The Fraud Scheme itself has a broader impact on consumers at large.

316.    The Fraud Scheme, and its various permutations amongst similar schemes and overlapping actors, have an impact locally – clogged Court dockets, needless investigative, legal, other claims and defense-related spend, and fraudulently obtained settlements and awards  - and nationally, wrongfully driving up the cost of legitimate insurance business operations, resulting in

COMPLAINT                                                                                            80

needlessly escalating premiums to the ultimate consumers of liability insurance and the cost of healthcare (*i.e., everyone*).

317.    This phenomenon and its effects have recently begun to attract media attention. New York Post, June 16, 2024: MS-13, Russian mobsters use migrants in elaborate injury scam — even getting spinal surgery to pull it off ("Insurance insiders claim losses have tripled since the pandemic, with payouts so massive they're driving up the cost of living for all New Yorkers… The scams are ballooning costs for insurance, housing, construction, food, utilities, and basic living expenses"); ABC News, October 4, 2024: 7 On Your Side investigation finds dozens of injury lawsuits from people living in same apartment buildings ("We have a system that allows for fraudulent claims, leads to million dollars settlements and it raises the cost of insurance premiums across the board," Brian Sampson, president of the Empire State Chapter of the Associated Builders & Contractors, said. "We need to find a way to get it to stop."); ABC News, March 17, 2024: Construction workers in NY faking falls on sites part of larger fraud scheme, lawsuit claims ("'These fraudulent acts have emerged as widespread insurance scams which lead to inflated costs in construction and housing throughout New York State,' said Assemblyman David Weprin.").

318.    The deceptive trade practices of the Count VI Defendants – the Fraud Scheme – occurred and is continuing to occur in New York, Count VI Defendants maintain a business presence in New York, and the effects are felt by consumers at large in New York.

319.    Under these circumstances, an entity such as Plaintiff has standing to pursue claims for violations of GBL § 349. Count VI Defendants are liable to Plaintiff for compensatory damages and the attorneys' fees incurred in bringing and prosecuting this Action.

COMPLAINT                                                                                              81

**WHEREFORE**, Plaintiff demands judgment against Count VI Defendants for:

    a.      An award of Plaintiff's actual damages to be established at trial;

    b.      Plaintiff's attorneys' fees incurred in the preparation and prosecution of this Action; and,

    c.      Such other relief as the Court deems just and proper.

## VII.  JURY TRIAL DEMAND

320.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims.

Dated: April 3, 2025

Respectfully submitted,

**THE WILLIS LAW GROUP, PLLC**

By: */s/ William J. Clay*_____
    **WILLIAM J. CLAY**
    **MICHAEL A. GRAVES**
    **DANIEL A. JOHNSTON**
    **AARON E. MEYER**
    1985 Forest Lane
    Garland, Texas 75042
    Telephone:  214-736-9433
    Facsimile:  214-736-9994
    Service Email: service@thewillislawgroup.com

    ***ATTORNEYS FOR THE PLAINTIFF***
    **UNION MUTUAL FIRE INSURANCE COMPANY**

COMPLAINT