## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

**UNION MUTUAL FIRE INSURANCE COMPANY,**

**Plaintiff,**

**Case #: 25-cv-01857-FB-JRC**

**v.**

**LIAKAS LAW, P.C.,**
**DEAN N. LIAKAS,**                            (*"Liakas Defendants"*)

**ORTHOPAEDICS SPINE & SPORTS MEDICINE,**
**LLC, d/b/a TOTAL ORTHOPAEDICS,**
**KAREN AVANESOV, D.O.,**
**VADIM LERMAN, D.O.,**
**DANTE LEVEN, D.O.,**                          (*"Total Ortho Defendants"*)

**MCCULLOCH ORTHOPAEDIC SURGICAL**
**SERVICES, P.L.L.C. s/d/b/a NEW YORK SPORTS**
**AND JOINTS ORTHOPAEDIC SPECIALISTS,**
**DAVID R. CAPIOLA, M.D.,**                     (*"McCulloch Defendants"*)

**GOTHAM NEUROSURGERY, P.L.L.C.,**
**ANDERS COHEN, D.O.,**                         (*"Gotham Defendants"*)

**NJMHMC, LLC d/b/a**
**HUDSON REGIONAL HOSPITAL,**                   (*"Hudson Regional Defendant"*)

**ACCELERATE RADIOLOGY, P.C.**
**d/b/a PRECISION ACCELERAD,**
**SIDDHARTH PRAKASH, M.D.,**                    (*"AcceleRad Defendants"*)

**PAIN PHYSICIANS OF NEW YORK, P.C.,**
**BOLESLAV KOSHARSKYY, M.D., a**nd
**LEONID REYFMAN, M.D.,**                        (*"PPNY Defendants"*)

**Defendants.**

---

## SECOND AMENDED COMPLAINT

I.     JURISDICTION AND VENUE ........................................................................... 3

II.    PARTIES .......................................................................................................... 3

  A.   Plaintiff .......................................................................................................... 3

  B.   Defendants ..................................................................................................... 3

    i. Legal Service Defendants ............................................................................ 3

    ii. Medical Provider Defendants ..................................................................... 4

    iii. Relevant Non-Parties ................................................................................ 7

III.   FACTUAL BACKGROUND ........................................................................ 10

  A.   The Fraud Scheme ...................................................................................... 10

  B.   The Fraud Scheme Enterprise .................................................................... 15

  C.   Defendants' Roles in the Fraud Scheme Enterprise ................................... 19

    i.  Liakas Defendants' Participation in the Fraud Scheme ........................... 20

    ii. Total Defendants' Participation in the Fraud Scheme .............................. 22

    iii. McCulloch Defendants' Participation in the Fraud Scheme .................... 29

    iv. Gotham Defendants' Participation in the Fraud Scheme ......................... 30

    v.  Hudson Regional Defendants' Participation in the Fraud Scheme ........... 32

    vi. PPNY Defendants' Participation in the Fraud Scheme ........................... 34

    vii. Accelerad Defendants' Participation in the Fraud Scheme ...................... 36

  D.   Defendants' Pattern of Racketeering Activity ........................................... 38

    i.   Claimant A ............................................................................................... 38

    ii.  Claimant B ............................................................................................... 44

    iii. Claimant C ............................................................................................... 51

    iv. Claimant D ............................................................................................... 58

    v.   Claimant E ............................................................................................... 70

    vi. Claimant F ............................................................................................... 70

    vii. Claimant G ............................................................................................... 85

    viii.Claimant H ............................................................................................... 97

    ix.  Additional Predicate Acts ...................................................................... 109

IV.   PLAINTIFFS' JUSTIFIABLE RELIANCE ................................................110

V.    DAMAGES ..................................................................................................112

VI.   CAUSES OF ACTION ................................................................................113

VII.  JURY TRIAL DEMAND ........................................................................... 134

SECOND AMENDED COMPLAINT

Plaintiff UNION MUTUAL FIRE INSURANCE COMPANY (hereinafter referred to as "Union") by and through their attorneys THE WILLIS LAW GROUP, PLLC, as and for their FIRST AMENDED COMPLAINT allege as follows:

## I.     JURISDICTION AND VENUE

1.     This is a civil action arising out of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, and 28 U.S.C. § 1331 in that certain of the claims arise under the laws of the United States, and over the remaining claims herein under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.     Venue is proper in this District under and pursuant to 18 U.S.C. § 1965, and pursuant to 28 U.S.C. § 1391, in that numerous of the acts, practices, and events giving rise to the claims alleged in this Complaint occurred in this District, and many of the Defendants reside in this District.

## II.     PARTIES

### A.     <u>Plaintiff</u>

3.     UNION MUTUAL FIRE INSURANCE COMPANY is an insurance company duly organized and existing under the laws of the State of Vermont and maintains its office in that state.

### B.     <u>Defendants</u>

#### i.     <u>Legal Service Defendants</u>

4.     Defendant LIAKAS LAW P.C. ("Liakas Firm") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, the Liakas Firm maintained its principal place of business in the State of New York.

5.     Upon information and belief, Defendant DEAN N. LIAKAS ("Dean Liakas") resides in and is a citizen of the State of New York. He is also the managing partner of Liakas

Firm. At all times relevant, Dean Liakas was licensed or otherwise authorized to practice law in the State of New York.

6.     Liakas Firm and Dean Liakas are collectively referred to herein as the "Liakas Defendants" or the "Legal Service Defendants."

ii.  <u>Medical Provider Defendants</u>

7.     At all times relevant herein, Defendant ORTHOPAEDICS SPINE & SPORTS MEDICINE, LLC a/k/a Total Orthopaedics & Sports Medicine ("Total Ortho") is and was limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, Total Ortho maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

8.     Defendant KAREN AVANESOV, D.O. ("Avanesov" and together with Total Ortho, the "Total Ortho Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Avanesov has been licensed or otherwise authorized to practice medicine in the State of New York and was the operator, officer, director and/or employee of Total Ortho. Upon information and belief, Avanesov has been an owner of Total Ortho since at least 2012.

9.     Defendant VADIM LERMAN, D.O. ("Lerman" and together with Total Ortho, the "Total Ortho Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Lerman has been licensed or otherwise authorized to practice medicine in the State of New York and was the operator, officer, director and/or employee of Total Ortho. Upon information and belief, Avanesov has been an owner of Total Ortho since at least 2016.

10.     Defendant DANTE LEVEN, D.O. ("Leven" and together with Avanesov, Lerman and Total Ortho, the "Total Ortho Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Lerman has been licensed or otherwise authorized to practice medicine

in the State of New York and was the operator, officer, director and/or employee of Total Ortho. Upon information and belief, Avanesov has been an owner of Total Ortho since at least 2021.

11.     Defendant MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C. s/d/b/a NEW YORK SPORTS AND JOINTS ORTHOPAEDIC SPECIALISTS ("McCulloch Ortho" or "NY S&J" when utilizing the alias) is a professional service limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, McCulloch Ortho maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

12.     Defendant DAVID R. CAPIOLA, M.D. ("Capiola" and together with McCulloch Ortho and McCulloch, the "McCulloch Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Capiola has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of McCulloch Ortho and NY S&J.

13.     Defendant GOTHAM NEUROSURGERY, P.L.L.C. ("Gotham Neurosurgery") is a professional service corporation organized and existing under the laws of the State of New York. At all times relevant herein, Gotham Neurosurgery maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

14.     Defendant ANDERS COHEN, D.O. ("Cohen" and together with Gotham Neurosurgery, the "Gotham Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Cohen has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Gotham Neurosurgery.

15.     Defendant NJMHMC, LLC d/b/a HUDSON REGIONAL HOSPITAL ("Hudson Regional") is a limited liability company duly organized and existing under the laws of the State of New Jersey. At all times relevant herein, Hudson Regional transacted significant business in the State of New York, including soliciting physicians, patients, and lawyers to utilize its services, providing and arranging transportation for New York patients, soliciting and receiving referrals from New York-based medical practices, and billing New York-based policies and insurers.

16.     Defendant ACCELERATE RADIOLOGY, P.C. d/b/a PRECISION ACCELERAD ("AcceleRad") is a professional service corporation organized and existing under the laws of the State of New York. At all times relevant herein, AcceleRad maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

17.     Defendant SIDDHARTH PRAKASH, M.D. ("Prakash" and together with AcceleRad, the "AcceleRad Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Prakash has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of AcceleRad.

18.     Defendant PAIN PHYSICIANS OF NEW YORK ("PPNY") is a professional service corporation organized and existing under the laws of the State of New York. At all times relevant herein, Pain Physicians NY maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

19.     Defendant BOLESLAV KOSHARSKYY, M.D. ("Kosharskyy") resides in and is a citizen of the State of New York. At all relevant times herein, Kosharskyy has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of PPNY.

20. Defendant LEONID REYFMAN, M.D. ("Reyfman," and together with Pain Physicians NY and Kosharskyy, the "PPNY Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Reyfman has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of PPNY.

21. The Total Ortho Defendants, McCulloch Ortho Defendants, Gotham Defendants, Hudson Regional Defendants, AcceleRad Defendants, and PPNY Defendants, are collectively referred to herein as the "Medical Provider Defendants."

22. The Liakas Defendants and the Medical Provider Defendants are collectively referred to herein as "Defendants."

iii. Relevant Non-Parties

23. "Funders" are litigation finance companies which advance money to claimants during the pendency of a claim and/or lawsuit as a "purchase of receivables." Funders will also frequently pay upfront amounts to medical providers, including Medical Provider Defendants, to induce performance of surgeries. Advances are structured so as to be considered non-recourse advances and not "loans," as they are provided at rates which would in other circumstances be usurious. This structure incentivizes the prolonging of lawsuits and rendering of unnecessary care, often leaving Claimants as the party (in theory supposed to be recovering near 66.6%) receiving the smallest portion of recovery.

24. "Runners" are persons who participated in the fraudulent scheme described below by recruiting Claimants into staging and/or perpetuating fake accidents at various locations throughout New York, and/or to sign up after accidents with minor or no injury, enticed Claimants to pursue claims and undergo surgeries, coached Claimants on how to efficiently malinger, and

otherwise coordinated the logistics of their rote protocol medical care and necessary lawsuit involvement.

25. Similar to the scheme set forth in *United States v. Rainford et al.*, 110 F.4th 455 (2d Cir. 2024), Runners typically have their own claims, which may be presented before, after, or in conjunction with their recruiting activities.

26. Upon information and belief, Defendant Liakas Firm employs or has employed at least two individuals purportedly as "paralegals" or employees retained to perform "client relations" who were in fact tasked with recruiting potential claimants in order to further the fraudulent scheme. Liakas Firm further employed "medical coordinators" who would shepherd the Claimants to co-conspirator medical providers and through pre-determined rote protocol treatments.

27. The Liakas Firm further conspired with another law firm ("Co-Conspirator Firm 1"), Co-Conspirator Firm 1's "investigator," and Co-Conspirator Firm 1's paralegal, who themselves operated as Runners and recruited potential claimants in order to further the fraudulent scheme, and further split the proceeds from such scheme through payments disguised as referral fees, "trial counsel" fee arrangements, and as case-related expenses.

28. These Runner networks bare identifiable hallmarks: statistically impossible clusters of related claimants often with the same treatment, from the same providers, and often with the same funders and attorneys, within incredible temporal proximity. For instance, **Figure 1:**

# Figure 1



- Former tenants of same apartment in Freeport.

29.     Since the time the above was prepared, an additional **_18 claimants,_** primarily represented by Liakas Firm, have been identified flowing from the same connections.

## III.     FACTUAL BACKGROUND

### A.  <u>The Fraud Scheme</u>

30.     From at least 2018 to the present, with a marked escalation since 2020, Defendants, together with others known and unknown, for their financial benefit, orchestrated a widespread fraud scheme to defraud Plaintiff and others by (i) fraudulently misrepresenting pre-existing and degenerative conditions as acute trauma, transforming legitimate minor or localized injuries into lucrative full-body claims, and otherwise manufacturing purported injuries from whole cloth; (ii) preparing and collecting documentation as well as submitting, filing, prosecuting and asserting fraudulent personal injury lawsuits on behalf of Claimants, frequently directly related and within short temporal proximity; (iii) providing or alleging to have provided medically unnecessary and excessive healthcare services to such Claimants; (iv) providing monies directly or indirectly to Defendants and to Claimants to fund the fraud scheme; and/or (v) using the fraudulent diagnoses and medically unnecessary and excessive healthcare services to inflate or manufacture settlement value (the "Fraud Scheme").

31.     Despite the complexity of the granular facts of each matter, the goal and *modus operandi* is straightforward: get desperate people to fake and/or grossly exaggerate minor accidents, and fake and/or grossly exaggerate injuries, and undergo needless surgeries to prolong litigation and obtain fraudulent windfall settlements from Plaintiff and others. The Claimants were compelled to cooperate by promises of windfalls by Liakas Firm, litigation funding often timed with, if not directly contingent on, filing suit and undergoing needless surgeries, and by the urging of the Runners.

32.     Runners, under the direction of the Liakas Defendants, Medical Defendants, and/or Funders, and in furtherance of and as a necessary step for the execution of the Fraud Scheme, recruited claimants ("Claimants") into staging and/or perpetuating fake trip and fall accidents at various locations  throughout New York. The Runners then referred and/or transported these Claimants to Liakas Firm, where attorneys and/or other employees of Liakas Firm met with these Claimants. In other circumstances, Claimants were referred and/or transported to medical "clinics," which would in turn sign them up with the Liakas Firm.

33.     Regardless of any actual bodily injury stemming from the purported accidents, these Claimants were instructed by the Runners and others, under the direction of the Liakas Firm, Medical Provider Defendants, and others known and unknown, to manufacture and/or grossly exaggerate particular specified bodily injuries that purportedly resulted from such accidents and to seek medical treatment from providers who would render treatment and documentation in furtherance of the scheme.

34.     Liakas Firm would file lawsuits on behalf of the Claimants, seeking payment for the manufactured and/or grossly exaggerated injuries and needless, unjustified treatment thereto, and setting forth purported facts about the subject "accidents." These suits, initiated by a "Complaint," were typically verified under penalty of perjury by the Dean Liakas and/or employees of the Liakas Firm at the Liakas Firm's instruction.

35.     New York law mandates that an insurer such as Plaintiff discharge its duty to defend, a legally mandated obligation which is *immediately* triggered by the filing of a Complaint as described above; even if the allegations are false or groundless – or fraudulent - the insurer has a duty to defend its insured. As required by law, each and every fraudulent claim made immediately and directly triggered Plaintiff's duty to defend, including investigative, claims handling, and legal

costs as a direct result. In each underlying case, CPLR § 3101(f) requires automatic disclosure of insurance carriers and policies, making Liakas firm acutely aware of *who* would be paying in the event the Fraud Scheme succeeded, and how much they were obligated to cover in indemnity. In simpler terms, a) Plaintiff incurred direct out of pocket costs from as a direct result of the Fraud Scheme from the moment the Complaints were filed; b) Liakas Firm had actual knowledge of the Fraud Scheme's intended targets being insurance carriers generally, and as to the cases documented herein, that Plaintiff, specifically, was to be the intended victim of the Fraud Scheme.

36.     In order to falsely inflate purported case value and thereby effectuate higher Fraud Scheme proceeds, Liakas Defendants, directly and/or indirectly through the Runners and/or others under their control including employed Medical Coordinators, directed the Claimants to seek medical diagnosis and treatment from certain associated medical providers with which the Defendants had an agreement or understanding as to the fraud scheme, including the Medical Provider Defendants, who provided a variety of services (radiology, physical therapy, pain management and orthopedic surgery) at Fraud Scheme-friendly facilities located in multiple states, including New York and New Jersey and regardless of where the Claimants themselves were located, with the ultimate goal being to falsely substantiate unwarranted knee and shoulder surgeries, and most valuably, unwarranted spinal fusions.

37.     As in State Farm v. Tri-Borough - wherein the Second Circuit expressly recognized the potential use of state courts as a medium to effectuate such a scheme and used in the conduct of an enterprise - implementation of the fraudulent treatment protocol requires that Medical Provider Defendants "routinely order unnecessary diagnostic tests for patients that do not affect their treatment, and that some of those tests are duplicative of information already obtained…" 120 F.4th at 74 (2d Cir. 2024).

38.     Here, the relevant medical service providers routinely ordered a variety of imaging services in every single case – and in virtually every instance, MRIs of the cervical and lumbar spine, shoulders and knees – from certain radiologists involved in the fraudulent scheme, whose reports contain findings that routinely deviate from the claimants' conditions as set forth by the imaging studies themselves.

39.     Medical Provider Defendants herein routinely did not consult the MRI films themselves, but knowingly and intentionally relied upon the above-described reports to misrepresent the claimants' conditions as causally related to the alleged incidents, falsely facially justify unnecessary procedures. While the specific body arts at issue may vary amongst the claimants, they always include the spine and either a knee, a shoulder, or both, and the underlying scheme remained the same.

40.     The Medical Provider Defendants provided false diagnoses, the use of their facilities and resources, and unnecessary, excessive, unwarranted, and costly medical services and/or medical services that were not causally related to the alleged accident, for which the Medical Provider Defendants received compensation through increased referral streams for these purposes, along with financial compensation through both Funding Defendants and via liens on Claimant files.

41.     During this process of the rote and escalating manufactured treatment, additional documentation known as Bills of Particulars and Supplemental Bills of Particulars were prepared, verified by the Claimant or the Claimant's attorney, and served upon all parties to the pending lawsuit, typically by mail and in some instances by wire. For Claimants represented by Liakas Defendants in personal injury lawsuits, Liakas Defendants have submitted documents attesting to the alleged accidents and associated injuries. Supplemental Bills of Particulars were filed in

escalating fashion so as to increase economic pressure on Plaintiff to capitulate and pay off the Fraud Scheme.

42.     Armed with the fraudulently documented medical diagnoses and medical services falsely claimed related to the accident, the Liakas Defendants falsely inflated the purported values of personal injury lawsuits in order to extract manufactured and falsely inflated settlements and awards, prolonged litigation and dramatically increased defense costs to general liability carriers, including from Plaintiff Union.

43.     Liakas Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by each Claimant (or commonly *via* Power of Attorney) for the release of each Claimant's medical records. Liakas Defendants knew, were recklessly indifferent regarding, or reasonably should have known the contents of such records were false, and had actual knowledge such releases would be transmitted to the Medical Provider Defendants by mail or wire. Liakas Defendants further prepared, verified, and transmitted Verified Complaints in regards to each Claimant; prepared, verified, and transmitted Bill of Particulars, as well as Supplemental Bills of Particulars, upon opposing counsel in relation to each Claimant's lawsuit.

44.     The scheme shares many structural elements similar to those found in *Rainford*, *supra*, as summarized by the Second Circuit Court of Appeals in its recent decision affirming criminal convictions:

> The scheme involved recruiting poor and homeless people to fake accidents at properties around the New York area. The recruit would stage an accident and then seek unnecessary medical treatment— sometimes including surgery—from doctors who were part of the scheme. The organizers of the scheme would then refer the recruit to a lawyer, who would sue the property owner or the owner's insurance company for damages. The proceeds from the lawsuits,

> which often settled, were then divided among the co-conspirators, with the recruits receiving relatively little.

*United States v. Rainford et al.*, 110 F.4th at 468 (2d Cir. 2024)

45.     Further evoking the structure and modus operandi in *Rainford*, the claimed injuries herein virtually always centered around the shoulders, knees, and most lucrative, the neck and back.

```
A.  Because it was part of the money, the money thing.  I guess
every part was -- every body part was valued, I guess.
```

Trial testimony of Wandy Diaz, *United States v. Rainford et al.*, 18-cr-00289, Doc. 153.

46.     Ms. Diaz's testimony also identified overlap in certain parties herein:

```
lawsuit that you filed in connection with your staged accident.
Did you meet with a lawyer in connection with that accident?
A.  Yes.
Q.  Do you recall his name?
A.  Nicholas Liakas.
```

```
Q.  Ms. Diaz, do you know if a lawsuit was filed in connection
with your accident?
A.  Yes.
```

*Id.*, at 386-387.

**B.  The Fraud Scheme Enterprise**

47.     The Fraud Scheme operated *via* an association-in-fact enterprise (the "Fraud Scheme Enterprise") within the meaning of 18 U.S.C. § 1961(4).

48.    The Fraud Scheme Enterprise was generally structured and operated/operates as depicted below in Figure 2.

**Figure 2.**



49.     The members of the Fraud Scheme Enterprise ("Count I Defendants") operated with a common purpose: to generate and monetize personal injury claims through falsified injuries, causation statements, testimony, medical necessity, and performance of unnecessary surgeries. The relationships among Count I Defendants and others enabled the enterprise's functions (referrals, imaging, surgeries, liens, funding, and litigation coordination); and, the Fraud Scheme Enterprise has maintained sufficient longevity to pursue its purpose, as well as continues through the present.

50.     The Fraud Scheme Enterprise was an ongoing organization with a decision-making and operational structure that, while informal, was coordinated and functioning, including: (i) leadership, management, and pursuit of claims necessary to the Fraud Scheme by Liakas Firm and Dean Liakas; (ii) operators who executed day-to-day acts, including Liakas Firm employees at the instruction of the Liakas Firm, as well as the Medical Provider Defendants who purportedly treated Claimants, but whose true purpose was to provide falsely substantiated clinical, diagnostic, and surgical treatment; and (iii) facilitators who provided financial and logistical support, including Runners and Funders. The Enterprise used established channels - email, phone, mail, bank wires, and corporate entities - to achieve the common purpose.

51.     The Fraud Scheme Enterprise is distinct from any single Defendant named herein. Each Defendant is a separate legal/real person who conducted or participated in the conduct of the Enterprise's affairs, not merely its own affairs, and indeed without the Fraud Scheme Enterprise machinery operating, could not have profited from the Fraud Scheme in its own right.

52.     The Enterprise engaged in, and its activities affected interstate commerce, including through interstate communications, mailings, and financial transactions across state lines, as well as several instances of Claimant and Medical Provider Defendant transit to utilize out of state surgical centers.

53.     Each Defendant so charged in Count I, *infra*, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, exercising decision-making authority, directing subordinates, and/or carrying out essential functions of the Enterprise.

54.     Each Defendant so charged in Count II, *infra*, agreed to participate in the Fraud Scheme Enterprise through a pattern of racketeering activity, and while not necessary to establish at the pleadings stage, did in fact engage in overt acts in furtherance of the Fraud Scheme Enterprise and its common purpose ("Count II Defendants").

55.     From approximately 2018 through the present and continuing, Count I Defendants committed at least two predicate acts of racketeering within the past ten years, including but not limited to violations of 18 USC § 1341 (mail fraud), § 1343 (wire fraud), and § 1952 (Travel Act violations), specifically as pled *infra*.

56.     The predicate acts were horizontally related, in that the predicate acts were related to other predicate acts alleged, with the same participants, victims, methods, and purpose, often with one leading to the next and could only occur in coordination. The predicate acts were vertically related, in that that were in direct furtherance of the Fraud Scheme and the Enterprise's common goals.

57.     The Fraud Scheme Enterprise and the conduct alleged herein represents an identifiable threat of continued criminal activity; indeed, several of the exemplar Claimants set forth herein have cases which are ongoing, and new claims filed meeting the Fraud Scheme criteria are filed on an ongoing basis.

58.     The pattern of racketeering activity described above and set forth in detail below reflects continuity in that:

a. the predicate acts occurred repeatedly over a substantial period of time – at least 7 years and continuing - not a single, isolated scheme (closed-ended); and/or

b. the Fraud Scheme Enterprise's regular way of doing business relies on the same unlawful methods and remains ongoing or, at minimum, poses a specific threat of repetition at the time of this filing (open-ended).

59.     The Fraud Scheme Enterprise is not a mere centralized conspiracy; each element of the Enterprise had substantial interrelation with each other Enterprise element and relied on the conduct of all other participants to play their roles in concert to further the Enterprise's common purpose.

**C.     Defendants' Roles in the Fraud Scheme Enterprise**

60.     At all relevant times, Count I Defendants constituted an association-in-fact enterprise and were engaged in, and the activities of which affected, interstate commerce, and each of the Count I Defendants participated in the operation or management of the enterprise. Each Count II Defendant agreed with some or all of the other participants to operate the enterprise and were at least aware of the common purpose of the enterprise and the general contours of the Fraud Scheme.

61.     Each Count I Defendant played specified roles in the Enterprise, which may have developed or changed over time. Each further exercised control over their portion of the scheme, exercised discretion in managing and operating their part of the scheme, and each was aware of the ultimate goal – get Plaintiff to pay a bogus claim. Each was an interlocking piece of the chain which fails without the organized cooperation of each component.

62.     Each Count II Defendant agreed, explicitly or implicitly, to aid in this conduct, and was generally aware of the overarching Fraud Scheme.

i.    Liakas Defendants' Participation in the Fraud Scheme

63.    Since at least 2018, the Liakas Firm has been involved in thousands of lawsuits, the majority of which involved purported trip and fall injuries, covered by various insurers including Plaintiff Union, in furtherance of and as a necessary step for the execution of the Fraud Scheme.

64.    Liakas Defendants directed, authorized, coordinated, and controlled the conduct engaged in by the Runners to recruit individuals (*i.e.*, Claimants) to stage trip and fall accidents and/or falsely claim injuries unrelated to the alleged trip and fall accidents, and thereafter coordinated and arranged for funding through the Funding Defendants to ensure continued cooperation.

65.    At all times relevant, Liakas Defendants, in cooperation and mutual understanding with each other, represented Claimants in personal injury lawsuits and directed, authorized, coordinated, and controlled the prosecution of Claimants' lawsuits, assigned duties and responsibilities to attorneys/employees of Liakas Firm, and intentionally submitted or caused the filing and submission of false assertions and medical documentation to various courts within the State of New York and all named parties in the fraudulent personal injury lawsuits.

66.    Liakas Defendants, directly and through employed medical coordinators, paralegals and case managers, directed the Claimants to seek medical treatment from the Medical Provider Defendants specifically, knowing and understanding that the Medical Provider Defendants would provide, in exchange for continuing to funnel patients to the Medical Provider Defendants, the kind of false and misleading medical documentation needed to prolong litigation and treatment, facially but falsely justify escalating and more invasive treatments, and falsely inflate case values.

67.    Liakas Defendants knowingly transmitted and received by mail, facsimile, and/or email documents that contained assertions of legitimate trip and fall accidents, the existence of injuries, and the necessity of medical treatment that Liakas Defendants knew or reasonably should

have known were false. At least one Claimant, Claimant H, was from out of state, and several Claimants were directed to receive surgeries in New Jersey.

68.     This unlawful conduct worked to falsely bolster and add value to Claimants' personal injury lawsuits, included the initiation, and prolonging, of litigation (and thus triggering and increasing defense costs paid by Plaintiff as required, by law, from the moment of the initial fraudulent claim or Complaint) and inflating claim value, and ultimately, Liakas Defendants' financial gain from the lawsuits.

69.     Upon information and belief, Runner Defendants would typically be internally referred to as "investigators" or "brokers" for their roles in bringing in claimants and facilitating the initial phases of the Fraud Scheme, though other known descriptors include "paralegal" and "client services liaison.".

70.     Liakas Defendants coordinated with Funders, including "Funder-A," in providing high-interest funding loans, structured as advances against proceeds, to Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

71.     Funders often paid Medical Provider Defendants upfront for unnecessary and expensive surgeries, so as to secure their cooperation with the scheme; such funds would also be recouped along with high interest from settlement proceeds. Through securing cooperation of Claimants and Medical Provider Defendants through advances and upfront payments, Funders, in coordination with Liakas Defendants astronomically increased the amount of their own recovery *via* astronomical interest and simultaneously increased the amount of the Liakas Defendants' contingency fees.

72.     While some Funders follow the regulatory requirements to file UCC statements (sometimes) which make the existence of funding known, many others – such as Jumpstart Funding LLC, in part or in whole owned by Liakas Firm principals and registered to Liakas Firm's New Jersey office, and which upon information and belief, continued to do business despite a revoked corporate status in 2023 – disregard such requirements while actively underwriting and issuing advances. As a result, the terms and conditions of the precise agreements, relationships with other actors, and indeed, the mere existence of involvement cannot be ascertained absent discovery.

ii.  Total Defendants' Participation in the Fraud Scheme

73.     Since at least 2018, Total Ortho has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

74.     Defendant Avanesov, as an orthopedic surgeon, controlled and directed the medical services provided to Claimants by Total Ortho, including evaluating and recommending surgeries that were unnecessary, excessive, unwarranted, costly, and not causally related to the alleged accident.

75.     Defendant Lerman, as an orthopedic surgeon, controlled and directed the medical services provided to Claimants by Total Ortho, including evaluating and recommending surgeries that were unnecessary, excessive, unwarranted, costly, and not causally related to the alleged accident. This includes at least three (3) surgeries where duly affirmed independent physicians have testified the surgeries performed by Lerman were entirely unjustified and were not performed as described, if at all, and is further evidenced by the numerous *identical* operative reports (changed only as to patient name, date, and level of spine) issued regarding different patients, on

different dates, all in favor of Liakas Defendants' clients and other similarly situated personal injury law firms.

76.    Lerman had his re-authorization to provide injured workers with treatment under Workers' Compensation denied in April 2025, after an extraordinary 19-page decision, finding that, *inter alia*:

a.  [Lerman] also consistently fail[ed] to provide or maintain adequate medical documentation or record-keeping.

b.  [Lerman] also consistently fail[ed] to provide clinical rationales for seeking variance from the MTGs to justify the medical necessity of the variance that you are requesting.

c.  [Lerman] also repeatedly submitted PARs for services that have been denied without escalating them for MDO review. You repeatedly resubmit PARs for services that have already been denied, even when there has been no substantial interim change in the claimant's clinical or functional status to warrant such reconsideration.

d.  [Lerman] ha[s] performed invasive/risky procedures, without adequately exhausting more conservative (and less risky) treatment modalities.

e.  [Lerman] ha[s] repeatedly provided incomplete and/or inconsistent medical documentation.

f.  [Lerman] ha[s] failed to follow published Board processes for the submission of medical bills, and [Lerman] ha[s] billed in excess of the Board's MFS, at times for services of questionable necessity.

g.   [T]his conduct also amounts to professional misconduct pursuant to Education Law §§6530(3), (5), (21) and (35).

77.    As of June 19, 2025, Lerman no longer maintains privileges at Nassau University Medical Center (cannot treat patients). In July 2025, Lerman resigned his privileges at all Northwell Health medical facilities.

78.    On several occasions, and made all the more alarming by the Workers' Comp Boards' independent findings above, Lerman has repeatedly been found to provide operative reports which have little to no correlation to objectively observed pre- and post-operative diagnostic films, that his operative reports are "quite unbelievable," and that post-op MRIs have demonstrated **no observable surgical changes**:

A second significant problem that I encountered during my review of Mr. ███ imaging examinations is the lack of imaging findings to justify a surgical instrumented fusion at L5-S1 performed by Dr. Lerman. Dr. Lerman is a spine surgeon and therefore should be capable of reviewing MR images of the lumbar spine; the pre- and post- operative diagnoses provided by Dr. Lerman for the operation are "L5-S1 disc herniation" which is not present on the imaging. Even if a herniation were present, it is unclear why Mr. ███, a relatively young patient, would require instrumented fusion rather than a single level microdiscectomy. Dr. Lerman reports having performed "bilateral hemilaminectomy, facetectomy, foraminotomy" which are not evident on the post-operative radiographs.

In the operative report of 5/19/20 he describes a midline incision and hemilaminectomies on the left where he performs foraminotomy and states that he finds compression of both left L5 and S1 nerve roots by an extruded L5-S1 disc fragment. ███

There is no objective evidence of injury to any part of the nervous system or spine. The reported radiographic findings of facet DJD and L5-S1 bulge have not been the cause of any symptoms nor are they the effects of any specific trauma. The reported EDS finding of prolonged H-reflex does not correlate with clinical or radiographic findings and should be disregarded. It is disconcerting to find what appears to be a surgical scar in right lower back that is nowhere near where Dr.Lerman claims to have performed surgery and found herniated extruded disc on the left that was not clinically or radiographically apparent to other consultants. His operative report is therefore quite unbelievable. ███

> At your request, I have reviewed an MRI of the lumbar spine that was performed 7 ½ weeks following the date of loss. This is a normal study in this then 28-year-old. There are no disc herniations or fractures. There is no radiographic evidence of traumatic or causally-related injury to the lumbar spine. According to the Verified Bill of Particulars, the patient reportedly underwent left hemilaminectomy and facetectomy on 5/19/20. However, repeat MRIs performed on 6/8/21 and 1/16/23 appears normal and essentially unchanged. No post-surgical changes are appreciated at L5/S1 or any other level.

79.     Defendant Leven, as an orthopedic surgeon and a member of Total Ortho, controlled and directed the medical services provided to Claimants by Total Ortho, including evaluating, recommending and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident.

80.     As with Lerman, this includes numerous *identical* operative reports issues regarding different patients, on different dates, all in favor of Liakas Defendants' clients and other similarly situated personal injury law firms.

81.     As with Lerman, examples abound of independent review of surgeries finding the operative reports inaccurate, the MRIs upon which they are based misleading or flatly false, and generally, credibility entirely lacking and surgeries unjustified:

> Nonetheless, on September 29, 2020, Mr. ███ presented to the Ambulatory Surgery Center of the Mount Sinai South Nassau Hospital, where he underwent a posterior spinal fusion with instrumentation at L4-L5, hemilaminectomy at "L4-L5" which was performed by Dante Leven, D.O. Dr. Leven prefaced his operative report of September 29, 2020 with a generic statement that indicated Mr. ███ had "progressive lumbar radiculopathy with deficit consistent with his imaging," which was factually inaccurate. Dr. Dante's operative report to my read appears to be a boilerplate account of the procedure. Dr. Leven stated that he performed a "hemilaminectomy," but did not indicate on which side this hemilaminectomy was performed. Further, Dr. Leven claimed that he found and removed an extruded disc fragment, whereas no such disc extrusion had been demonstrated on Mr. ███'s preoperative imaging. Dr. Leven did not detail the anatomic location of this extruded fragment, nor did he describe its relationship to the thecal sac and nerve roots. Mr. ███'s small lumbar incisions were closed by plastic surgery, who was consulted for this purpose on the day of Mr. ███'s surgery. There were no intraoperative or perioperative adverse events and Mr. ███ was discharged from the Mount Sinai South Nassau Hospital on the day of his surgery.

> The lumbar surgery which Dr. Dante Leven performed on Mr. ███ in September 2020 was based on unsound and insecure indications. His report of that surgery was generic and like his office notes provided neither credible nor reliable information.

----



compression testing resulted in bilaterally positive results. Astonishingly, even though Mr. ████'s neurologic findings did not correlate with his clinical, radiologic or electrophysiologic findings to support anterior cervical discectomy and fusion at the C3-C4 level, Dr. Leven advised this surgical remedy without reconciling these substantial inconsistencies.

None of these several outpatient notes, which were written by Dr. Leven offered diagnostic or specific therapeutic remedies to address the lumbar complaints of Mr. ████, which he always referenced.

So, in June 2020, Mr. ████ presented to the Nassau University Medical Center, where Dr. Leven executed his operative plan. Interestingly, when Mr. ████ arrived at the Nassau University Medical Center he denied having pain.

Additionally, the number ██ ████ ████ participate in this cervical surgery through a one-inch incision is difficult to conceive. Dr. Leven's operative report declared that at surgery he found a "large tear" in the posterior aspect of the annulus along with a "large piece of central herniated disc material within the spinal canal." These remarkable intraoperative findings were unsupported by the MRI imaging upon which Mr. ████'s surgery was predicated.

(Liakas client, a 24-year-old).

----

The visit report from Dante M. Leven DO, of 9/25/2020 does not describe either a mechanism of injury or a single objective finding. It cites an MRI that shows mild degenerative changes.

The operative summary from Dante Leven, DO and Vadim Lerman DO of 5/18/21 does not mention a single word that would suggest trauma.

----

It appears that the surgery performed on the claimant's cervical spine by Dr. Leven was done in an arbitrary fashion, and as such, the surgery does not appear to be causally-related to the subject accident of June 26, 2016.

Furthermore, review of the operative report prepared by Dr. Leven indicates that intraoperatively, he found a large foraminal disc herniation at the C5-6 level. However, this was not visualized in the preoperative MRI study. The objective MRI findings should be given more credence than what was reported by the surgeon, who reported this finding without oversight or a way to verify his reported finding.

82.     Notably, on November 7, 2025, it was reported that "The NUMC board [has] launched a review to determine whether other surgeons at Total Orthopedics — which operates the hospital's orthopedics department — engaged in similar conduct," as well as a direct statement

from NUMC that "the new leadership team has been evaluating other groups to help support the Orthopedics Department and anticipates that Total Orthopedics will play a smaller role in its orthopedic practice, specifically with regard to spine surgery, and subject to enhanced oversight."[1]

83.     As part of the Fraud Scheme, Total Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Union and others involved in Claimants' personal injury lawsuits for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

84.     As part of the Fraud Scheme, Total Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

85.     As part of the Fraud Scheme, Total Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants and/or Plaintiff's agents, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such claims and lawsuits.

86.     In virtually every surgery performed by Avanesov, Lerman, Leven, and Total Ortho generally, the same company provided the implants (Spinal Elements/Amendia), a California

---

[1] November 7, 2025, Newsday, <u>NUMC launches investigatory review of surgical cases performed by orthopedics department doctors, officials say</u>; **https://archive.is/5GiqF**.

company, as well as the graft tissue (rebranded to Orios, a Spinal Elements/Amendia trademark, sourced from a tissue bank in Florida in which Amendia had invested).

87.     Lerman and Avanesov <u>each</u> notably purchased $450,000 worth of stock in Amendia in 2014, were granted $288,000 worth of stock in Amendia in 2016 (with no investment made), and invested over $250,000 of their own money into the company in 2017 for a preferred share series with superior terms (the same year Amendia merged with Spinal Elements, with the latter remaining the corporate name, and Lerman/Avanesov's disclosures never having been updated from the grants in the name of the former).

88.     It is further noted that in 2017, at least as to surgeries performed at NUMC, only approximately 34% of surgeries by Total Ortho involved the use of Amendia/Spinal Elements products. **By 2021, that number was 93% of all spine surgeries at NUMC which were performed by Total Ortho surgeons. <u>In 2021, Lerman used Amendia/Spinal Elements in 94.1% of surgeries at NUMC; Leven, 91.8%, Avanesov, 97.5%.</u>**

89.     Total Defendants knowingly profited from case liens and upfront payments from Funders for the alleged medical and diagnostic rendered by Defendants Lerman, Leven, Avanesov, and/or any other employee/agent of Total Ortho, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

90.     Total Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendants Avanesov, Lerman, Leven and/or any other employee/agent of Total Ortho provided medical and diagnostic services and received reimbursement for such services.

iii. <u>McCulloch Defendants' Participation in the Fraud Scheme</u>

91.    Since at least 2018, McCulloch Ortho has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

92.    Since at least 2018, McCulloch Ortho, directly and through selective use of NY S&J, has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

93.    Defendant Capiola, as an orthopedic surgeon and employee of McCulloch Ortho and NY S&J, controlled and directed the medical services provided to Claimants, including evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme. This included the use of *identical* operative reports for at least three (3) claimants herein**, two (2) of which underwent these surgeries on the same day, and *none* of which operative reports corresponded to MRI imaging**.

94.    As part of the Fraud Scheme, McCulloch Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others involved in Claimants' personal injury lawsuits for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

95.    As part of the Fraud Scheme, McCulloch Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

96.     As part of the Fraud Scheme, McCulloch Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants and/or Plaintiff's agents knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such claims and lawsuits.

97.     McCulloch Defendants knowingly profited from case liens and upfront payments from Funders for the alleged medical and diagnostic services rendered by Defendants McCulloch, Capiola, and/or any other employee/agent of McCulloch Ortho, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme, including but not limited to their performance of, and receipt of compensation for, unnecessary surgeries upon Claimants A, B, D, E, F, G, and H.

98.     McCulloch Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme (at times with Capiola performing *at least five [5] surgeries in a single day*), for whom Defendant Capiola, and/or any other employee/agent of McCulloch Ortho and/or NY S&J provided medical and diagnostic services and received reimbursement for such services.

### iv. Gotham Defendants' Participation in the Fraud Scheme

99.     Since at least 2018, Gotham Neurosurgery has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

100.    Defendant Cohen, as a neurosurgeon and a principal of Gotham Neurosurgery, controlled and directed the medical services provided to Claimants by Gotham Neurosurgery, including evaluating, diagnosing and performing surgeries that were unnecessary, excessive,

unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

101.    Despite being the head of neurosurgery at Brooklyn Hospital Center (located where the majority of the Claimants either lived or fell, and which has an ambulatory surgical center) and being affiliated with Weill Cornell (with facilities within New York City), Cohen chose to send Claimants to Hudson Regional in New Jersey (Defendant NJMHMC) to perform surgeries, pursuant to, upon information and belief, a financial compensation arrangement with Hudson Regional. Cohen further chose to repeatedly perform surgeries with only half of the standard instrumentation, a choice that predictably led to the fusions repeatedly failing, including for two (2) claimants herein, one of their relatives, and at least four (4) others – ***all of whom were represented by Liakas firm***.

102.    Cohen's wife, who now works for Gotham, was previously a "Medical Coordinator" for the Liakas Firm.

103.    As part of the Fraud Scheme, Gotham Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others involved in Claimants' personal injury lawsuits for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

104.    As part of the Fraud Scheme, Gotham Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

105.    As part of the Fraud Scheme, Gotham Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants and/or Plaintiff's agents knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such lawsuits.

106.    Gotham Defendants knowingly profited from case liens and upfront payments from Funders for the alleged medical and diagnostic services rendered by Defendant Cohen and/or any other employee/agent of Gotham Neurosurgery, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

107.    Gotham Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Cohen and/or any other employee/agent of Gotham Neurosurgery provided medical and diagnostic services and received reimbursement for such services.

v.  Hudson Regional Defendants' Participation in the Fraud Scheme

108.    Since at least 2018, Hudson Regional has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

109.    As part of the Fraud Scheme, Hudson Regional Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others involved in Claimants' personal injury lawsuits for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

110.    As part of the Fraud Scheme, Hudson Regional Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

111.    As part of the Fraud Scheme, Hudson Regional Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants and/or  knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such lawsuits. Upon information and belief, Hudson Regional also provided the transportation for Claimants to and from surgery in New Jersey.

112.    Hudson Regional Defendants knowingly profited from case liens and direct payments from the Funders for the alleged medical, diagnostic, and surgical services caused  to be rendered, overseen, or permitted, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

113.    Hudson Regional Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Hudson Regional provided medical, diagnostic, and surgical services and received reimbursement for such services.

114.    Upon information and belief, Hudson Regional Defendants are engaged in a kickback scheme with certain Medical Providers, including Cohen, whereby financial remuneration or other things of value were provided in exchange for using the Hudson Regional facility despite numerous other available facilities more conveniently located to Cohen and the

Claimants, with such other facilities providing opportunities to lower costs or eliminate them through health insurance, or otherwise less costly to the Claimants (and in turn through liens, Union).

vi. <u>PPNY Defendants' Participation in the Fraud Scheme</u>

115.    Since at least 2018, PPNY has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries. PPNY serves to provide manufactured justification for surgeries, in furtherance of and as a necessary step for the execution of the Fraud Scheme.

116.    Defendant Reyfman, as a physician and a principal of PPNY, controlled and directed the medical services provided to Claimants by PPNY, including providing consultations, evaluating, diagnosing and performing injections and surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

117.    Notably, in <u>Geico v. Mayzenberg</u>, Geico established that there was no material fact in genuine dispute and was entitled as a matter of law to prevail on its fraud and RICO claims originating from Igor Dovman's use of shell companies to facilitate an illegal patient referral and kickback scheme in which Mayzenberg participated.[2] Presico Inc. was identified as one such company post-judgment, and Reyfman received a few of those checks during the relevant time period – which included checks made out to at least one Claimant who was ultimately represented by Liakas in their action:[3]

---

[2] *See* EDNY Docket #: 17-CV-2802, Doc #: 148.
[3] *See* EDNY Docket #: 17-CV-2802, Doc #: 201-4, pp. 53, 61, 81.

Check number: 1008 | Amount: $4,000.00



Check number: 1354 | Amount: $4,000.00



Check number: 1057 | Amount: $3,000.00





118.     Defendant Bolesharskyy, as a physician and a principal of PPNY, controlled and directed the medical services provided to Claimants by PPNY, including providing consultations, evaluating, diagnosing and performing injections and surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

119.     As part of the Fraud Scheme, PPNY Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others involved in Claimants' claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

120.     As part of the Fraud Scheme, PPNY Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

121. As part of the Fraud Scheme, PPNY Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants and/or Plaintiff's agents knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging inflating the settlement value of such lawsuits.

122. PPNY Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Reyfman and Bolesharskyy and/or any other employee/agent of PPNY, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

123. PPNY Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Reyfman and Bolesharskyy and/or any other employee/agent of Pain Physicians provided medical and diagnostic services and received reimbursement for such services.

vii. Accelerad Defendants' Participation in the Fraud Scheme

124. Since at least 2018, AcceleRad has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

125. Defendant Prakash, as a radiologist and a principal of AcceleRad, controlled and directed the medical services provided to Claimants, who were referred to AcceleRad by each of the Gotham, McCulloch, Total Ortho, and PPNY Defendants at various times, by providing radiological and imaging diagnostics and MRI reports identifying purported positive findings that are thereafter purportedly relied upon by treating providers to justify procedures irrespective of the

fact that so-called "abnormal" findings were intentionally misleading, false, manufactured, or otherwise not consistent with the MRI films themselves.

126.    Notably, AcceleRad is a continuation of Precision Radiology, a practice previously owned and operated by perpetual RICO defendant Kolb, and his former partner Lichy (who affirmed under oath Kolb had been altering MRI reports to benefit his personal injury clientele). It operates out of the same building and maintains the same employees, including the same custodian of records.

127.    Like its predecessor, AcceleRad rents office space that **does not actually house an actual machine with which to actually perform MRI or have an actual technician on-site.**

128.    MRIs (or other tests) are performed somewhere else at an undisclosed facility, by an undisclosed technician, and the study is subsequently sent to AcceleRad for review and report, almost universally by Prakash. This has been the case since at least 2016. While AcceleRad relies on these "Excess Capacity Agreements," the lack of disclosure as to actual facility that performed the tests, *who* performed the tests, and the actual origination of the images, leaves AcceleRad operating as a facility that has never legitimately authenticated an MRI image before a Court of law.

> 13.    PRECISION operated out of the same offices used by LK at 222 East 68th Street, New York, New York 10065. Because LK's facilities do not contain MRI equipment, PRECISION, in accordance with federal and state law, entered into "Excess Capacity Agreements" with various entities ("Excess Capacity Providers") that owned and operated MRI facilities which were not being utilized on a full-time basis. Pursuant to these agreements, PRECISION paid the Excess Capacity Providers for technicians' time and "table time." Each MRI study was then subsequently forwarded to PRECISION for its review and written analysis.

129.    As part of the Fraud Scheme, AcceleRad Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Seneca and others to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

130.    As part of the Fraud Scheme, AcceleRad Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants and/or Plaintiff's agents knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such lawsuits.

131.    AcceleRad Defendants knowingly profited from reimbursements for the alleged medical and diagnostic services rendered by Prakash, and/or any other employee/agent of AcceleRad, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

132.    AcceleRad Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Prakash, and/or any other employee/agent of AcceleRad provided medical and diagnostic services and received reimbursement for such services.

### D.    Defendants' Pattern of Racketeering Activity

133.    The pattern of racketeering engaged in by Defendants involving a scheme to defraud and steal from Plaintiff and others, began on or before 2018, and continues to the present day, and includes, among others, the following specific predicate acts:

#### i.    Claimant A

134.    Claimant A's relevant, redacted records are attached as **Exhibit 1.**

135.     Claimant A (Freeport resident, claimed a fall from standing height on a cracked sidewalk in Queens in November 2020, went to Wyckoff hospital in Brooklyn even further away, approximately 30 miles from his residence) retained Liakas on or about three (3) days after his fall.

136.     Claimant A first treatment following date of accident was nine (9) days after the fall at NY S&J, on a lien (*i.e.,* to be paid for through proceeds of a claim).

137.     Within two weeks he saw McCulloch Ortho and Total Ortho. Claimant A ultimately had surgery with both. Claimant A was provided funding through Funder-A.

138.     Both of Claimant A's brothers, and his cousin, all Freeport residents, purportedly have trip and falls from standing height on cracked sidewalks in December 2020 (in Brooklyn, surgeries with McCulloch and Total Ortho), January 2021 (in Queens, with Funder-A funding, treatment unknown), and April 2021 (in Brooklyn, with Golden Pear Funding, also treated with McCulloch and Total Ortho) – **all are represented by Liakas**.

139.     Claimant A cycled through PPNY, AcceleRad, McCulloch Ortho, and Total Ortho Defendants, ultimately receiving a spinal fusion in May 2021, listed in all records as an L5-S1 fusion (which never had any findings) except Leven's copy of the operative report (with no notation of change, indicating the surgery was L4-5), purportedly dictated and transmitted **a month after the date of surgery**.

140.     **Leven's operative report used is an identical, verbatim copy-paste job used in no less than seventeen (17) other cases** – and that is just from what is publicly available.  **These reports are provided in favor of just three firms – one of which is Defendant Liakas Firm, and another being a law firm run by the principals' cousins. One such identical report is from Claimant A's <u>brother</u>'s surgery, two (2) days after his own.**

141.     Leven's co-surgeon for the operation was Defendant Lerman.

142.     The indication given for Claimant A's surgery was a herniation with impingement

and radiculopathy.

PREOPERATIVE DIAGNOSES: L5-S1 disk herniation with nerve root impingement, lumbar radiculopathy.

143.     The only MRI imaging done on Claimant A revealed no herniation at any level, a

**bulge** at L4-5, and **no findings at all at L5-S1**:

L4-L5 level demonstrates a disc bulge causing impingement upon the anterior thecal sac and bilateral neural foramina. Contact with the exiting bilateral L4 spinal nerves.

L5-S1 level demonstrates no disc bulge or herniation. No foraminal impingement or canal stenosis.

144.     As Total Ortho, Lerman, and Leven are well aware, a bulge is not a herniation.

> Q.     I'm asking the question in the practice of orthopedics
> and surgery is there a difference from the term bulge and
> herniated disc?
> A.     There is a difference, yes.
> Q.     There is a difference; correct?
> A.     Yes.
> Q.     A bulge is not a herniated disc; correct?
> A.     Correct.

Testimony of Lerman, December 6, 2024 (testifying for Liakas client).

145.     Claimant A ultimately required corrective lumbar surgery following this

unnecessary procedure.

146.     Claimant A and his brother also both received right shoulder surgeries within two (2) weeks of each other from Capiola, despite Claimant A's diagnostic findings of mild "fraying" and low-level degenerative findings.

147.     Medical care was rendered, by design and as a matter of intended course, with the Liakas Defendants' knowledge and agreement, according to pre-determined protocols bearing no relationship to any purported accident.

148.     On or about February 3, 2021, and continuing thereafter, Kosharskyy of PPNY created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant A's treatment. This included, as with Total Ortho, administering non-indicated injections and preparing falsified clinical examination reports to falsely justify escalating treatment.

149.     These records were forwarded by PPNY to the Liakas Defendants, with knowledge and intent that as a necessary step in and in furtherance of the Fraud Scheme, same would be forwarded by mail to opposing counsel on Claimant A's lawsuit. On March 15, 2022, these records were mailed as anticipated, in violation of 18 U.S.C. § 1341.

150.     On or about February 18, 2021, Capiola of McCulloch Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant A's shoulder surgery. These records were forwarded by McCulloch Ortho to the Liakas Defendants, with knowledge and intent that as a necessary step in and in furtherance of the Fraud Scheme, same would be forwarded by mail to opposing counsel on Claimant A's lawsuit on March 15, 2022, in order to manufacture or otherwise falsely inflate a claim for damages as a necessary step in and in furtherance of the Fraud Scheme, in violation of 18 U.S.C. § 1341.

151. On or about March 4, 2021, Prakash of AcceleRad created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant A's treatment. These records were forwarded by AcceleRad *via* mail on March 4, 2021 to the McCulloch Defendants in order to falsely justify continuing and escalating treatment as a necessary step in and in furtherance of the Fraud Scheme, in violation of 18 U.S.C. § 1341.

152. On or about May 11, 2021, Leven and Lerman of Total Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant A's spine surgery. These records were caused to be forwarded by Total Ortho *via* fax to the opposing counsel on Claimant A's lawsuit on May 5, 2023, in order to manufacture or otherwise falsely inflate a claim for damages as a necessary step in and in furtherance of the Fraud Scheme, in violation of 18 U.S.C. § 1343.

153. On dates unknown and unavailable through due diligence to the pleading party, Funders provided advances to Claimant A and compensation to McCulloch Ortho, Capiola, Leven, and Total Ortho for the unnecessary surgeries.

154. On or about October 28, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Dean Liakas executed and filed a Verified Complaint *via* the New York State Courts Electronic Filing system ("NYSCEF"), making use of the wires, containing allegations related to the purported trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant A's injuries, which were known, made with reckless indifference, or should have been known, to be false.

155.    On or about March 15, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Matthew Kerner of the Liakas Firm, upon the direction of the Firm and Dean Liakas**,** served a Verified Bill of Particulars through the mail containing allegations related to the purported trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant A's injuries, which were known, made with reckless indifference, or should have been known, to be false.

156.    On or about January 10, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Matthew Kerner of the Liakas Firm, upon the direction of the Liakas Firm**,** filed and served a Verified Bill of Particulars through the mail containing allegations related to the purported trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant A's brother's injuries, which were known, made with reckless indifference, or should have been known, to be false.

157.    A Verified Bill of Particulars was similarly served in the *other* brother of Claimant A's case, verified by Salah Shawa of the Liakas Firm, upon the direction of the Liakas Firm**,** containing allegations related to the purported trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant A's other brother's injuries, which were known, made with reckless indifference, or should have been known, to be false, on or about January 20, 2023, in violation of 18 U.S.C. § 1341.

ii.    <u>Claimant B</u>

158.    Claimant B's relevant, redacted records are attached as **Exhibit 2**.

159.    Claimant B (who lives in Freeport, purportedly fell from standing height due to uneven sidewalk in Brooklyn some 30 miles away, presented to Jamaica hospital in the company of Runner 1, and gave the hospital the email address for Co-Conspirator Firm 1's paralegal) initially reported injuries to his right shoulder, lower back, and right knee and claimed a December 13, 2020 trip and fall. Each body part demonstrated normal range of motion and no objective observed indicia of injury beyond subjective complaints of pain. Imaging at the hospital was utterly negative for any issues in these body parts except for demonstrating endplate osteophytes – a archetypal degenerative change which takes time to develop – at the L3-4 level. He was discharged with the suggestion he take Motrin.

160.    Claimant B retained the Liakas Firm with funding coordinated through Funder-A.

161.    MRIS taken and read approximately three (3) months after the "accident," and three (3) months prior to surgery, by an MRI facility not named herein as a Defendant, revealed no meniscal tear of the right knee, but identified a "surface irregularity" of the ACL.

162.    Within the same breath, first summarizing the MRI report findings and then providing a treatment plan, Capiola noted the surface irregularity as a "partial tear of the ACL" and characterized chondromalacia (the softening and degeneration of the cartilage on the underside of the kneecap) as "traumatic" (which the MRI report did not) while entirely omitting reference to the meniscus at all; **then promptly provided an assessment of a "clinically occult meniscal tear," and a plan for surgery**:

> An MRI of the right knee from 3/31/2021 demonstrates synovitis, traumatic chondromalacia, partial tear of the ACL, soft tissue swelling, PCL sprain, patellofemoral chondromalacia
>
> **ASSESSMENT AND PLAN:**
> Status post fall on an uneven sidewalk on 12/13/2021
> 1. Right knee traumatic chondromalacia, multiple ligament sprains, clinical occult meniscal tear, worsening buckling, mechanical instability, pain, swelling, weakness
>
> With respect to the RIGHT KNEE, various options were discussed. Due to the persistence of the patient's symptoms, the physical exam and MRI findings, and failure of conservative treatment including physical therapy, activity modification, and medication, options discussed included continued conservative intervention versus corticosteroid injection for likely temporary relief versus surgical intervention. The patient does wish for surgical intervention. Pros

163.     An "occult meniscal tear" has been defined in National Institute of Health studies and peer-reviewed orthopedic journals as "an underlined operatively reported meniscal tear that was not visible on the MRI images, even when the MRI images were retrospectively reviewed." [4]

164.     *I.e.*, a meniscal tear discovered <u>during</u> a surgery performed for a reason unrelated to a meniscal tear, which was unknown prior to surgery and not visible even upon later review. By definition, <u>an occult tear is not a *pre*-operative diagnosis</u>.

165.     Undeterred, Capiola performed an arthroscopy on Claimant B based upon a single pre-operative diagnosis which was unsupported by any imaging or clinical findings on June 3, 2021:

> PREOPERATIVE DIAGNOSIS:   Right knee meniscal tear and synovitis.

166.     Notably, the "partial tear of the ACL" Capiola intuited from a "surface irregularity" was nowhere to be found:

---

[4] Iowa Orthop J. 2020; <u>40(2):30–36</u>; *citing* Laundre BJ, Collins MS, Bond JR, Dahm DL, Stuart MJ, Mandrekar JN. MRI accuracy for tears of the posterior horn of the lateral meniscus in patients with acute anterior cruciate ligament injury and the clinical relevance of missed tears. AJR Am J Roentgenol. 2009;193:515–523. doi: 10.2214/ AJR.08.2146.

> The ACL was probed in its entirety and was found to be intact.

167.    Later independent review of the pre-surgical MRI films confirmed that there were no tears present, and the structures of the knee were demonstrated as intact:

> The MRI of the right knee performed on 03/31/2021 reveals no evidence of recent fracture or dislocation. The bone marrow signal is within normal limits. There is no bone marrow edema or contusion. There is no osteochondral lesion. The articular cartilage is intact in all three compartments. There is no chondromalacia patella. The medial and lateral menisci are intact. The anterior and posterior cruciate ligaments are intact. The medial and lateral collateral ligaments are intact. The iliotibial band is intact. There is no evidence of posterolateral corner injury. The gastrocnemius, popliteus, and biceps femoris tendons are intact. There is no evidence of patellar subluxation injury. The patellar retinaculum is intact. The quadriceps and patellar tendons are intact. There is no joint effusion or hemarthrosis. There is no intra-articular loose body. The superficial and popliteal fossa soft tissues are intact.
>
> In conclusion, the MRI of the right knee performed on 03/31/2021 reveals no recent traumatic injury or internal derangement.

168.    Similarly, the right shoulder MRI performed on Claimant B at the same non-Defendant facility found "superficial erosion" of the labrum. There were no tears noted in the MRI report of the labrum or the rotator cuff.

169.    Regardless, on the first visit post-knee arthroscopy, Capiola determined a right shoulder arthroscopy was warranted and proceeded with the following on September 16, 2021:

> PROCEDURE PERFORMED:
> 1.    Right shoulder examination under anesthesia, right shoulder arthroscopy, extensive debridement of anterior and superior labrum.
> 2.    Rotator cuff subscapularis side-to-side repair with 2 FiberWire sutures.
> 3.    Lysis of adhesions.
> 4.    Subacromial decompression.
> 5.    Complete synovectomy.

170.    This procedure was entirely inconsistent with Claimant B's MRI; however, the procedure, operative report, date, and location are *identical* to Capiola's procedure on Claimant "D," detailed below.

171.    An MRI on Claimant B's lumbar spine performed January 4, 2021, found disc bulges throughout L1-S1, and noted there is no significant central spinal stenosis.

172.    Later peer review of this MRI found "small disc bulges are evident throughout the lumbar spine, most prominent L2/3, L3/4 and L4/5. There is suggestion of mild early degenerative changes of the facet joints with a degree of osseous hypertrophy. Early degenerative changes of facet joints and disc bulges result in minimal narrowing. There are no acute disc herniations or annular tears evident," and further, "These findings are chronic. These findings are not posttraumatic. These findings are not secondary to the alleged injury. There are no findings on this exam causally related to the claimant's alleged injury."

173.    A subsequent MRI of the lumbar spine was performed on February 13, 2021. This MRI again found disc bulges throughout L2-S1. Later peer review of the film again found "small disc bulges are evident, which appear unchanged from the prior exam, dated 01/04/21. Mild, early degenerative changes of facet joints are noted, which appear unchanged. There are no acute disc herniations or annular tears evident," and again, "These findings are chronic. These findings are not posttraumatic. These findings are not secondary to the alleged injury. There are no findings on this exam causally related to the claimant's alleged injury."

174.    Another MRI of the lumbar spine was performed on Claimant B on September 26, 2023, nearly three (3) years post-accident. This MRI found "Focal posterior disc herniation just left of the midline at T12-L1. Posterior disc bulge at L4-L5." Later peer review of the film found "early degenerative changes of the discs and facet joints with disc bulges, all of which appears unchanged from the prior studies," and again:

> **CONCLUSION:**
> An MRI of the lumbar spine performed two years and nine and a half months following the date of the claimant's alleged injury demonstrates evidence of early degenerative changes of the discs and facet joints, all of which appear unchanged from the prior studies. These findings are chronic. These findings are not posttraumatic. These findings are not secondary to the alleged injury. There are no findings on this exam causally related to the claimant's alleged injury.

175.    The above MRIs, conducted over a three-year span, including review from a total of **four (4) different radiologists, three (3) of which being Claimant B's own treating providers, <u>never observed or diagnosed an L4-5 herniation</u>**.

176.    Despite the overwhelming diagnostic evidence above, on November 30, 2023, Leven once again unilaterally determines a pre-operative diagnosis and clinical justification for surgery of "L4-L5 disc herniation with severe nerve impingement, lumbar radiculopathy, extruded disc herniation, neurologic deficits, and axial back pain with gross instability," findings **not one diagnostic film or report supports, with the most recent just two (2) months prior.**

177.    On the basis of this imagined justification, Leven performed a posterolateral fusion L4-L5; segmental pedicle fixation L4-L5; bilateral hemilaminectomy L4-L5; bilateral facetectomy L4-L5 foraminotomy; discectomy L4-L5, and neurolysis bilateral S1 nerve roots.

178.    In other words, based on an entirely unsupported proposition, with no legitimate justification, Leven, in furtherance of the Fraud Scheme, purportedly removed nerves, tissue, and bone material from Claimant B's spine, and inserted a cage unit screwed into his spine, in substantially similar fashion to Claimant A.

179.    On or about December 13, 2020, in furtherance of and as a necessary step for the execution of the Fraud Scheme, Claimant B was given instructions and accompanied to the hospital by a Runner Defendant associated with numerous Liakas Claimants. Of note, the Runner was

living at the time with Claimant A's brother – both with their own cases ("trip and falls" from June 2020 [Runner], December 3, 2020 [Claimant A's brother]), both represented by Liakas, also with Funder-A Funding (Runner) and Total Ortho treatment (Claimant A's brother).

180.     On or about June 3, 2021, Capiola of McCulloch Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant B's knee surgery. These records were created with the intention to be used in litigation, in cooperation and through the Liakas Defendants, with the foreseeable and intended result that such records would be served on the opposing counsel on Claimant B's lawsuit. On March 27, 2023, as intended, in order to manufacture or otherwise falsely inflate a claim for damages, and as a necessary step in and in furtherance of the Fraud Scheme, these records were mailed to opposing counsel by the Liakas Firm in violation of 18 U.S.C. § 1341.

181.     On or about September 16, 2021, Capiola of McCulloch Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant B's knee surgery. These records were created with the intention to be used in litigation, in cooperation and through the Liakas Defendants, with the foreseeable and intended result that such records would be served on the opposing counsel on Claimant B's lawsuit. On March 27, 2023, as intended, in order to manufacture or otherwise falsely inflate a claim for damages, and as a necessary step in and in furtherance of the Fraud Scheme, these records were mailed to opposing counsel by the Liakas Firm in violation of 18 U.S.C. § 1341.

182.     On or about January 10, 2022, and continuing thereafter, Leven and Total Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant B's treatment. These records were created with the intention to be used in litigation, in cooperation and through the Liakas

Defendants, with the foreseeable and intended result that such records would be served on the opposing counsel on Claimant B's lawsuit. On April 25, 2023, as intended, in order to manufacture or otherwise falsely inflate a claim for damages, and as a necessary step in and in furtherance of the Fraud Scheme, these records were mailed to opposing counsel by the Liakas Firm in violation of 18 U.S.C. § 1341.

183.    On or about October 8, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Dean Liakas filed a Verified Complaint through the NYSCEF system, making use of the wires, containing allegations related to the purported trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant B's injuries, which were known, made with reckless indifference, or should have been known, to be false.

184.    On or about January 3, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Dean Liakas filed a Verified Complaint through the NYSCEF system, making use of the wires, containing allegations related to a purported trip and fall accident from October 17, 2020 by Claimant B's *wife*, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant B's wife's injuries, which were known, made with reckless indifference, or should have been known, to be false.

185.    Claimant B's wife also was provided funding through Funder-A.

186.    On or about March 27, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Matthew Kerner of the Liakas Firm, upon the direction of the Firm and Dean Liakas, served a Verified Bill of Particulars through the mail containing allegations related to the purported trip and fall accident, including

the existence, extent, causal relationship of, and medical care necessitated by, Claimant B's injuries, which were known, made with reckless indifference, or should have been known, to be false.

187.    On dates unknown and unavailable through due diligence to the pleading party, Funders provided advances to Claimant B and compensation to McCulloch, Capiola, Leven, and Total Ortho for the unnecessary surgeries, as well as to Claimant B's wife.

iii.    <u>Claimant C</u>

188.    Claimant C's relevant, redacted records are attached as **Exhibit 3**.

189.    Claimant C (a Freeport resident who purportedly fell 30 miles away on uneven sidewalk in Queens on April 30, 2022) presented to the emergency room solely with complaints of pain to the left shoulder and left knee.

<u>Assessment and Plan:</u>
51 y/o M who denies PMH presenting with left shoulder pain and left knee pain after a fall. Was walking on an uneven sidewalk when he tripped and fell, landing on his left shoulder and knee. No headstrike or LOC. No pain in other areas. No regular meds or blood thinners.

190.    EMS noted no deformities or swelling to any body part, solely subjective pain upon palpation; these findings were consistent with the hospital's findings. <u>There were no back complaints, with Claimant C expressly denying head, neck, or back pain</u>. He was discharged the same day, and retained the Liakas Firm on or about May 3, 2022.

191.    Claimant C sought treatment on May 12, 2022 from Advanced Orthopaedics, PLLC with Dov Berkowitz,[5] and: he complains of pain to the left shoulder, left knee, the neck and the biceps.

192.    <u>No back complaints</u>. Despite no back complaints, and an utter lack of any indication in the reports, Berkowitz referred Claimant C for a lumbar MRI, which was done May 15, 2025.

---

[5] RICO Defendant under EDNY Docket #: 1:24-cv-08606-JRC.

193.     Two (2) months after the date of incident, on June 27, 2022, Claimant C presented to Lerman at Total Ortho complaining of neck and back pain. He is recommended to commence PT for his lower back. Claimant C sees another physician once in both July and August, who provided epidurals. Each visit again noted Claimant C is in PT for his knee and shoulder and should initiate PT for his back.

194.     On September 16, 2022, Claimant C saw Lerman a second time. It was again noted Claimant C was in PT only for his knee and shoulder. Lerman's report also stated "OTC medications are being taken for pain," while the following section indicated Claimant C was actively taking Tramadol, an opioid pain medication. **The physical exam of Claimant C's lumbar spine found no instability – consistent with the MRI which found no spondylolisthesis**. HPI stated numbness/tingling radiating down the limbs; ROS states "Pertinent negatives: numbness, tingling." It was again referenced that Claimant C's PT was limited to knee and shoulder, not lumbar, yet Lerman provided that Claimant C had exhausted attempts at conservative treatment. Lerman included a diagnosis for lumbar spinal stenosis (M48.06), despite that the MRI made no such finding.

195.     Lerman recommended, and purportedly performed, a posterolateral fusion with hemilaminectomy, facetectomy, and foraminotomy with insertion of pedicle screws and insertion of a 45mm rod. This was a clinically unjustifiable decision, compounded by an operative report that made zero medical sense.

196.     Neither the MRI nor the clinic notes documented spondylolisthesis, pars defects, gross facet arthropathy, or pre-operative instability—classic prerequisites for fusion. Major guidelines (*e.g.*, Blue Cross/Blue Shield medical-policy criteria, NASS) state that fusion *is **not***

*routine after primary discectomy for radiculopathy* unless imaging-proven instability is present, which here, it was not.

197.    Lerman appeared to try and justify the fusion using intra-op findings:

> Due to resection of 70% of the facet B/L we now paid
> attention to PSF/Instrumentation. The MIS retractors

> POSTEROLATERAL FUSION L4-L5:
>         There was evidence of motion at the L4-L5
> level. With careful retraction the posterolateral gutters
> were decorticated around the base of the pedicle
> screws and transverse processes, remaining of the
> facet joints, laminas, pars. The graft with BMP was
> carefully pushed laterally into the area of the
> transverse processes.  The facet joint and pars were
> carefully packed as well.

198.    This fails when a) the operative report up until the notation of "70% resection" provides no indication of such resection having occurred, and b) the stated *intent* of the surgery was a fusion (as clinically non-indicated as it was), it was not an intra-operative pivot procedure.

199.    Further still, Lerman purportedly observed a bilateral herniation (L4-L5 MRI showed only a *right* herniation, and a L5-S1 *left* herniation which was simply never discussed or addressed). There is no language in the operative report regarding actual removal of herniated disc material.

> Under microscopic control the interlaminar space was further cleared of any soft tissue debris. Using a Midas Rex 3mm burr a small sliver of the lower edge of the lamina was removed to enlarge the interlaminar opening. The ligamentum flavum was then incised. Epidural fat and the epidural space were appreciated. Small angled rongeurs were utilized to remove the lamina as far lateral as the medial wall of the pedicle.
> Care was taken to protect the nerve roots and cauda equina throughout the entire procedure. Next each of the individual nerve roots of L4 and L5 were

> decompressed while decompressing neuroforaminas. Using gentle traction and blunt dissection adhesions around the bilateral nerve root were mobilized allowing medial retraction of the nerve roots over the ventrally located disc herniation in neuroforamina B/L. Small epidural veins were controlled using the micro-cautery. After coagulation the veins and adhesions were cut using a micro-scissors.
>
> Inspection of Nerve Root and Foramen:
> The nerve root retractor was removed from the spinal canal and nerve allowed to fall back into its normal position. With the aid of a microdissector and a nerve hook the nerve root and foramen were inspected for any signs of residual free fragments or neural compression.
> It was noticed that neuroforamen are wide open.

200.    Further confounding is that the MRI demonstrated *anterior* impingement – *i.e.*, compression from the *front* of the nerves.

> IMPRESSION:
> At L4-5, there is a disc bulge and a right foraminal herniation. There is severe right and significant left foraminal impingement. Anterior thecal sac impingement is present.

201.    Lerman removed instead *posterior* facet material – allegedly 70% of it – despite no offending condition therein, and performed a fusion for the "instability" and "motion" *not present*

*on clinical exam, MRI, or by any metric prior to the surgery,* which Lerman's own inexplicable surgery *itself caused.*

202.    Making matters worse, the precise same operative report – *verbatim*, word for word, copy-pasted – **in dozens of other cases.**[6]

203.    Given the level of inconsistencies between the MRI report and the operative report, with the operative report having been recycled several times over, only two explanations present: a) the operative report does not accurately describe the operation performed, or; b) the operative report accurately describes an operation which made no clinical sense.

| Item | MRI report (objective radiology) | Operative report (Lerman's narrative) | Problem |
|---|---|---|---|
| **Level(s) with disc herniation** | **L4-5:** broad-based disc bulge,**right** foraminal herniation. | Describes a ventrally located disc herniation in neuro-foramina **bilaterally** at L4-5, with bilateral nerve-root mobilization. | MRI shows *only right* foraminal herniation at L4-5 and the *left* herniation is at L5-S1, not L4-5. |
| | **L5-S1: left** foraminal herniation. | No mention of treating the documented L5-S1 herniation. | Surgery treats bilateral L4-5 and ignores L5-S1. |

---

[6] Including a Liakas client who was 23 years old at the time Lerman inserted screws and a rod into the young man's spine, following a motor vehicle accident with no reported injuries and less than $1000 in damage to the vehicles. Independent review of the pre- and post-operative MRIs in that matter determined a) such surgery was wholly unjustified, and b) **post-operative imaging reports did not show any evidence of the operation claimed to have been performed by Lerman**:

microdiscectomy.  Dr. Lerman reports having performed "bilateral hemilaminectomy, facetectomy, foraminotomy" which are not evident on the post-operative radiographs.

| Item | MRI report (objective radiology) | Operative report (Lerman's narrative) | Problem |
|------|------|------|------|
| **Facet joints / instability** | "Mild diffuse facet hypertrophy"; **no spondylolisthesis; alignment preserved.** | Lerman resects ~**70 % of the facet joints bilaterally** at L4-5, then states there was "evidence of motion" and proceeds to instrument and **posterolaterally fuse L4-5** with pedicle screws, rods, BMP and graft. | **MRI shows no pre-existing facet destruction or instability.**<br><br>Removing most of the facets itself *creates* instability that then "needs" fusion. |
| **Extent of decompression** | No central canal stenosis; only right foraminal issue. | Performs hemilaminectomy, facetectomy, foraminotomy under the microscope. | Central laminectomy/ facetectomy is not indicated for isolated foraminal herniation |

204.    As Claimant C treated on a lien and on litigation funding, Lerman was not just able to foresee, but was in fact keenly aware, that as a necessary step and in furtherance of the fraud scheme, the records he created in providing the fraudulent treatment would be mailed several times over, including on June 28, 2024, when the subject records were mailed by Total Ortho's health information management service to opposing counsel on the underlying matter, in violation of 18 USC § 1341.

205.    Similarly, trading his Total Ortho hat for his Associate Director of Orthopedic Spine Surgery at NUMC hat, Lerman was not just able to foresee, but was in fact keenly aware, that as a necessary step and in furtherance of the fraud scheme, the false records he authored in providing the fraudulent treatment at the facility would be mailed several times over, including on June 26, 2024, when the subject records were mailed by NUMC's health information management service to opposing counsel on the underlying matter, in violation of 18 USC § 1341.

206.    On February 3, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Dean Liakas served a Verified Complaint, as so Verified by Scott Steinberg of the Liakas Firm, through the NYSCEF system, making use of the wires, containing allegations related to a purported trip and fall accident from April 30, 2022 by Claimant C, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant C's injuries, which were known, made with reckless indifference, or should have been known, to be false. This included the following allegation, with the "aforesaid premises" being 37-14 97th St. in Queens:

> That on or about April 30, 2022, the Plaintiff, ███████████████ was caused to trip and fall due a broken, cracked, depressed, misaligned, uneven, and defective condition of the sidewalk/pavement, while lawfully at the aforesaid premises.

207.    On or about October 2, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Paul Generosa verified personally and, on behalf of the Liakas Firm, served a Verified Bill of Particulars through the mail containing sworn allegations related to the purported trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant C's injuries, which were known, made with reckless indifference, or should have been known, to be false.

208.    Claimant C's action remains pending; no filings have been made on that matter since September 2023.

209.    On April 14, 2025, two (2) years after the first Complaint and just prior to expiration of the statute of limitations, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Dean Liakas served a Verified Complaint, so

Verified by Dean Liakas himself, through the NYSCEF system, making use of the wires, containing allegations related to a purported trip and fall accident from April 30, 2022 by Claimant C, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant C's injuries, which were known, made with reckless indifference, or should have been known, to be false. This included the following allegation, now suing Con Edison, with the "aforesaid premises" being 37-14 97th St. in Queens:

That on or about April 30, 2022, the Plaintiff, ███████████████████, was caused to be seriously injured when he was caused to trip and fall due to a defective sidewalk vault and/or access point and/or utility cover, while lawfully at the aforesaid premises.

iv.     Claimant D

210.    Claimant D's relevant, redacted records are attached as **Exhibit 4**. Claimant D alleges to have tripped and fallen on uneven sidewalk in Brooklyn on January 24, 2021 – just like his brother, who allegedly fell on uneven sidewalk exactly one week prior on January 17, 2021, right around the corner, also represented by Liakas:



211.    Claimant D's brother presented two (2) days after the fact to Woodhull Hospital complaining of left shoulder, left knee, and lower back pain. Claimant D himself presented a day

after his purported date of "accident" to Woodhull Hospital complaining of right shoulder, right knee, and lower back pain.

212.     Claimant D and his brother both treated at non-party Physical Medicine & Rehab ("PMR"). All of Claimant D's PMR records erroneously reflect his brother's date of accident, even from the first appointment of February 9, 2021. Both Claimant D and his brother were sent to AcceleRad for MRIs – or more precisely, *to some unknown and undisclosed facility* for an MRI that would be sent to AcceleRad for a Fraud Scheme-friendly read. These reports were then used to justify multiple surgical interventions.

213.     As to the lumbar spine, the Accelerad report indicated the following:

IMPRESSION:
1.  Broad-based central posterior disc herniation with annular tear at L4-L5 indenting the thecal sac, lateral recesses, and foramina, abutting the bilateral exiting L4 and descending L5 nerve roots with left facet inflammation. Please correlate for radiculopathy in this distribution. An EMG may be beneficial for further assessment.
2.  Disc bulge at L5-S1 indenting the thecal sac, lateral recesses, and foramina, abutting the bilateral exiting L5 nerve roots.

214.     Peer review of the film later would contradict AcceleRad's findings, noting not just discrepancies in the report as compared to the films, but material omissions simply unreported due to their degenerative etiology (omitting material that would undercut needed Fraud Scheme findings):

There is no abnormal signal evident to suggest fracture. Pars interarticularis are intact. Conus medullaris appears normal in signal and morphology.

Degenerative disc disease with disc desiccation, disc space narrowing, endplate remodeling, disc bulge and endplate osteophyte formation, most prominent L5/S1, is evident. There is evidence of degenerative annular signal present. Facet arthropathy is evident. Degenerative disc disease and degenerative arthropathy result in levels of stenosis.

FINDINGS (CONTINUED):
There are no acute disc herniations or acute annular tears evident. The visualized paraspinal soft tissues are grossly unremarkable. Normal lumbar lordosis is evident.

IMPRESSION:
MRI of the lumbar spine demonstrates degenerative disc disease and degenerative arthropathy resulting in levels of stenosis.

COMMENTS:
I concur with the primary reader's findings of disc abnormalities; however, I disagree with the primary reader's findings of disc herniation at L4/5. There is evidence of degenerative disc disease and degenerative arthropathy not definitely stated by primary reader.

215.    Claimant D and his brother both treated with Gotham/Cohen. Once again, all of Claimant D's Gotham records reflect his brother's date of accident rather than his own purported date of accident. Claimant D first purportedly treated with Gotham and Cohen on March 4, 2021, *via* Zoom. Cohen allegedly performed range of motion testing virtually. Additionally, Cohen noted he "extensively reviewed" cervical and lumbar MRIs from <u>October 1, 2020</u>, predating Claimant D's fall by three months, and assessed identical herniations claimed here, <u>as the result of a motor vehicle accident</u>.



Assessment: Cervicalgia and left arm pain, low back pain status post motor vehicle accident. Disc herniation C5-6 and C6-7, L4-5 and L5-S1.

216.    The next visit recorded is *post-surgery*.

217.    Cohen, despite being the Director of Neurosurgery at Brooklyn Hospital Center (which has both its own OR and its own ASC) and an affiliate of Weill Cornell, performed surgery on both brothers at Hudson Regional, across state lines in New Jersey – both specifically receive a "left decompression, discectomy, interbody cage fusion, postero-lateral fusion and stabilization."

218.    The paperwork from Hudson Regional list Liakas Law as Claimant D's insurance provider, and again state his brother's date of accident.



219.    Regardless of the claimed *central* herniation at L4-L5, abutting the ***bilateral*** L4 and L5 nerves, as well as the disc bulge at L5-S1 abutting the ***bilateral*** L5 nerve (*i.e.*, no mention whatsoever of any S1 nerve compression), Cohen performs an **<u>exclusively left-sided</u>** surgery, and "removed the herniation encroaching the **S1 nerve root**." He then placed three pedicle screws – on the left side only – into L4, L5, and S1, and connected them with a single bar, without any support or connection to the other side:



220.    This generally makes no sense, as without properly being supported, a single-sided fusion construct has higher rates of cage subsidence, non-union ("pseudoarthrosis"), and revision surgery. This makes even *less* sense in a patient with a *bilateral* issue. Picture a ladder with the rungs screwed in on only one side.

221. Perhaps unsurprisingly, a subsequent CT scan post-op found the following:

a. Noted degenerated endplate osteophytes at L5/S1 that AcceleRad omitted;

b. **There was now osseous material impacting the left S1 nerve** (not present previously);

c. **The spacers and osseous material at the surgical levels showed subsidence** (sunken, pushed into the lower spinal level);

d. **The right side of the L4/L5 herniation remained, in the vicinity of the L5 nerve** (Cohen inexplicably only operated on the left side, and on the S1 nerve root);

e. **There was now osseous material within the spinal canal itself at the L5/S1 level, resulting in contact with the S1 nerve** (not observed in prior imaging and purportedly "corrected" during surgery; graft compressed out into the canal);

f. There were now disc bulges in L1/2, L2/3, and L3/4 (**messed up the rest of his lumbar spine**).

222. Put in simplest terms, and rendered further unjustifiable by the bilateral nature of the claimed MRI findings, Cohen only bolted the spine down on one side, put the weight-bearing cages in the middle, and called the job done. Those cages then sank (pushed into the degenerated bone below) and bone graft oozed into the nerve canal - *exactly what you'd expect when half the hardware is missing*.

223. *I.e.,* the surgery was not only an eminently foreseeable failure, it made matters significantly worse, with little to no correlation to conditions shown by any objective metrics.

224.     It makes perhaps more sense, in a horrifying way, <u>that this operative report was</u> <u>written long before Claimant D's surgery</u>. It is copy-pasted, *verbatim*, from another surgery in 2019, also by Cohen, also at Hudson Regional, *and also for another Liakas client* (who *also* had a meniscal repair by Capiola/McCulloch).

225.     Cohen performed a predetermined procedure from his "cookbook." <u>Cohen would</u> <u>go on to use the copied operative report, word-for-word, and use it as Claimant H's operative report</u> <u>in 2022</u>.

226.     Incredibly, it appears Cohen performed a virtually identical surgery on Claimant D's *brother*, also at Hudson Regional, also represented by Liakas, regarding his "fall" seven (7) days prior to Claimant D. In <u>identical fashion, **his surgery failed too** – **for** *the same reason*</u>, and <u>required revision surgery to add the other half of the procedure he has repeatedly failed to perform</u> (when paid by litigation finance for Liakas claimants) – this language was added to Claimant D's brother's Bill of Particulars, *attributing the revision surgery to the purported accident*:



**Lumbar Spine:**

- L4/5 left decompression, discectomy, interbody cage fusion with sagittal balancing, postero-lateral fusion and stabilization preformed on January 28, 2022,
- Revision of L4-5 interbody fusion with contralateral posterolateral stabilization preformed on 6/14/2022;

227.     Upon review of cases wherein this approach was utilized (outside of the three examples herein, **as well as Claimant G**, which were all Liakas claimants, all done by Cohen, all at Hudson Regional, and all the result of trip and falls), four (4) other instances of utilizing one-sided pedicle screws joined by a single, essentially free-flying connecting rod were located - 529165/2021, 509492/2021, 150464/2019, and 512449/2018. They are notably each also:

    a.  **All Liakas claimants;**

    b.  **All done by Cohen;**

    c.  **All at Hudson Regional; and,**

    d.  <u>**All the result of claimed trip and falls**</u>.

228.    The nature of these surgeries, the identical operative reports, the fact they all involved Cohen going to a private facility in New Jersey despite ready access to surgical facilities locally, all on behalf of the same firm's clients, all give rise to a reasonable inference of a kickback scheme, "unlawful activity" under 18 USC § 1952.

229.    In travelling from New York to New Jersey to perform these surgeries, and relevant here, *this* surgery on September 10, 2021, with the intent to carry on, or facilitate the promotion, management, establishment, or carrying on of such scheme, and proceeding to perform the surgery to carry on such scheme, Cohen engaged in a violation 18 USC § 1952.

230.    Hudson Regional is a hospital in New Jersey, and looks like this:



231.    Meanwhile, Claimant D testified his back surgery was at a clinic somewhere in either Manhattan or Brooklyn.

232.    Claimant D also treated with the McCulloch Defendants, and ultimately underwent an arthroscopy with meniscal repair by Capiola. Claimant D's first appointment with them was on February 11, 2021, eight (8) days after retaining Liakas, with his insurance listed as "self," despite Medicaid, and later on a case lien.

233.    The initial examination of Claimant D and the earlier Liakas client referenced above (¶ 231) were both performed by Capiola, one at McCulloch Ortho (Claimant D) and one at NY S&J (earlier client), and have **entirely identical findings, down to the precise degrees of range of motion**.

234.    As with the others, Capiola "erroneously" lists the date of accident as Claimant D's *brother*'s date of accident, January 17, 2021. Claimant D was told to get an MRI and return in three (3) weeks.

235.    Two (2) months later, Claimant D returned to Capiola with MRIs, who immediately scheduled an arthroscopy. Claimant D was seen again in May 2021 for a substantially identical appointment, and ultimately underwent the right knee arthroscopy on June 3, 2021.

236.    The operative report is virtually identical to the procedure received by the same earlier Liakas client referenced above (¶ 231). Further, **Claimant D's operative report is a carbon copy of Claimant B's operative report, which is purportedly conducted <u>the same day by Capiola</u>.**

237.    For the second time (that day), Capiola's surgery treated a tear not found on any prior diagnostics, in an operative report disassociated from any prior findings.

2/24/21 MRI

The lateral meniscus is intact.             <u>No lateral meniscal tear</u>.

The underlying articular cartilage is intact.   <u>No chondromalacia</u>.

There is no suprapatellar joint effusion.    No synovitis.

IMPRESSION:
1. Oblique tear posterior horn and body of the medial meniscus.
2. Grade 1 sprain anterior cruciate ligament.
3. Medial popliteal fossa cyst.
4. Probable ganglion cyst adjacent to the proximal lateral collateral ligament complex.

**6/3/21 Surgery**: Lateral meniscal tear. Chondromalacia. Synovitis. No medial meniscus tear. ACL intact.

Immediately, there was found to be synovitis and complete synovectomy was performed in the suprapatellar pouch. There was found to be adhesions in the suprapatellar pouch abutting the medial femoral condyle causing chondral damage. A lysis of adhesions was completed utilizing a shaver as well as a cautery. A chondroplasty was performed of the medial femoral condyle as well as for grade 2 changes on the undersurface of the patella laterally.

The medial and lateral gutters demonstrated synovitis and a synovectomy was completed.

The medial joint was entered. There was found to be no full-thickness tear of the medial meniscus.

The intercondylar notch was entered and extensive synovectomy was performed anterior to the ACL. The ACL was probed in its entirety and was found to be intact.

The lateral joint was entered. There was found to be tearing involving the posterior horn and body of the lateral meniscus and a partial meniscectomy was performed utilizing arthroscopic biters and shaver and electrocautery to the edges. A synovectomy was completed in this compartment as well.

238.    This MRI and operative report are flatly incompatible. The fact it was the second operative report that is *identical*, from the same day, and representing a *second* instance on that same day of providing a surgical report bearing not even passing relevancy to prior diagnostics, leaves only two reasonable inferences, both of which give rise to fraud: a) Capiola did not accurately report his operations, or; b) Capiola accurately reported unnecessary operations on healthy tissue and structures.

239.    Once again, later independent review of the films themselves, not simply of the reports, revealed *there was no meniscal tear in the first instance*, with no evidence of trauma present on the MRI films:

> **COMMENTS:**
> I concur with the primary reader's findings of ganglion. I disagree with the primary reader's findings of abnormal anterior cruciate ligament and meniscal tear, as these findings are not present.
>
> **CONCLUSION:**
> MRI of the right knee performed one month following the date of the claimant's alleged injury demonstrates evidence degeneration of medial meniscus, which is chronic and not secondary to the alleged injury. Ganglion is evident, which is not secondary to the alleged injury. There are no findings on this exam causally related to the claimant's alleged injury.

240.    Claimant D presented to PPNY on May 18, 2021, and the date of accident proffered was once again his *brother's* date of accident, not his own.

> The patient reports that he developed above condition as a result of an injury on 01/17/2021.

241.    While his "Attending Provider" was listed as Roman Shulkin, Claimant D repeatedly treated with Defendant Reyfman. The narratives contained in each visit are substantially identical and the reported pain numbers never vary despite injections from PPNY and surgery from other providers, and on each date it is detailed that the patient developed the claimed symptoms as a result of injury on 1/17/2021 – his brother's fall date, a week before his own. Claimant D treats on a lien despite having Medicaid.

242.    Claimant D received advances from Funders at least four (4) months before any lawsuit was filed.

243.    On September 16, 2021, six (6) days after the Cohen surgery, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Dean Liakas served a Verified Complaint, so Verified by Dean Liakas, through the NYSCEF system, making use of the wires, containing allegations related to a purported trip and fall accident

SECOND AMENDED COMPLAINT                                                                                      67

from January 24, 2021 by Claimant D, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant D's injuries, which were known, made with reckless indifference, or should have been known, to be false.

244. On June 22, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Dean Liakas served a Verified Complaint, so Verified by Dean Liakas, through the NYSCEF system, making use of the wires, containing allegations related to a purported trip and fall accident from January 17, 2021 by Claimant D's brother, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant D's brother's injuries, which were known, made with reckless indifference, or should have been known, to be false.

245. On or about December 27, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Salah Shawa of the Liakas Firm served a Verified Bill of Particulars through the mail and/or email falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant D's *brother's* injuries.

246. On or about May 5, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Salah Shawa of the Liakas Firm served a Verified Bill of Particulars through the mail falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant D's injuries.

247. On or about February 18, 2021, Prakash of AcceleRad created knowingly false and/or materially misleading records, otherwise containing material omissions and comprised of

recycled language, regarding Claimant D's treatment, in order to falsely justify continuing and escalating treatment. In a necessary step and in furtherance of the fraud scheme, and both foreseeable and intended by Prakash, these records were forwarded by AcceleRad *via* email to opposing counsel in Claimant D's lawsuit on or about June 26, 2023, in violation of 18 U.S.C. § 1343.

248.    On or about June 3, 2021, Capiola of McCulloch Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant D's knee surgery. Capiola, compensated through liens and litigation funding, was acutely aware that these records would be mailed and/or transmitted as a necessary step and in furtherance of the scheme, which they were by the Liakas Defendants by mail to opposing counsel on Claimant D's lawsuit on May 5, 2023, in violation of 18 U.S.C. § 1341.

249.    On or about September 10, 2021, Cohen of Gotham created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant D's back surgery. Cohen, compensated through liens and litigation funding, was acutely aware that these records would be mail and/or transmitted as a necessary step and in furtherance of the scheme, which they were by the Liakas Defendants by mail to opposing counsel on Claimant D's lawsuit on May 5, 2023, in violation of 18 U.S.C. § 1341.

250.    On or about June 28, 2023, Hudson Regional forwarded records *via* mail to opposing counsel on Claimant D's lawsuit in order to manufacture or otherwise falsely inflate a claim for damages, and as a necessary step and in furtherance of the Fraud Scheme, in violation of 18 U.S.C. § 1341.

251.     PPNY and Reyfman, all being compensated through liens, were acutely aware that the falsified records they were creating were intended to be presented  in litigation, and that such records would be mailed or transmitted as a necessary step and in furtherance of the Fraud Scheme. On May 5, 2023, such records were in fact mailed by Liakas firm to defense counsel on the matter, a violation of 18 USC § 1341.

252.     On dates unknown and unavailable through due diligence to the pleading party, Funders provided advances to Claimant D and compensation to McCulloch, Capiola, Cohen, and Gotham for the unnecessary surgeries.

253.     Claimant D's case remains pending.

v.     Claimant E

254.     Claimant E's relevant, redacted records are attached as **Exhibit 5**.

255.     Claimant E claimed to have fallen on sidewalk near her house on April 6, 2020 (Total Ortho records), April 7, 2020 (McCulloch Ortho records), or April 20, 2020 (Complaint and Bill of Particulars). She did not go to the hospital or make any complaint that day, and there are no witnesses.

256.     Claimant E's first treatment was with non-party PMR on April 23, 2020, with complaints about the right knee and ankle. PMR purportedly conducted range of motion tests on those body parts, as well as the lumbar spine despite no noted complaint, sent her for MRIs of the ankle and knee, and X-ray of the lumbar. Claimant E started PT at PMR on May 12, 2020, on a lien, and the billing statement indicates that first April 23, 2020 visit was on a lien as well.

257.     On May 7, 2020. Claimant E had her initial appointment with McCulloch Ortho. It was a telemedicine visit, the physician is listed as Eric LeClair, PA, and signed by LeClair, but is "co-signed" by Capiola with an undated signature. The record indicates a fall date of April 7, 2020,

and a "visual" range of motion test was conducted. The MRI report is referenced and flatly misrepresented.

258. The MRI report, dated April 28, 2020, indicated a "type 1 signal" involving the body of the medial meniscus. This is a classic indicator of mild degeneration and is not indicative of a tear. This is particularly true in the degenerative setting demonstrated by the MRI report: "thinning of the chondral surfaces," "variant marrow edema… not uncommonly seen in overweight females," "tendinosis/tendinopathy," and a textbook degenerative horizontal lateral meniscus tear that extends to the free margin. Such a tear is commonly referred to as a "cleavage tear," and arises from internal meniscal breakdown.

259. Indeed, later peer review was consistent with degeneration and lack of acute indicators, and found no medial meniscal tear:

> There is lateral subluxation of the patella. This is due to tautness of the retinaculum which pulls the patella laterally. This is unrelated to trauma. This results in abnormal tracking of the patella over the femur which in turn leads to degenerative arthritis of the patellofemoral joint space. There is chondromalacia of both the patellar and trochlear cartilage. This is due to chronic wear and tear and is degenerative in nature.
>
> There is intrameniscal mucoid degeneration of the posterior horn of the medial meniscus. This is due to chronic degeneration and is unrelated to trauma.
>
> There is a faint linear tear of the posterior horn of the lateral meniscus. The exact age of the meniscal tear is indeterminate based exclusively upon its MRI appearance. Once the meniscus is torn, it can remain stable in appearance for a long period of time. There are no additional findings such as hemarthrosis, bone contusion or soft tissue swelling to confirm an acute injury to the knee. There is a trace joint effusion. This can accompany both acute and chronic meniscal tears as well as degenerative changes of the knee.

260. Regardless, McCulloch Ortho (more specifically, their PA) nakedly claimed both medial and lateral meniscal tears were demonstrated. It was immediately stated that "future surgical intervention may be required."

261.     Claimant E did not return to McCulloch Ortho until six (6) months later, on November 16, 2020. Capiola recommended surgery right knee surgery.

262.     Claimant E then did not return to McCulloch Ortho until nearly a year later, on September 21, 2021. The narrative of the report is verbatim identical to report from the year prior as are the ROM and exam findings. Capiola again recommended surgery despite no documented progression and without any new films, relying solely on a year and half old MRI, and claimed Claimant E had been going to physical therapy despite no such PT for the preceding 10 months.

263.     Claimant E underwent right knee arthroscopy with Capiola on October 7, 2021. Despite that each of Claimants B, D, and E had distinct MRIs and entirely different purported conditions, Capiola once again used the virtually identical "cookbook" operative report, with virtually the exact same procedure purportedly performed.

264.     The operative report once again, just like Claimants B and D, found synovitis and performed synovectomies in all compartments, despite no such MRI findings. The operative report here also indicated a chondroplasty of the lateral femoral condyle and tibial plateau – where no such chondromalacia was found on the MRI – and makes no reference to the medial patellofemoral articulation, where the MRI did find chondromalacia.

265.     On June 5, 2020, Claimant E first presented to Avanesov at Total Ortho. The date of fall was alleged to be April 6, 2020. Avanesov provided an epidural.

266.     Total Ortho reiterated that an MRI that was performed on May 6, 2020, by AcceleRad; more accurately, AcceleRad reviewed and reported on an MRI performed at an unknown and undisclosed facility that was forwarded to them. The MRI claimed left paracentral disc herniations at L1/2, L2/3, and a broad-based central posterior disc herniation at L4/5 abutting

the exiting L4 nerve root, with no bulge or herniation at L3/4 or L5/S1. <u>Notably, there was no mention of an extruded disc fragment.</u>

267.     A subsequent MRI was performed at non-Fraud Scheme provider on August 26, 2020 (3 weeks before surgery). This subsequent MRI found disc bulges at L1/2, L2/3, nothing at L3/4, a bulging disc with biforaminal impingement on the exiting L4 nerve root, and a disc bulge with no stenosis at L5/S1. <u>Notably, again, there was again no mention of an extruded disc fragment, and notably *no herniations*, on an MRI just three (3) weeks prior to surgery</u>. This MRI depicted a far less severe picture than that falsely portrayed earlier by AcceleRad. **Total Ortho never reviewed the August 26, 2020 MRI before proceeding with surgery on September 17, 2020**.

268.     Peer review of the August 26, 2020 MRI film found demonstrated disc desiccation and "mild" disc bulges at L1/2, L2/3, and L4/5, as well as osteophytes at L1/2 and L2/3 further indicating a degenerative picture. Again, <u>no extruded disc fragment</u>. The reader's ultimate conclusion was:

> In my opinion, there are multilevel degenerative changes. There is no evidence for disc herniation or acute traumatic related injury on the submitted examination.

269.     On July 9, 2020, Total Ortho performed an EMG test. The listed impression was "evidence of right L4/L5 radiculopathy," without noting this was **a clinically negative test on the data points, and was inconsistent with both *all* of the MRIs (bilateral impingement) and the clinical tests (straight leg test purportedly positive bilaterally).**

270.     On that same day, the clinical note further misrepresented the *clinically negative* EMG test as "consistent with L4/5 radiculopathy."

271.    On August 7, 2020, after a virtually identical set of clinical findings to the prior visits, with no findings or discussion regarding spinal instability, Avanesov recommended an L4/5 decompression and fusion.

272.    On September 17, 2020, Avanesov, with Leven assisting, purportedly performed that procedure. The incredible and apparent arbitrary operation described therein requires examination:

9/17/2020 Surgery                                         Incompatibility

| | |
|---|---|
| Removed an "extruded disc fragment" | Neither the May 6, 2020 nor the August 26, 2020 MRI reports (nor the peer review of the August 26, 2020 film) identified an extruded disc fragment. |
| "L5 nerve root were mobilized allowing medial retraction of the nerve roots over the ventrally located disc herniation." | Both MRIs identified compressed **L4 nerve root**. **L5 nerve root was never identified as compressed**. This operation described a herniation under L5. |
| Specimen of purportedly removed material not preserved. | NUMC Hospital, where the surgery was performed, is Joint Commission Accredited. Joint Commission Standards (QSA.13.01.01) requires all removed tissue be preserved and sent to pathology unless exempt. No indication this was or would be so, just stated "No specimen submitted." |
| Fusion | No indication of instability in prior MRIs or notes. No indication for widescale laminectomy, particularly not as evidenced on the more recent MRI, instability itself is indicated as a *post-op* finding, despite the fusion planned from the outset. |

273.    On June 4, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Dean Liakas served a Verified Complaint, so Verified by Dean Liakas, through the NYSCEF system, making use of the wires, containing allegations related to a purported trip and fall accident from April 20, 2020 by Claimant E, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant

E's injuries, which were known, made with reckless indifference, or should have been known, to be false.

274.    On or about October 15, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Matthew Kerner of the Liakas Firm served a Verified Bill of Particulars through the mail falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant E's injuries.

275.    On or about November 13, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Matthew Kerner of the Liakas Firm, upon the direction of the Firm and Dean Liakas, served a Second Supplemental Verified Bill of Particulars through the mail falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant E's injuries.

276.    On or about September 17, 2020, Avanesov created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant E's spinal surgery. Avanesov, paid on a case lien, was acutely aware these records would be presented in litigation and either mailed or transmitted as a necessary step and in furtherance of the Fraud Scheme. As with the other Total Ortho operative reports, this particular one has been utilized, *verbatim*, in no less than seven (7) other matters based on publicly available documents alone. These records were in fact so mailed by Total Ortho to opposing counsel on Claimant E's lawsuit on November 9, 2021, in violation of 18 U.S.C. § 1341.

277.    On or about October 7, 2021, Capiola of McCulloch Ortho created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of

recycled language, regarding Claimant E's knee surgery. Capiola, paid on a case lien, was acutely aware these records would be presented in litigation and either mailed or transmitted as a necessary step and in furtherance of the Fraud Scheme. These records were forwarded by McCulloch Ortho via mail and/or email to the Liakas Defendants and forwarded by mail to opposing counsel on Claimant E's lawsuit on October 15, 2021, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. § 1341.

278.    On dates unknown and unavailable through due diligence to the pleading party, Funders provided advances to Claimant E and compensation to Capiola, McCulloch Ortho, and Total Ortho for the unnecessary surgeries.

279.    Claimant E's case remains pending.

vi.    Claimant F

280.    Claimant F's relevant records are attached hereto as **Exhibit 6**. Claimant F presented to the emergency room with complaints regarding the right shoulder, hip, and knee, following a purported standing height fall due to uneven sidewalk. Full range of motion was found for all body parts and the only objective observation of any trauma whatsoever was a "superficial abrasion" on the right knee. No neck complaints were made, and the hospital felt the need to **bold** the following:

> Comments: **No obvious signs of trauma, ecchymosis, erythema, rash or edema to the back. No cervical, thoracic or lumbar spinal point tenderness. No CVA or flank tenderness. Full ROM of the cervical spine with no nuchal rigidity.**

281.    He was given Motrin and discharged with instructions to follow up with his PCP. The Liakas Firm was retained within 24 hours.

282. Six (6) days after being seen with no objective findings except a "superficial abrasion" of the knee, non-party PMR was consulted, who issued a finding of **total disability**. Once again, there was **no reference to any neck complaints**.

283. Three (3) days after being seen by PMR with no neck complaints, and nine (9) days after the purported accident and hospital visit with no neck complaints, Claimant F consulted with a neurosurgeon, Cohen at Gotham Neuro, now with a chief complaint of neck and low back pain. Clinical examination was entirely absent of any findings at C3-4. Claimant F was sent to AcceleRad for MRIs of the cervical spine and lumbar spine. While the lumbar MRI purportedly displayed disc bulges, the cervical results of that MRI from August 2, 2022 were as follows:



284. After primarily treating Claimant F for his back, with discussion of intervention limited to the L5-S1 level, on March 23, 2023, Cohen, without elaboration and nine (9) months post-"accident," with no intervening diagnostics or testing, decided Claimant F was a candidate for C3-4 surgery and sent Claimant F for a medical clearance referral along with a referral for new MRIs at AcceleRad, who attempted to accommodate the request for justification:

At C2-C3, there is no disc bulge or herniation and the facet joints are normal.

At C3-C4, there is no disc bulge or herniation and the facet joints are normal.

At C4-C5, there is a 1 mm sagittal disc bulge indenting the thecal sac.

At C5-C6, there is no disc bulge or herniation and the facet joints are normal.

At C6-C7, there is no disc bulge or herniation and the facet joints are normal.

285.     On April 20, 2023, while noting that Claimant F already secured the surgical clearance prior to this visit which is pretextually to review the MRIs from the day before, Cohen made findings **entirely unsupported by the entirety of the diagnostic studies**.



-MRI Cervical spine 4/18/2023- demonstrates loss of lordosis with kyphotic deformity C3-4 with loss of hydration, disc bulge C4-5.

-X-Ray Cervical spine 4/19/2023- demonstrates straightening of lordosis, C3-4 anterior listhesis in flexion.

**Assessment:  Severe, persistent cervicalgia, straightening of lordosis with loss of hydration C3-4; disc herniation L5-S1.**

**Plan:** I have gone over his films with the aid of my spine models.  I have shown him the area of concern at C3-4, and I believe it correlates with the clinical exam.  We have discussed the risks, benefits, and alternatives as well as likely hospitalization and recovery course without any guarantee of partial or full relief of his symptoms.  I have answered all his questions to his satisfaction.  He has already obtained medical clearance.  He is scheduled for the surgical procedure in the near future.

Anders Cohen, D.O.
Chief - Division of Neurosurgery & Spine Surgery
The Brooklyn Hospital Center
Assistant Professor -of Neurological Surgery - Weill  Cornell
Board Certified in Neurological Surgery

04/18/2023 04:38 PM EDT
04/19/2023 08:34 AM EDT

MRI C SPINE

The disc spaces are hydrated.

At C3-C4, there is no disc bulge

or herniation and the facet joints are normal.

04/19/2023 02:45 PM EDT
04/19/2023 06:58 PM EDT

XRAY C SPINE

With flexion and extension

no abnormal motion is observed

There is no

evidence of fracture or

loss of vertebral body height

No evidence of fracture or

abnormal motion on flexion extension.

286.     Within eleven (11) days of the X-rays finding nothing wrong with C3-C4, ten (10) days of the second MRI which *again* found nothing wrong at C3-4, Claimant F was nonetheless sent to Hudson Regional to undergo neck surgery with hardware implants at C3-4.

287.     **The justification for surgery provided by Cohen in the Hudson Regional pre-operative documentation was completely fictional, pulled from thin air**:



288.     There was *never* a finding of a herniation in any reports, even Cohen's own. The operative report was already written before the surgery.  The *verbatim, word-for-word* operative report by Cohen shows up on at least four (4) other cases, purportedly performed on other patients, on publicly available documents alone. Three (3) of them pre-date Claimant F's surgery. Two of those three (2/3) were for Liakas Firm clients.

289.     A CT scan performed in August 2024 showed new osteophyte development at C4/5 - consistent with adjacent-segment stress after an unnecessary fusion.

290.     The surgery is simply and utterly inexplicable, unless incentives other than Claimant F's well-being mandated the surgery. Below is the implant used in the surgery:





291.    The Blackhawk device is made by ChoiceSpine, LLC. Below are CMS-required disclosures regarding moneys received by Dr. Cohen, by what companies, and for what products:





292. The circumstances of this operation and the relationship with the implant company plainly give rise to a reasonable inference of a kickback scheme, in turn considered unlawful activity within the meaning of the Travel Act, rendering Cohen's travel to New Jersey on April 28, 2023 with the intent to carry on and facilitate such unlawful activity, and in fact doing so *via* the surgery, a violation of 18 § USC 1952.

293. Claimant F, with no observable loss in range of motion and no observable injury on date of accident, also treated with the McCulloch Defendants. He was sent out for an MRI at AcceleRad which stated the following:

No rotator cuff tear is noted.

IMPRESSION:
1. SLAP tear. Posterior inferior labral tear.
2. Mild diffuse rotator cuff tendinosis.
3. Acromioclavicular capsular hypertrophy minimally abutting the underlying subacromial space.

294. Capiola performed an arthroscopy on August 17, 2023. The pre- and post-op diagnoses were flatly at odds with the MRI findings, and even the notes, findings, and plans set forth in McCulloch Defendants' records.

PREOPERATIVE DIAGNOSIS: Right shoulder labral tear and partial rotator cuff tear and synovitis.

POSTOPERATIVE DIAGNOSIS:
1. Right shoulder tear of anterior and superior labrum, partial rotator cuff tear, and biceps tendon partial tear.
2. Adhesions.
3. Synovitis.
4. Impingement.

295.     These diagnoses were, however, consistent with the *four (4) other* shoulder arthroscopies performed *that very day* by Capiola – all for personal injury clientele with pending lawsuits.

296.     On March 21, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Dean Liakas served a Verified Complaint, so Verified by Dean Liakas, through the NYSCEF system, making use of the wires, containing allegations related to a purported trip and fall accident by Claimant F, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant F's injuries, which were known, made with reckless indifference, or should have been known, to be false.

297.     On or about November 22, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Salah Shawa of the Liakas Firm served a Verified Bill of Particulars through the mail falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant F's injuries.

298.     On or about April 18, 2023, Prakash created knowingly false and/or materially misleading records, otherwise containing material omissions, regarding Claimant F's treatment. Prakash, paid on a case lien, was acutely aware these records would be presented in litigation and either mailed or transmitted as a necessary step and in furtherance of the Fraud Scheme. These records were so faxed by AcceleRad to Cohen on April 19, 2023, and subsequently mailed by the Liakas Defendants to opposing counsel on Claimant F's lawsuit on November 22, 2023, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. §§ 1341 and 1343.

299.     As described *supra*, Cohen created knowingly false and/or materially misleading records, otherwise containing material omissions, regarding Claimant F's treatment. Cohen, paid on a case lien, was acutely aware these records would be presented in litigation and either mailed or transmitted as a necessary step and in furtherance of the Fraud Scheme. These records were so e-mailed by Gotham on January 5, 2024, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. § 1343.

300.     On or about January 12, 2024, as a necessary step and in furtherance of the Fraud Scheme, Hudson Regional forwarded records via mail to opposing counsel on Claimant F's lawsuit in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. § 1341.

301.     On or about August 17, 2023, Capiola created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant F's shoulder surgery. Capiola, paid on a case lien, was acutely aware these records would be presented in litigation and either mailed or transmitted as a necessary step and in furtherance of the Fraud Scheme. These records were so mailed by the Liakas Defendants to opposing counsel on Claimant F's lawsuit on November 22, 2023, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. § 1341.

302.     On dates unknown and unavailable to the pleading party, upon information and belief, one or more Funders provided advances to Claimant F and financial remuneration to McCulloch, Capiola, Cohen, and Gotham for the unnecessary surgeries.

303.     Claimant F's case remains active.

vii.     Claimant G

304.    Claimant G's relevant records are attached hereto as **Exhibit 7.**

305.    Claimant G claimed to have fallen on March 7, 2020. She did not go to the hospital. The following day, at approximately 10:30 PM, Claimant G presented to the clinic at Wyckoff Heights with complaints of back pain and right hand pain from the prior day. The following day (2 days post-accident), Claimant G returned to the ER with complaints of mid-back pain and right hand pain following a slip and fall. She denied neck pain and any right upper extremity pain, and the only observed symptom was a subjective complaint of tenderness of the thoracic spine. The only test run was a thoracic spine X-ray, which demonstrated multi-level degenerative disc disease. Claimant G felt better after being given a Motrin and was discharged.

306.    **Claimant G underwent a lumbar MRI on March 23, 2020, purportedly as requested by Cohen, despite that Cohen's first appointment with Claimant G would not be for another two (2) months.** The MRI found that, in sum, Claimant G's facet joints were fine, no instability (no evidence of significant spondylolisthesis), normal curvature (normal lordosis), no bulge or herniation L1-L4/5, and at L5/S1 a **left-sided** paracentral/posterolateral herniation impinging upon the **left S1 nerve root**, with a lesser degree of general foraminal impingement on the right side.

The marrow signal intensity is normal.
Facet joints: There is no significant facet joint or ligamentum flavum hypertrophy. There is no significant facet joint fluid. If a subtle pars defect is suspected, correlation with oblique plain film radiographs or CT is suggested.

ALIGNMENT:
There is a normal lumbar lordosis.
There is no evidence of significant spondylolisthesis.

> **IMPRESSION:**
> At L5-S1, there is a left paracentral/posterolateral herniation impinge upon left S1 nerve root with left lateral recess and left foraminal impingement. Right foraminal impingement is present to lesser degree.

307.    **So as not to bury the lede, Cohen, treating on a case lien, without clinical justification in the first instance, ultimately performed surgery and installed pedicle screws on the <u>wrong side</u>, implanted materials during the surgery which the op report entirely omitted, removed <u>healthy facets</u>, and used the same defective one-sided approach as with Claimants D and H, which predictably failed - <u>and then Cohen lied about it</u>.**

308.    Claimant G first saw Cohen at Gotham on May 15, 2020. Claimant G, now two (2) months post-accident, made no complaint of mid-back pain, only neck and lower back pain. The report noted she was only in PT for her right shoulder. Cohen noted the **<u>left-sided L5-S1 herniation with nerve impingement</u>**, and sent Claimant G out for a cervical MRI.

> -MRI Lumbar spine 3/23/2020- demonstrates left central disc herniation L5-S1 with S1 nerve root impingement, right foraminal impingement.

309.    Claimant G saw Cohen again at Gotham on May 27, 2020. Cohen again noted the above, and now added to his impression the following, and further stated he showed Claimant G the "area of concern" at L5-S1, and "believe[d] it correlate[d] to the clinical exam":

> Impression: Cervicalgia, low back pain, right upper and lower extremity pain status post trip and fall injury. Disc injury at L5-S1 with left paraspinal herniation and nerve root encroachment, straightening of lordosis in the cervical spine with right central disc herniation C5-6 and central disc herniation C7-T1, preserved disc height.

310.    Claimant G returned to Cohen five (5) months later on October 26, 2020. Cohen gave the same clinical Impression and a minor update to the MRI findings language, again focused on the **<u>left-sided</u>** issues:

> -MRI Lumbar spine 3/23/2020- demonstrates left central disc herniation L5-S1 with loss of hydration and with S1 nerve root impingement, right foraminal impingement.

311.    On December 23, 2020, Claimant G returned to Cohen, who repeated the same MRI findings and now a **<u>solely left-sided</u>** clinical Impression regarding the L5-S1 level, "Disc injury at L5-S1 with left paraspinal herniation and nerve root encroachment." On January 7, 2021 Cohen administered an epidural.

312.    On January 20, 2021, Claimant G complained of "pain radiat[ing] down her legs bilaterally, **<u>left worse than right</u>**." Cohen recommended a "minimally invasive discectomy decompression with fusion stabilization," to address Claimant G's "Disc injury at L5-S1 with **<u>left</u>** paraspinal herniation and nerve root encroachment."

313.    On March 16, 2021 Claimant G visited a different provider in the Bronx for a pre-surgical clearance. She reported 8/10 back pain and the doctor noted limited range of motion. Notably, Claimant G saw that same doctor on October 27, 2020, for her pre-surgical clearance regarding Capiola's surgery, *infra*. That visit was **1 day after a Cohen/Gotham visit on October 26, 2020 where Claimant G reported 10/10 back pain and 9/10 neck pain that was "affecting all her average daily activities of life."** Meanwhile, on October 27, 2020, 1 day later while seeking pre-surgical clearance for her shoulder, Claimant G reported shoulder pain 8/10, but as to her back:

        a.    **<u>Reported no back pain.</u>**
        b.    **<u>Full range of motion observed.</u>**
        c.    **<u>"Able to perform heavy work around the house."</u>**

314. On April 16, 2021, Cohen performed Claimant G's surgery at Hudson Regional, despite ready availability of local operating rooms and ambulatory surgical centers. Upon information and belief, Hudson Regional arranged transportation for New York-based Claimant G. In doing so, both Cohen and Hudson Regional made use of facilities in interstate commerce with the intent to carry on and facilitate unlawful activity, and in fact did so, in violation of 18 USC § 1952.

315. At Hudson Regional, the "History & Physical" form states LBP (lower back pain) R (right) pain." Similarly, the informed consent form identifies the operation to be on the right side.





316. No explanation was given as to why a right-sided surgery was being done to address a left sided herniation with a left S1 nerve root compression.

317. Cohen proceeded with surgery on the right side to address a purported right-sided herniation (contradicting not just the MRI but months of his own clinical notes):

**Procedure:** L5/S1 right decompression, discectomy, postero-lateral fusion and stabilization.

**Indication for Procedure:** Patient with severe, longstanding, progressive low back pain and right S1 radiculopathy status post trauma. Patient was found to have significant disc injury at L5/S1 with right herniation. Patient had failed conservative treatment. The risks, benefits and alternatives of a lumbar discectomy, decompression with stabilization was discussed with the patient on multiple occasions and she agreed to proceed.

318. Cohen proceeded to do a <u>right-sided</u> laminectomy (removing bone), facetectomy (removing part of Claimant G's healthy right facet), all to perform a <u>right-sided</u> foraminotomy, a procedure to widen the opening in the spine where nerve roots exit to relieve a compressed nerve root – such as, according to the prior MRI, months of Cohen's notes, and Cohen's claimed indication for surgery in the first place, Claimant G's **<u>left</u> S1 nerve root.**

319. Cohen also made use of a TLIF (transforaminal lumbar interbody fusion) cage device. This was noted both in the implants list utilized, appears in the Anesthesia record as the "Actual Surgery Performed," and the device is confirmed to have been put in by intra-op CT.



 PostOP 

Diagnosis: HNP L5-S1, HNP L5-S1

Planned Procedure(s): L5-S1 LUMBAR DISCECTOMY DECOMPRESSION FUSION

Actual Procedure(s): TLIF L5-S1, TLIF L5-S1

Surgeon: COHEN, ANDERS

 Anesthesia Record

| Height: 165.1 cm | Weight: 75.8kg | PS: ASA 2 | OR: ORRM7 |
| --- | --- | --- | --- |

Diagnosis: HNP L5-S1, HNP L5-S1

Planned Procedure(s): L5-S1 LUMBAR DISCECTOMY DECOMPRESSION FUSION

Actual Procedure(s): TLIF L5-S1, TLIF L5-S1

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Recent Radiology Impressions:
Recent Imaging Information
Imaging Date/Time        Procedure                        Interpreting Staff
Apr 16, 2021@10:23      SPINE LUMBAR SINGLE VIEW              TAO, FENG
Impression: FINDINGS/IMPRESSION:    Intraoperative fluoroscopy was
provided for posterior instrumented decompressive fusion at the L4-L5
level.  Static image intensifier views reveal well-seated posterior 1
segment paired rod and transpedicular screws with interbody cage
projecting over the respective height-restored disc interspace. No
immediate hardware complication. Operative segment alignment appears
anatomic. For details, please refer to operative report. |FINAL
Please note, follow-up post-procedure conventional radiographs of the
lumbar spine are recommended to assess adequacy of hardware placement
and operative segment alignment.  Thank you for the opportunity to
participate in the care of this patient.  Signed by FENG TAO, MD at
04/16/2021 11:09:29 AM    Patient Name:  TIBURCIO, ROSA ANNY
Patient ID:  1100191181 DOS:  04/16/2021 10:23:00 AM|

320.    **There was not only no indication TLIF was planned to be performed in any of Cohen's clinical notes or hospital paperwork, but also no indication to perform same was contained in the "informed consent," and outrageously, the operative report itself entirely omitted any information whatsoever about any TLIF procedure, including omission of any steps taken to prepare the insertion of the device (including endplate preparation, disc curetting, cage sizing, etc.), nor did it state the device was used or inserted at all**.

321.    Notably, such TLIF prep results in a small amount disc fragments and shavings –
**much like the aggregate material fragments turned in to pathology that Cohen claimed to be**
**the removed (phantom) right-side herniation he "removed."**

322.    A herniation which extends far enough to compress a root nerve is significant, and
Cohen claimed to have fully "remove[d] the disc herniation that was encroaching the S1 nerve
root." However, the total volume of the purportedly removed disc material was 1.2 x. 0..8 x .3 cm
in the aggregate – a volume of 0.28 cubic cm, **or between 1/4th and 1/3rd the size of a pea** – was
nowhere near substantial enough to be a removed herniation that had been previous compressing
a root nerve. **It is, however, fully consistent with fragments from TLIF preparation**.

323.    **It is alleged Cohen never removed any herniation during the procedure and**
**his record is false. It is further alleged that evidence and record suggests Cohen recognized**
**an error had been made and immediate efforts were made to conceal same.**

324.    As with several other claimants, he further installed one-sided pedicle screws –
again, **on the wrong side**.



325.    While Cohen may have made an egregious error in **<u>performing the surgery on the</u>**
**<u>wrong side</u>**, he made a **<u>conscious and intentional decision to install hardware - and indeed</u>**

**perform a different operation than claimed** – with major operative steps that were not recorded in the op report.

326.    On August 17, 2021, Claimant G underwent a 4-month post-op CT scan, which found the following:

> The patient is status post posterior fusion at L5/S1 utilizing right-sided pedicle screws with an interconnecting rod and there is a spacer within the L5/S1 intervertebral disc space. In addition, there is partial right facetectomy at the surgical level and there is an osseous fusion mass in the region of the right L5/S1 facet joint. The right S1 pedicle screw extends 3 mm beyond the anterior sacral cortex. The spacer device is retropulsed 4 mm dorsally into the anterior epidural space. There is no evidence of loosening or fracture of the surgical hardware.

> At L5/S1, evaluation is limited secondary to streak artifact however there is no definite neural foraminal narrowing.

327.    At the following appointment, Cohen described these CT results as follows:

> -CT lumbar spine 8/17/2021- demonstrates postoperative changes at L5-S1. There is slight posterior migration of the expandable cage that comes in from the right side. The pedicle screw construct is intact without any fracture, breakage or loosening. The exiting left S1 nerve root is well visualized.

> Assessment: Stable, status post L5-S1 discectomy, decompression, and fusion with stabilization for injured segment.

328.    These statements are utterly incompatible with what the CT scan reported. More directly stated, **they were false with the intent to minimize damage Cohen had caused.**

|  CT Scan | Cohen |
|---|---|
| "S1 pedicle screw extends 3mm beyond the anterior sacral cortex."<br>"The spacer device is retropulsed 4mm dorsally into the anterior epidural space." | "Slight posterior migration of the expandable cage."<br>"Pedicle screw construct is intact." |
| "At L5/S1, evaluation is limited secondary to streak artifact however there is no definite neural foraminal narrowing."<br>No mention of left S1 root or any findings, specifically says can't really see that level. | "The exiting left S1 nerve root **is well visualized**." |

329.     Despite that the MRI *upon which the surgery was predicated* demonstrated a left-sided S1 nerve root compression, which *Cohen did not correct while he performed wrong-sided surgery*, Cohen assessed "Based on her current complaint, I believe it is suspicious for left S1 joint inflammation." This was a bald attempt to shift the root cause away from the condition that the surgery was purportedly intended to address, **which he surgically did not do** while performing a host of unnecessary and unjustified procedures, removing healthy bone and healthy tissue, and installing screws on the wrong side of Claimant G's spine.

330.     Claimant G also treated with Capiola, on a case lien, first on September 24, 2020 (over 6 months post-"accident"). Capiola, on the first appointment, recommends a right shoulder arthroscopy.

331.     X-rays of Claimant G's right shoulder were already done on March 23, 2020, purportedly requested by Cohen (who she did not have her initial appointment with until 2 months after such time). The X-ray, closest in time to the accident, found no indication of acute trauma or injury; the only abnormality was sclerosis (a hallmark of degenerative/osteoarthritic change) at the margins of the acromioclavicular joint.

332.     MRIs from September 17, 2020, showed low-grade interstitial tears of supraspinatus & infraspinatus, osteophytes at the acromioclavicular joint (consistent with the

degenerative sclerosis), a low-lying, curved acromion (a congenital condition, can cause tears in its own right), and the only *potentially* acute findings of mild effusion and bursitis.

333.    Most notable from the MRI:



Glenohumeral joint:
There is no evidence of Hill Sachs fracture.
There is no evidence of bony Bankart fracture. There is cystic change in the posterior greater tuberosity.
There is no tear of the superior labrum.
There is no tear of the anterior inferior labrum. There is no tear of the posterior labrum.
There is no tear of the inferior labrum.
The glenohumeral ligaments are intact.
The articular cartilage is intact.

334.    On November 5, 2020 Capiola performed the right shoulder arthroscopy on Claimant G, with upfront funding.

| PRIMARY INS: | Name: | FUNDED | | Claim Office: FUNDED |
| | Phone: | | Copay: .00 | Fax: |
| | Insured ID: | FUNDED | Group Name: DOI030720 | Group Number: |

335.    The pre-operative diagnosis for surgery flatly contradicted the MRI findings.

PREOPERATIVE DIAGNOSIS:  Right shoulder labral tear, partial rotator cuff tear, and impingement.

336.    No explanation is given for the inconsistency, and the full description of that portion of the procedure was "There was found to be tearing of the anterior and superior labrum. This was aggressively debrided."

337.    Capiola, in the operative report, morphed the identified low-grade, likely degenerative, interstitial tears of supraspinatus & infraspinatus into a single "near full-thickness rotator-cuff tear" which needed repaired with FiberWire/FiberTape and a 4.75 mm SwiveLock anchor.

338. Notably, the internal paperwork at the surgical facility did not identify Claimant G's condition as traumatic, and listed Liakas Firm as the referral source.



339. On April 24, 2021, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Dean Liakas served a Verified Complaint, so Verified by Dean Liakas, through the NYSCEF system, making use of the wires, containing allegations related to a purported trip and fall accident by Claimant G, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant G's injuries, which were known, made with reckless indifference, or should have been known, to be false.

340. On or about October 19, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Matthew Kerner of the Liakas Firm served a Verified Bill of Particulars through the mail falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant G's injuries.

341. On or September 24, 2020, and continuing thereafter, Capiola created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant G's treatment and shoulder surgery. Capiola, paid on a case lien, was acutely aware these records would be presented in litigation and either mailed or

transmitted as a necessary step and in furtherance of the Fraud Scheme. These records were so emailed by McCulloch Ortho to opposing counsel on Claimant G's lawsuit on November 22, 2023, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. § 1343.

342.    On or about April 16, 2021, Cohen created knowingly false and/or materially misleading records, otherwise containing material omissions, regarding Claimant G's treatment and spinal surgery. Cohen, paid on a case lien, was acutely aware these records would be presented in litigation and either mailed or transmitted as a necessary step and in furtherance of the Fraud Scheme. These records, along with a purported billing statement, were so e-mailed by Gotham on January 13, 2024, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. § 1343.

343.    On or about May 26, 2023, as a necessary step and in furtherance of the Fraud Scheme, Hudson Regional forwarded records via mail to opposing counsel on Claimant G's lawsuit, in violation of 18 U.S.C. § 1341.

344.    On dates unknown and unavailable through due diligence to the pleading party, Funders provided advances to Claimant G and financial remuneration to Cohen and Gotham for the unnecessary surgeries. On or around November 5, 2020, Funder-A provided funding for Claimant G's arthroscopy.

345.    Claimant G's case was settled, at a falsely manufactured and fraudulently inflated amount, to Plaintiff's damage.

346.    Upon information and belief, Liakas Firm initially received the aggregate Fraud Scheme proceeds from Claimant G's case.

347.     In turn, and knowing the funds to be the proceeds of some form of unlawful activity, on dates unknown, with such information solely within the knowledge of Defendants and unobtainable to Plaintiff outside of discovery, Liakas Firm conducted several financial transactions which in fact involved the proceeds of specified unlawful activity (18 USC § 1956),  with each such transaction exceeding $10,000 (18 USC § 1957), including:

    a.  Disbursement to Gotham and Cohen of over $10,000; upon information and belief, approximately $31,050;

    b.  Disbursement to McCulloch Ortho and Capiola of at least $10,000;

    c.  Disbursement to Hudson Regional of at least $10,000; and,

    d.  Disbursement to Funder-A of at least $10,000.

348.     Cohen, Gotham, Capiola, and McCulloch Ortho layered Fraud Scheme Enterprise proceeds from this matter, each in excess of $10,000, into their legitimate income accounting so as to conceal the nature and origin of funds, as well as to promote the carrying on of specified unlawful activity.

### viii.     Claimant H

349.     Claimant H, a Pennsylvania resident, purportedly fell on uneven sidewalk in Queens, 144 miles away, on October 17, 2020. The relevant and redacted records for Claimant H are attached as **Exhibit 8.**

350.     She presented to Jamaica Hospital at approximately 6:30 PM after a purported fall that morning, with complaints of pain exclusively to her right knee, as well as earlier pain to her right wrist which "has resolved"; she specifically "denied any neck pain, back pain, hip pain or any other injury." No objective signs of injury were present on physical examination, with the sole observation being a subjective complaint of tenderness to the right knee. No range of motion limitations were noted, and it was specifically identified that there was "No L-spine or paraspinal

tenderness." A right knee X-ray was performed with no acute findings, and Claimant H was discharged.

351.    On November 2, 2020, over two (2) weeks after this uneventful hospital visit with a negative X-ray and no objective sign of any injury, Claimant H went directly to a knee surgeon's office, Capiola, for her very treatment appointment – on a case lien, despite having Medicaid. Without any diagnostic films, Capiola's PA Eric LeClair diagnosed a meniscal tear.

352.    Claimant H, on a lien despite Medicaid, first consulted with PMR on November 5, 2020. Claimant H returned for visits with PMR thereafter on April 7, 2022, an EMG test on April 26, 2022, and once more on March 16, 2023.

353.    Claimant H started physical therapy, on a lien despite Medicaid, November 18, 2020. She went three (3) days in a row, once more on November 25, 2020, once on December 2, 2020, and then returned April 19, 2022, April 20, 2022, and April 26, 2022.

354.    On November 21, 2020, Claimant H underwent an MRI (which noted the history was "motor vehicle accident"), which found a standard degenerative "cleavage" lateral meniscus tear, a horizontal tear that runs in the anterior horn to the surface with concordant mild joint effusion. The MRI also found intermediate grade cartilage loss in the medial trochles, and low grade cartilage loss in the patella; common degenerative findings, particularly in the complete absence of any indication of trauma. No fracture, no dislocation, no bone lesion, no erosion, no contusion, no ACL or PCL damage, no hematoma, no bursitis. A mildly degenerated knee in a clinically obese woman.

355.    On December 7, 2020, Claimant H returned to Capiola, who claimed the cartilage loss as "traumatic chondromalacia," without clinical explanation, and literature, recommended a right knee arthroscopy. Capiola further based the recommendation on the "failure of conservative

treatment," and listed conservative treatment modalities with no indication as to what conservative treatment had actually been done. At this point Claimant H had in fact been in PT for less than a month and gone a total of 5 times.

356.    Claimant H did not return to Capiola again until March 28, 2022. It was noted Claimant H had been pregnant and gave birth in August 2021. Despite the year and 3 month gap, the pain complaint is identical at 8-9/10. Relying upon a year and 5 month old MRI and again on the "failure of conservative treatment" including physical therapy (which she had not done in over a year), Capiola again recommended surgery. It was noted Claimant H would restart PT and return. Claimant H went to PT on three dates: April 19, 2022, April 20, 2022, and April 26, 2022.

357.    Claimant H returned to Capiola on April 28, 2022. The visit note is virtually identical to the previous visit except to note she was now scheduled for a May 5, 2022 surgery without any new imaging ordered.

358.    Notably, examination under anesthesia revealed a "stable knee," in contradiction to the repeated claims of mechanical instability/buckling partially used to justify the surgery. Capiola once again claimed to perform complete synovectomies in all compartments in yet another patient with no consistent imaging with any conditions indicative of same, let alone tri-compartmental synovitis. Grade 2 and 3 chondromalacia was found, consistent with the degenerative conditions found on MRI that continued to degenerate for another year and a half, as is the tear described in the MRI that is found to have further degenerated in the operative report. The scope confirmed a chronic, horizontally cleaved, degenerative meniscus that had progressed—exactly what one would expect given the 16-month delay and virtually no non-operative management.

359.    Capiola affirmed as true over the course of years that these conditions were caused by an accident, including arbitrarily assigning a textbook degenerative condition, chondromalacia,

as "degenerative chondromalacia," identifying "buckling/mechanical instability" despite imaging showing intact ligaments, and shown to be false or exaggerated on examination under anesthesia, and misrepresenting Claimant H's conditions with the understanding the records would be used in litigation. Capiola further failed to follow clinical guidelines as imaging, likely to *avoid* imaging confirmation of degenerative conditions that would weigh against surgery, failed to actually consider what conservative measures had been attempted or request records,

360.    Turning to Claimant H's back, she had an MRI performed on November 21, 2020, which showed degenerative endplate changes at L4-5 and L5-S1, mild <u>diffuse</u> facet hypertrophy (degenerative), no evidence of instability (no spondylolisthesis), L4-5 central herniation and <u>diffuse</u> disc bulge (degenerative) with <u>bilateral</u> impingement and in close proximity to <u>bilateral</u> L5 nerve root, and L5-S1 <u>broad-based</u> central/right herniation (degenerative) with <u>bilateral</u> S1 nerve root concerns and <u>bilateral</u> foraminal impingement.



FINDINGS:

THECAL SAC: The conus and cauda equina are normal in appearance. No gross thecal sac lesion is seen.

PARASPINAL SOFT TISSUES: The paraspinal musculature is normal in appearance. No definitive retroperitoneal abnormality is seen.

OSSEOUS STRUCTURES:
Vertebral bodies: There is no compression fracture.

There is Schmorl's node formation and edematous endplate changes at L4-5 and L5-S1.
Facet joints: There is mild diffuse facet hypertrophy.

There is no definitive defect of the pars interarticularis.

ALIGNMENT:
There is a normal lumbar lordosis.
There is no evidence of significant spondylolisthesis.

DISCS:

At L1-2, there is no bulge or herniation. There is no evidence of foraminal or thecal sac impingement.

At L2-3, there is no bulge or herniation. There is no evidence of foraminal or thecal sac impingement.

At L3-4, there is no bulge or herniation. There is no evidence of foraminal or thecal sac impingement.

At L4-5, there is a central herniation and diffuse disc bulge. There is anterior thecal sac impingement and bilateral foraminal impingement. This central herniation is in close proximity to the bilateral L5 nerve roots.

At L5-S1, there is a broad-based central/right paracentral herniation close proximity to the left S1 nerve root and direct abutting the right S1 nerve root. There is right lateral recess impingement. Significant bilateral foraminal impingement is present.

361.    There is no evidence of an acute injury. Each condition was qualified with degenerative descriptions and in the setting of chronic degenerative endplate changes at those levels, and notably all issues at L4-5 and L5-S1 were <u>bilateral</u>.

362.    Cohen met with Claimant H on December 9, 2020 and despite further noting loss of hydration and loss of height at L4-5 and L5/S1 (key findings demonstrating degenerative disc disease consistent with multilevel <u>diffuse</u> bulges, <u>broad-based</u> herniations and chronic endplate changes), Cohen still inexplicably refers to the levels as "injured discs." Laterality of any condition is not identified and Cohen claimed to identify an inconsistent L3-4 bulge.

363.    Cohen noted Claimant H was in physical therapy three times a week. As above, Claimant H was not in physical therapy three times a week at this time, or at all again for another year and three months.

364.    Cohen noted Claimant H had no contributing history. Claimant H was in fact struck by a vehicle in 2018, injuring her back.



Q    What parts of your body did you injure
from the 2018 pedestrian case?

A    My back.

365.    Claimant H did not return to Cohen until April 20, 2022. Cohen again noted Claimant H was attending physical therapy 3x/week; however, Claimant H more accurately attended PT three times *that* week, and at no other point in 2021 or 2022. (April 19, 2022, April 20, 2022, and April 26, 2022). Cohen again reiterated his read on the MRI and his clinical impression, which remained internally impossibly inconsistent. Once again no laterality is identified, and again the discs are referred to as "injured" with no explanation, particularly within the overwhelming constellation of degenerative findings he himself noted.

-MRI lumbar spine 11/21/2020- demonstrates preserved lordosis with significant disc injury at L4-5 and L5-S1 with central herniations with loss of height and hydration. There are significant Modic changes of the bilateral endplates of L4 and L5 and to a lesser degree at L5-S1. Disc bulge L3-4.

Assessment: Severe, persistent low back pain and radicular pain, significant disc injuries at L4-5 and L5-S1 with loss of height and hydration and nerve root encroachment.

366.    Claimant H returned to Gotham and Cohen on June 23, 2022, one (1) day before her surgery. At no point did Cohen order updated MRIs. Even on this date no notation is made as to surgical or condition laterality. Cohen noted "she can no longer live with this pain."

367.    Meanwhile, on June 20, 2022, at a pre-operative clearance visit with a non-defendant doctor, Claimant H had full range of motion, was in no acute distress, but claimed to have "two severed discs." Claimant H's medication list was reviewed: she was prescribed Motrin, once, in March 2022, and never refilled the prescription.

368.    On June 24, 2022, Cohen performed back surgery on Claimant H. Once again, Liakas Firm was listed as the insurance provider:

```
      INSURANCE                    POLICY #
1  LIAKAS LAW FIRM              DOA 10172020
2
3
```

369.    Notably, on <u>all</u> of the internal documentation at Hudson Regional, Claimant H's

condition prompting surgery was <u>chronic and degenerative, not traumatic.</u>

History & Physical: Degenerative Disc Disease (DDD)



Registration Form: Non-Specific Low Back (inappropriate codes for trauma)

```
                                  *** DIAGNOSIS ***
ADM.DIAGN:    M54.50 LOW BACK PAIN, UNSPECIF   SEC.DX.CODE:
PR. DX CODE: M51.26 OTHER INTERVERTEBRAL DI    SEC.DX.CODE:
   .DX.CODE: M54.16 RADICULOPATHY, LUMBAR R    SEC.DX.CODE:
```

ICD codes:

M51.26 - Other intervertebral disc displacement, lumbar region

"This code is utilized to diagnose a herniated disc in the lower back that <u>is not caused by any specific condition</u>."

M54.50 - low back pain, unspecified

ICD-10 guideline I.C.13.b: "any current, acute injury should be coded to the appropriate injury code from chapter 19."

M54.50 – Radiculopathy, Lumbar Region

Non-specific coding

Intra-operative report: Chronic back pain



Surgical Services Hand Off: Chronic back pain

PAT Checklist: Chronic back pain

Pre-Op form: Lumbar Disc Desease

| Diagnosis | Lumbar disc disease (<null>) |
| --- | --- |
| Planned Procedure | L4-5, L5-S1 LUMBAR FUSION TLIF |

370.    As with the other Claimants with inherently deficient Cohen surgeries, no mention is made – right up until Claimant H is on the operating table – of what side the surgery will take place on. Here, despite that every condition which the surgery purported to correct was <u>bilateral</u>, Cohen once again decided to utilize a one sided surgery.

Name of Primary Surgeon: A. Cohen

Assistant Name: W. VandenWall ☐ No Assistant

PREOPERATIVE DIAGNOSIS: Lumbar Disc HNP L4/5 L5/S1

PROCEDURE: Anterior / Posterolateral Decompression Stabilization & Fusion L4/5 L5/S1

371.    Here, the left side. For no discernable reason, whatsoever. The same line about "injured discs" demonstrating classic degenerative indicia is proffered, and with no explanation, the entirely bilateral conditions are addressed left side only.



**Preoperative Diagnosis:** Injured L4/5 & L5/S1 Discs with herniation, nerve root encroachment, loss of height and hydration with mechanical low back pain and radicular pain

**Postoperative Diagnosis:** Injured L4/5 & L5/S1 Discs with herniation, nerve root encroachment, loss of height and hydration with mechanical low back pain and radicular pain

**Procedure:** L4/5 & L5/S1 left decompression, discectomy, interbody cage fusion with sagittal balancing, postero-lateral fusion and stabilization.



the skin which was prepped and draped sterilely. Lidocaine was injected the skin. A left-sided Wiltsie incision was made on the left side from the transverse process of L4 to the S1 segment.

372.    Cohen proceeded to perform extensive left sided surgical work. Intra-operative imaging confirmed Cohen proceeded to instrument the left side only.



373. Turning all the way back to the *only imaging* Cohen relied upon in performing such extensive and invasive treatment, while every condition was bilateral, the most imperative conditions were <u>right-sided</u>. The surgery addresses none of this, focused solely on left-sided work,

and used half the traditional implementation while leaving all right-sided symptoms unaddressed for what appears to have been an arbitrary decision on the operating table.

> At L4-5, there is a central herniation and diffuse disc bulge. There is anterior thecal sac impingement and bilateral foraminal impingement. This central herniation is in close proximity to the bilateral L5 nerve roots.
>
> At L5-S1, there is a broad-based central/right paracentral herniation close proximity to the left S1 nerve root and direct abutting the right S1 nerve root. There is right lateral recess impingement. Significant bilateral foraminal impingement is present.

374. On October 24, 2022, 4 months post-surgery, the post op CT scan showed:

> L3-L4: Minimal degenerative changes in endplates. Mild facet hypertrophy.
>
> L4-L5: Postsurgical and degenerative changes in the endplates. Left posterolateral osteophyte and disc protrusion. Postsurgical changes of the left facet joint.
>
> Minimal right facet hypertrophy.
>
> L5-S1: Postsurgical and degenerative changes in the interspace. Postsurgical changes of the left facet joint.
>
> Minimal right facet hypertrophy.
>
> There is left foramina narrowing at L5-S1.
>
> No central stenosis.
>
> IMPRESSION:
> IMPRESSION:
> 1. Spondylosis.
> 2. Postsurgical changes.
> 3. No central stenosis.
> 4. L4-L5 there is a left posterolateral disc protrusion and there is soft tissue density consistent with postsurgical granulation tissue and/or disc protrusion.
> 5. At L5-S1 there is granulation tissue and/or disc protrusion in the left anterolateral epidural fat. There may be left foramina narrowing.

375. L3-4 has now been impacted by Cohen's apparently arbitrary surgical choices. The entirety of the areas Cohen performed surgery on now had increased degeneration and osteophytes, as well as protrusions.

376. The choice for this one-sided surgery made no medical sense, nor did it for the prior Claimants.

377. Each subsequent Claimant who underwent these surgeries – one-sided instrumentation despite repeated failures, with side appearing arbitrarily chosen and appearing never to correct core problems claimed to justify the surgery, inevitably causing additional spinal damage and ongoing problems – lessens the inference of negligence and raises the inference of intentional conduct by Cohen, with foreseeable additional bills of particulars about further surgery or continuing problems benefitting the Fraud Scheme Enterprise.

378. On July 26, 2022, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1343, Dean Liakas served a Verified Complaint, so Verified by Dean Liakas, through the NYSCEF system, making use of the wires, containing allegations related to a purported trip and fall accident by Claimant H, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant H's injuries, which were known, made with reckless indifference, or should have been known, to be false.

379. On or about April 26, 2023, in furtherance of and as a necessary step for the execution of the Fraud Scheme, and in violation of 18 U.S.C. § 1341, Matthew Kerner of the Liakas Firm, served a Verified Bill of Particulars through the mail and/or email falsely attesting to the truthfulness of the allegations set forth therein related to the trip and fall accident, including the existence, extent, causal relationship of, and medical care necessitated by, Claimant H's injuries.

380. On or about May 5, 2022, and continuing thereafter, Capiola created knowingly false and/or materially misleading records, otherwise containing material omissions, comprised of recycled language, regarding Claimant H's treatment and knee surgery. Capiola, paid on a case lien, was acutely aware these records would be presented in litigation and either mailed or transmitted as a necessary step and in furtherance of the Fraud Scheme. These records were so

emailed by McCulloch Ortho to opposing counsel on Claimant H's lawsuit on April 4, 2024, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. § 1343.

381. On or about June 24, 2021, Cohen created knowingly false and/or materially misleading records, otherwise containing material omissions, regarding Claimant H's treatment and spinal surgery. Cohen, paid on a case lien, was acutely aware these records would be presented in litigation and either mailed or transmitted as a necessary step and in furtherance of the Fraud Scheme. These records, along with a purported billing statement, were so e-mailed by Gotham on November 25, 2023, in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. § 1343.

382. On or about September 30, 2023, Hudson Regional forwarded records via mail to opposing counsel on Claimant H's lawsuit in order to manufacture or otherwise falsely inflate a claim for damages, in violation of 18 U.S.C. § 1341.

383. On dates unknown and unavailable to the pleading party, upon information and belief, one or more Funders provided advances to Claimant H and financial remuneration to McCulloch Ortho, Capiola, Cohen, Gotham, and Hudson Regional for the unnecessary surgeries.

ix. Additional Predicate Acts

384. For purposes of establishing a pattern of racketeering activity, not all predicate acts need have caused Plaintiff harm.

385. In addition to the acts set forth above and under Count I herein, the predicate acts as alleged against the Liakas Firm, Dean Liakas, Total Ortho, Lerman, Leven, PPNY, Kosharskyy, McCulloch Ortho, NY S&J, Capiola, Cohen, and Gotham Defendants as set forth in EDNY Docket No. #: 25-cv-00300, Doc. #: 1, Roosevelt Road RE, LTD., *et. al.* v. Liakas Law, P.C., *et. al.* (attached as **Exhibit 9**), are incorporated by reference as if fully set forth herein.

386.    In addition to the acts set forth above and under Count I herein, the predicate acts as alleged against Total Ortho, Lerman, PPNY, Kosharskyy, and McCulloch Ortho Defendants as set forth in EDNY Docket No.  #: 25-cv-03386-LKE, Doc. #: 1, <u>Roosevelt Road RE, LTD., et. al.</u> <u>v. William Schwitzer & Assoc., P.C., et. al.</u>, (attached as **Exhibit 10**), are incorporated by reference as if fully set forth herein.

387.    In addition to the acts set forth above and under Count I herein, the predicate acts as alleged against Total Ortho, Lerman, PPNY, Kosharskyy, and Reyfman Defendants as set forth in EDNY Docket No.  #: 25-cv-05859 Doc. #1, <u>Merchants Mutual Insurance Company v. William</u> <u>Schwitzer & Assoc., P.C., et. al.</u> (attached as **Exhibit 11**) are incorporated by reference as if fully set forth herein.

388.    In addition to the acts set forth above and under Count I herein, the predicate acts as alleged against McCulloch Ortho/NY S&J Defendants as set forth in EDNY Docket No.  #: 1:25-cv-02652-OEM-CLP Doc. #110, <u>Union Mutual Fire Insurance Company v. Subin Associates,</u> <u>LLP, et. al.</u> (attached as **Exhibit 12**) are incorporated by reference as if fully set forth herein.

## IV.    PLAINTIFFS' JUSTIFIABLE RELIANCE

389.    As the predicate acts sounding in mail and wire fraud as set forth against the Count I RICO Defendants herein are alleged to have been foreseeably transmitted, in furtherance of, and as a necessary step in, the Fraud Scheme (the overarching scheme or artifice to defraud), reliance is not required element to be established or pled as to each such individual document mailed or transmitted.

390.    Plaintiff at no time knew or had reason to know in the exercise of due diligence or reasonable care that Defendants were engaged in misrepresentations, omissions, concealment of material facts, and fraudulent conduct.

391.    The mere filing of the subject Complaints in the State Courts mandated an actionable level of reliance – Plaintiff was forced to rely on the misrepresentation of the Defendants insofar as the retention of attorneys, investigators, and experts was necessary to avoid default judgments; these are actions Plaintiff would not have taken (or had to take) but for the knowing misrepresentations made by the Defendants. New York law requires that the insurer abide the duty to defend, which is triggered upon the filing of a claim or complaint, regardless of whether same is fraudulent or meritless.

392.    Each Complaint, Bill of Particulars, bill, lien, and individual medical record created and transmitted by the Defendants, when viewed in isolation, does not reveal its fraudulent nature. Only when the bills and supporting documentation are viewed together as a whole, in conjunction with their repeated use in numerous cases, do the patterns emerge revealing the fraudulent nature of these submissions.

393.    Each subsequent falsified record produced in the course of the Fraud Scheme, upon disclosure and transmission to Plaintiff, required Plaintiff to, at minimum, rely on such submissions in incurring further fees and costs in discharging its legal obligation to provide a defense to its insured, prolonged litigation, required additional reserves, and were relied upon in valuing the claim as to exposure and/or settlement.

394.    As to settlements made as a result of the Fraud Scheme, Plaintiff at all times comported with reasonable due diligence requirements through the retention of reputable defense firms, investigators, and experts. However, the Fraud Scheme was designed and implemented in order to circumvent these safeguards. Further, the protections under HIPAA and attorney-client privilege, along with New York's insulation of litigation financing disclosures, rendered the scheme unable to be detected through the use of ordinary due diligence. Any payments made were

after Plaintiff had engaged in reasonable due diligence and were made in reasonably justified reliance.

## V.   DAMAGES

395.   Plaintiff is an insurance carrier which underwrites policies that cover the various claims and lawsuits filed and prosecuted by Claimants and the Legal Defendants, with the necessary and substantial assistance of the Medical Defendants, Funders, and Runners, as part of the Fraud Scheme.

396.   As a result of the Fraud Scheme, Plaintiff has incurred substantial damages. Such damages include the payments that Plaintiff made to Liakas Defendants directly in the form of settlements due to Defendant's pattern of fraudulent conduct. Damages also include payments Plaintiff made as legal, expert, and investigative costs in defending Fraud Scheme lawsuits.

397.   But for Defendants' perpetration of the Fraud Scheme, Plaintiff would not have incurred such damages. Each and every predicate act contributed to the damages incurred, as the scheme is designed reinforce itself, becoming more difficult to discern, more expensive to combat, and more effective generally upon each subsequent production of false statements and documents, effectuated through the use or mail and wire communication, and through reinvestment in the scheme and iteration, in an ever-escalating bootstrap; damages would have lessened or not incurred at all but for fraudulent scheme.

398.   New York law mandates that an insurer's duty to defend is triggered by the filing of a claim or suit - even if the allegations are false or groundless, the insurer has a duty to defend its insured. By law, each and every fraudulent claim and lawsuit immediately and directly caused legally mandated costs and expenses incurred by Plaintiff.

399.   Each transmission of records of fraudulent medical treatment rendered (or falsely recorded) had the direct and immediate effect of causing out of pocket damages through Plaintiff's

further incurred fees and costs in discharging its legal obligation to provide a defense, through prolonged litigation, the need for experts, required additional reserves, and were relied upon in valuing the claim as to exposure and/or settlement in figures that were fraudulently inflated.

400. Each transmission of falsified Bills of Particulars had the direct and immediate effect of causing additional damages through Plaintiff's further incurred fees and costs in discharging its legal obligation to provide a defense to its insured, through prolonged litigation, the need for experts, required additional reserves, and were relied upon in valuing the claim as to exposure and/or settlement in figures that were fraudulently inflated.

401. Further, Plaintiff's business operations include general liability services from underwriting through claims handling and subsequent administrative and legal actions, including effective handling of personal injury claims. As a direct and foreseeable result of the fraudulent scheme, Plaintiff was obligated to hire and retain additional personnel specifically to address fraudulent claims beyond the normal scope of business.

## VI. CAUSES OF ACTION

### COUNT I
### Substantive Violation of RICO 18 USC § 1962(c)

**As Against:**

**LIAKAS LAW, P.C.,**
**DEAN N. LIAKAS,**
**ORTHOPAEDICS SPINE & SPORTS MEDICINE,LLC**
**d/b/a TOTAL ORTHOPAEDICS,**
**DANTE LEVEN, D.O.,**
**MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C.**
**s/d/b/a NEW YORK SPORTS AND JOINTS ORTHOPAEDIC SPECIALISTS,**
**DAVID R. CAPIOLA, M.D.;**
**GOTHAM NEUROSURGERY, P.L.L.C.;**
**ANDERS COHEN, D.O.;**
**ACCELERATE RADIOLOGY, P.C. d/b/a PRECISION ACCELERAD,**
**SIDDHARTH PRAKASH, M.D., and**
**PAIN PHYSICIANS OF NEW YORK, P.C.**
**("Count I Defendants")**

402.     Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

403.     Each Count I Defendant was and is a "person" as that term is defined by statute under 18 U.S.C. § 1961, *et. seq.*

404.     At all times relevant herein, Count I Defendants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and legal entities associated in fact, which was engaged in, and the activities of which affected interstate commerce. Each of the Count I Defendants participated in the operation or management of the enterprise, which Liakas Firm overarchingly orchestrated and coordinated.

405.     In addition to any legitimate transactions, the course of conduct of this enterprise included a pattern of racketeering activity carried out by Count I Defendants.

406.     Each of the Count I Defendants knowingly and willfully associated with the association-in-fact enterprise and conducted and participated in the conduct of the enterprise's affairs, directly and indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

407.     The Count I Defendants engaged in a pattern of racketeering activity involving numerous predicate acts in the conduct of the Enterprise as described in detail *supra*, constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. §§ 1956 and 1957) and violations of the Travel Act (18 U.S.C. § 1952) – each being "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

408.     The predicate acts of mail fraud, wire fraud, Travel Act violations, and money laundering, all involved the transmission and use of false and misleading documentation in

furtherance of the Defendants' scheme to defraud Plaintiff in connection with submitting, filing, prosecuting and asserting claims and personal injury lawsuits arising out of fraudulent accidents.

409.    Each Defendant engaged in a pattern of racketeering activity in the conduct or in participation of the conduct of the Fraud Scheme Enterprise's conduct including, but not limited to, the following:

**Liakas Law**

| Date | Claimant | Predicate Act | Conduct |
|---|---|---|---|
| 3/15/22 | A | 18 USC § 1341 *Via* Kerner | Mailed correspondence containing falsified BP to opposing counsel in furtherance of Fraud Scheme |
| 1/10/23 | A | 18 USC § 1341 *Via Kerner* | Mailed correspondence containing falsified BP to opposing counsel in furtherance of Fraud Scheme re A's brother |
| 1/20/23 | A | 18 USC § 1341 *Via Shawa* | Mailed correspondence containing falsified BP to opposing counsel in furtherance of Fraud Scheme re A's other brother |
| 3/27/23 | B | 18 USC § 1341 *Via Kerner* | Mailed correspondence containing falsified BP to opposing counsel in furtherance of Fraud Scheme |
| 10/2/23 | C | 18 USC § 1341 *Via Generosa* | Mailed correspondence containing falsified BP to opposing counsel in furtherance of Fraud Scheme |
| 12/17/22 | D's brother | 18 USC § 1341 *Via Shawa* | Mailed correspondence containing falsified BP to opposing counsel in furtherance of Fraud Scheme |
| 5/5/23 | D | 18 USC § 1341 *Via Shawa* | Mailed correspondence containing falsified BP to opposing counsel in furtherance of Fraud Scheme |
| 10/15/21 | E | 18 USC § 1341 *Via Kerner* | Mailed correspondence containing falsified BP to opposing counsel in furtherance of Fraud Scheme |
| 11/13/23 | E | 18 USC § 1341 *Via Kerner* | Mailed correspondence containing falsified BP to opposing counsel in furtherance of Fraud Scheme |
| 11/22/23 | F | 18 USC § 1341 *Via Shawa* | Mailed correspondence containing falsified BP to opposing counsel in furtherance of Fraud Scheme |
| 10/19/22 | G | 18 USC § 1341 *Via Kerner* | Mailed correspondence containing falsified BP to opposing counsel in furtherance of Fraud Scheme |
| ~May 2025 | G | 18 USC § 1956 | Layered fraud scheme proceeds into its legitimate income so as to conceal the nature and origin of funds, as well as to promote the carrying on of specified unlawful activity. |
| ~May 2025 | G | 18 USC § 1957 | Knowingly engaged in transactions utilizing fraud scheme proceeds in excess of $10,000 |
| 4/26/23 | H | 18 USC § 1341 *Via Kerner* | Mailed falsified BP to opposing counsel in furtherance of Fraud Scheme |

**Dean Liakas**

| Date | Claimant | Predicate Act | Conduct |
|------|----------|---------------|---------|
| 5/5/22 | A | 18 USC § 1343 | Filed Verified Complaint on NYSCEF, making use of the wires, in furtherance of Fraud Scheme |
| 10/8/21 | B | 18 USC § 1343 | Filed Verified Complaint on NYSCEF, making use of the wires, in furtherance of Fraud Scheme |
| 1/3/22 | B's wife | 18 USC § 1343 | Filed Verified Complaint on NYSCEF, making use of the wires, in furtherance of Fraud Scheme |
| 2/3/23 | C | 18 USC § 1343 | Filed Verified Complaint on NYSCEF, making use of the wires, in furtherance of Fraud Scheme |
| 4/14/25 | C | 18 USC § 1343 | Filed Amended Verified Complaint on NYSCEF, making use of the wires, in furtherance of Fraud Scheme |
| 9/16/21 | D | 18 USC § 1343 | Filed Verified Complaint on NYSCEF, making use of the wires, in furtherance of Fraud Scheme |
| 6/22/22 | D's brother | 18 USC § 1343 | Filed Verified Complaint on NYSCEF, making use of the wires, in furtherance of Fraud Scheme |
| 6/4/21 | E | 18 USC § 1343 | Filed Verified Complaint on NYSCEF, making use of the wires, in furtherance of Fraud Scheme |
| 3/21/23 | F | 18 USC § 1343 | Filed Verified Complaint on NYSCEF, making use of the wires, in furtherance of Fraud Scheme |
| 1/11/21 | G | 18 USC § 1343 | Filed Verified Complaint on NYSCEF, making use of the wires, in furtherance of Fraud Scheme |
| 7/26/22 | H | 18 USC § 1343 | Filed Verified Complaint on NYSCEF, making use of the wires, in furtherance of Fraud Scheme |

**Total Ortho**

| Date | Claimant | Predicate Act | Conduct |
|------|----------|---------------|---------|
| 5/11/21 | A | 18 USC § 1343 | Faxed falsified records to opposing counsel in case in furtherance of Fraud Scheme |
| 4/25/23 | B | 18 USC § 1341 | Caused to be mailed falsified records to opposing counsel in case in furtherance of Fraud Scheme |
| 6/28/21 | C | 18 USC § 1341 | Caused to be mailed falsified records to opposing counsel in case in furtherance of Fraud Scheme |
| 11/9/21 | E | 18 USC § 1341 | Mailed falsified records to opposing counsel in case in furtherance of Fraud Scheme |

**Leven**

| Date | Claimant | Predicate Act | Conduct |
|------|----------|---------------|---------|
| 5/11/21 | A | 18 USC § 1343 | Caused to be faxed falsified records to opposing counsel in case in furtherance of Fraud Scheme |
| 4/25/23 | B | 18 USC § 1341 | Caused to be mailed falsified records to opposing counsel in case in furtherance of Fraud Scheme |
| 11/9/21 | E | 18 USC § 1341 | Caused to be mailed falsified records to opposing counsel in case in furtherance of Fraud Scheme |

**McCulloch Ortho**

| Date | Claimant | Predicate Act | Conduct |
|------|----------|---------------|---------|
| 3/15/22 | A | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |
| 3/27/23 | B | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |
| 5/5/23 | D | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |
| 11/22/23 | F | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |
| 11/28/23 | G | 18 USC § 1343 | E-mailed falsified records to opposing counsel in furtherance of Fraud Scheme |
| ~ May 2025 | G | 18 USC § 1956 | Layered fraud scheme proceeds into its legitimate income so as to conceal the nature and origin of funds, as well as to promote the carrying on of specified unlawful activity. |
| ~May 2025 | G | 18 USC § 1957 | Knowingly engaged in transactions utilizing fraud scheme proceeds in excess of $10,000 |
| 4/26/23 | H | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |

**Capiola**

| Date | Claimant | Predicate Act | Conduct |
|------|----------|---------------|---------|
| 3/15/22 | A | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |
| 3/27/23 | B | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |
| 5/5/23 | D | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |

| Date | Claimant | Predicate Act | Conduct |
|---|---|---|---|
| 10/15/21 | E | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |
| 11/22/23 | F | 18 USC § 1343 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |
| 11/28/23 | G | 18 USC § 1343 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme. |
| ~May 2025 | G | 18 USC § 1956 | Layered fraud scheme proceeds into its legitimate income so as to conceal the nature and origin of funds, as well as to promote the carrying on of specified unlawful activity. |
| ~May 2025 | G | 18 USC § 1957 | Knowingly engaged in transactions utilizing fraud scheme proceeds in excess of $10,000 |
| 4/26/23 | H | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |

## Gotham

| Date | Claimant | Predicate Act | Conduct |
|---|---|---|---|
| 5/5/23 | D | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |
| 1/5/24 | F | 18 USC § 1343 | E-mailed falsified records to opposing counsel in furtherance of Fraud Scheme |
| 1/13/24 | G | 18 USC § 1343 | E-mailed falsified records and invoice to opposing counsel in furtherance of Fraud Scheme |
| ~May 2025 | G | 18 USC § 1956 | Layered fraud scheme proceeds into its legitimate income so as to conceal the nature and origin of funds, as well as to promote the carrying on of specified unlawful activity. |
| ~May 2025 | G | 18 USC § 1957 | Knowingly engaged in transactions utilizing fraud scheme proceeds in excess of $10,000 |
| 11/15/23 | H | 18 USC § 1343 | E-mailed falsified records and invoice to opposing counsel in furtherance of Fraud Scheme |

## Cohen

| Date | Claimant | Predicate Act | Conduct |
|---|---|---|---|
| 5/5/23 | D | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |
| 9/10/21 | D | 18 USC § 1952 | With intent to facilitate and carry on kickback and fraud scheme, travelled to NJ and performed surgery in furtherance of same |

| | | | |
|---|---|---|---|
| 4/28/23 | F | 18 USC § 1952 | With intent to facilitate and carry on kickback and fraud scheme, travelled to NJ and performed surgery in furtherance of same |
| 1/5/24 | F | 18 USC § 1343 | Caused transmission of falsified records to opposing counsel in furtherance of Fraud Scheme |
| 4/16/21 | G | 18 USC § 1952 | With intent to facilitate and carry on kickback and fraud scheme, travelled to NJ and performed surgery in furtherance of same |
| 1/13/24 | G | 18 USC § 1343 | Caused transmission of falsified records and invoice to opposing counsel in furtherance of Fraud Scheme |
| ~May 2025 | G | 18 USC § 1956 | Layered fraud scheme proceeds into its legitimate income so as to conceal the nature and origin of funds, as well as to promote the carrying on of specified unlawful activity. |
| ~May 2025 | G | 18 USC § 1957 | Knowingly engaged in transactions utilizing fraud scheme proceeds in excess of $10,000 |
| 11/15/23 | H | 18 USC § 1343 | Caused transmission of falsified records and invoice to opposing counsel in furtherance of Fraud Scheme |
| 5/5/22 | H | 18 USC § 1952 | With intent to facilitate and carry on kickback and fraud scheme, travelled to NJ and performed surgery in furtherance of same |

**AcceleRad**

| Date | Claimant | Predicate Act | Conduct |
|---|---|---|---|
| 3/4/21 | A | 18 USC § 1341 | Mailed falsified records in furtherance of Fraud Scheme to Capiola |
| 6/27/23 | D | 18 USC § 1343 | E-mailed falsified records in furtherance of Fraud Scheme to opposing counsel on underlying case |
| 4/19/23 | F | 18 USC § 1343 | Faxed falsified records in furtherance of Fraud Scheme to Cohen |
| 11/22/23 | F | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |

**Prakash**

| Date | Claimant | Predicate Act | Conduct |
|------|----------|---------------|---------|
| 3/4/21 | A | 18 USC § 1341 | Caused to be mailed falsified records in furtherance of Fraud Scheme to Capiola |
| 6/27/23 | D | 18 USC § 1343 | Caused falsified records to be emailed in furtherance of Fraud Scheme to opposing counsel on underlying case |
| 11/22/23 | F | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |

**PPNY**

| Date | Claimant | Predicate Act | Conduct |
|------|----------|---------------|---------|
| 3/15/22 | A | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |
| 5/5/23 | D | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |

410.    As a direct and proximate result of the § 1962(c) violations, Plaintiff has been injured in its business or property in an amount to be determined at trial, including but not limited to fraudulent claim payments, settlements, investigative costs, claims handling fees, litigation costs, expert fees, and attorneys' fees.

411.    Plaintiffs' injuries were the foreseeable and intended consequence of the racketeering activity; absent Defendants' predicate acts committed in furtherance of the Enterprise, Plaintiff would not have suffered the losses described.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, and each of them, jointly and severally, for:

a.    An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b.    Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

c.      Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

d.      Such other relief as the Court deems just and proper.

### COUNT II
### RICO Conspiracy (§ 1962[d])

### (As Against All Defendants)

412.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

413.    From at least 2018 to the present, Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d).

414.    The pattern of racketeering activity in which the Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific acts and conducts as described in detail in this Complaint, constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343) Travel Act violations (18 USC § 1952), and money laundering (18 U.S.C. § 1956) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

415.    The substantive 18 USC § 1962(c) violations are set forth in Count I.

416.    The predicate acts of mail fraud, wire fraud, Travel Act violations, and money laundering also involved the transmission and use of false and misleading documentation in furtherance of the Defendants' scheme to defraud Plaintiff in connection with submitting, filing, prosecuting and asserting claims and personal injury lawsuits arising out of fraudulent accidents.

417.    As a result of the pattern of racketeering activity, Plaintiff has suffered damage to their business and property.

418.    These predicate acts were necessary steps in and in furtherance of the Fraud Scheme Enterprise, in meeting the necessary steps of the Fraud Scheme agreed upon by the Defendants, including:

    a.    Recruiting Claimants and staging accidents;

    b.    Securing retainer of the attorneys within the Fraud Scheme Enterprise;

    c.    Managing Claimants through pre-determined protocol treatment;

    d.    Performing pre-determined and unnecessary surgeries;

    e.    Filing and prosecuting the fraudulent suits;

    f.    Laundering and concealing the nature of the Fraud Scheme proceeds; and,

    g.    Concealing the nature of the Fraud Scheme itself to perpetuate the scheme.

419.    Each Defendant knew that the acts detailed herein were part of a pattern of racketeering activity and agreed to facilitate, and did facilitate, the Fraud Scheme to the benefit of the Fraud Scheme Enterprise. At least one conspirator committed overt acts in furtherance of the conspiracy, including the predicate acts as alleged in Count I. Each Defendant had knowledge of, at minimum, the general contours of the overall scheme and common objective; specifically, defrauding Plaintiffs and those similarly situated.

420.    While not necessary to establish herein, each Defendant named herein and not named as a Count I Defendant engaged in overt acts in furtherance of the conspiracy, including but not limited to:

### Avanesov

| Date | Claimant | Overt Act | In Furtherance |
|------|----------|-----------|----------------|
| 9/17/20 | E | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |
| 9/17/20 | E | Performed unnecessary surgery | To construct false medical narrative, inflate case value, prolong litigation<br>Assert lien/receive funding for unnecessary surgery |

### Lerman

| Date | Claimant | Overt Act | In Furtherance |
|------|----------|-----------|----------------|
| 6/26/24 | C | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |
| 6/26/24 | C | Performed unnecessary surgery | To construct false medical narrative, inflate case value, prolong litigation<br>Assert lien/receive funding for unnecessary surgery |

### Kosharskyy

| Date | Claimant | Overt Act | In Furtherance |
|------|----------|-----------|----------------|
| 3/15/22 | A | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |
| 2/3/21 | A | Prepared falsified reports | To justify escalating treatment toward pre-determined and unnecessary surgery |

### Hudson Regional

| Date | Claimant | Predicate Act | Conduct |
|------|----------|---------------|---------|
| 6/28/23 | D | 18 USC § 1341 | Mailed falsified records to opposing counsel in furtherance of Fraud Scheme |
| 1/12/24 | F | 18 USC § 1341 | Mailed falsified records to opposing counsel in furtherance of Fraud Scheme |
| 5/26/23 | G | 18 USC § 1341 | Mailed falsified records to opposing counsel in furtherance of Fraud Scheme |

| 9/30/2021 | H | 18 USC § 1341 | Mailed falsified records to opposing counsel in furtherance of Fraud Scheme |
|---|---|---|---|

**Reyfman**

| Date | Claimant | Overt Act | In Furtherance |
|---|---|---|---|
| 5/5/23 | D | 18 USC § 1341 | Caused mailing of falsified records to opposing counsel in furtherance of Fraud Scheme |
| 5/18/22 | D | Prepared falsified reports | To justify escalating treatment toward pre-determined and unnecessary surgery |

421.   As a direct and proximate result of the § 1962(c) violations that Defendants conspired to commit, Plaintiff has been injured in its business or property in an amount to be determined at trial, including but not limited to fraudulent claim payments, settlements, investigative costs, claims handling fees, and attorneys' fees.

422.   Plaintiffs' injuries were the foreseeable and intended consequence of the conspiracy; absent Defendants' agreement and the predicate acts committed in furtherance thereof, Plaintiff would not have suffered the losses described.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, and each of them, jointly and severally, for:

a.   An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b.   Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

c.   Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

d.   Such other relief as the Court deems just and proper.

**COUNT III**
**Common Law Fraud**

**As Against:**

**LIAKAS LAW, P.C.,**
**DEAN N. LIAKAS,**
**ORTHOPAEDICS SPINE & SPORTS MEDICINE,LLC**
**d/b/a TOTAL ORTHOPAEDICS,**
**MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C.**
**s/d/b/a NEW YORK SPORTS AND JOINTS ORTHOPAEDIC SPECIALISTS,**
**GOTHAM NEUROSURGERY, P.L.L.C.; and,**
**ACCELERATE RADIOLOGY, P.C. d/b/a PRECISION ACCELERAD**
**("Count III Defendants")**

423.     Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

424.     The Count III Defendants made knowing and material misrepresentations of facts, and deliberately concealed and otherwise omitted materials facts that they had a duty to disclose, in connection with the Fraud Scheme.

425.     These misrepresentations of fact by the Count III Defendants included, but were not limited to, the material misrepresentations of fact made in asserting the legitimacy of accidents, the existence of injuries and the necessity of treatment.

426.     The specific documents containing misrepresentations, who they were made by, and when, are detailed in the tables under Count I, with specific allegations as to the falsity of specific contents set forth in the relevant Claimant section *supra*. Each and all transmissions by Liakas Firm and Dean Liakas as set forth in Count I are alleged herein under Count III. As to the remaining Count III Defendants, the following documents with misrepresentations alleged to be false are as follows:

## Total Ortho

| Date | Claimant | Predicate Act | Conduct |
|------|----------|---------------|---------|
| 5/11/21 | A | 18 USC § 1343 | Faxed falsified records to opposing counsel in case in furtherance of Fraud Scheme |
| 11/9/21 | E | 18 USC § 1341 | Mailed falsified records to opposing counsel in case in furtherance of Fraud Scheme |

## McCulloch Ortho

| Date | Claimant | Predicate Act | Conduct |
|------|----------|---------------|---------|
| 11/28/23 | G | 18 USC § 1343 | E-mailed falsified records to opposing counsel in furtherance of Fraud Scheme |

## Gotham

| Date | Claimant | Predicate Act | Conduct |
|------|----------|---------------|---------|
| 1/5/24 | F | 18 USC § 1343 | E-mailed falsified records to opposing counsel in furtherance of Fraud Scheme |
| 1/13/24 | G | 18 USC § 1343 | E-mailed falsified records and invoice to opposing counsel in furtherance of Fraud Scheme |
| 11/15/23 | H | 18 USC § 1343 | E-mailed falsified records and invoice to opposing counsel in furtherance of Fraud Scheme |

## AcceleRad

| Date | Claimant | Predicate Act | Conduct |
|------|----------|---------------|---------|
| 3/4/21 | A | 18 USC § 1341 | Mailed falsified records in furtherance of Fraud Scheme to Capiola |
| 6/27/23 | D | 18 USC § 1343 | E-mailed falsified records in furtherance of Fraud Scheme to opposing counsel on underlying case |

427. The Count III Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading. The falsity of each such representation is set forth under Count I and the corresponding Claimant sections of this Complaint, *supra*.

428.    The Count III Defendants made these misrepresentations with the intent they reach Plaintiff, and in furtherance of the scheme to defraud Plaintiff by submitting claims and/or documentation in support of claims for payment of general liability insurance proceeds, knowingly falsified treatment records, inflated liens, and other submissions presented to Plaintiff through the course of the Fraud Scheme. The Liakas Defendants presented such misrepresentations directly to Plaintiff and/or its attorneys. The remaining Count III Defendants presented such misrepresentations directly to Plaintiff's agents.

429.    The Count III Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Plaintiff to make payments for claims that were not legitimate. The knowledge of such falsity can be reasonably inferred from the constellation of facts set forth in each Claimant section, *supra*.

430.    Plaintiff reasonably and justifiably relied, to its detriment, on the Count III Defendants' representations, the validity of such claims and treatment, and without knowledge of the Count III Defendants' scheme and artifice to defraud them.

431.    The Count III Defendants knew, or should have known, that Plaintiff would rely on such representations, and planned to exploit such reliance.

432.    But for the Count III Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct, Plaintiff would not have incurred damages.

433.    As a matter of New York law, which requires Plaintiff to fulfill its duty to defend its insured immediately upon the filing of a claim or lawsuit, regardless of merit, and even in the face of suspected fraud, such reliance was thrust upon Plaintiff. Plaintiff was induced to take action it otherwise would not have taken, based on the contents of the false misrepresentations.

434. Each subsequent falsified record produced in the course of the Fraud Scheme, upon disclosure and transmission to Plaintiff, forced reliance upon Plaintiff to, at minimum, rely on such submissions in discharging its legal obligation to provide a defense to its insured through increased legal, investigative, and expert costs, as well as necessarily resulted in prolonged litigation, required additional reserves, and in valuing the claim as to exposure and/or settlement within the parameters of discharging its legal duty to defend.

435. As to settlements made as a result of the Fraud Scheme, Plaintiff at all times comported with reasonable due diligence requirements through the retention of reputable defense firms, investigators, and experts. However, the Fraud Scheme was designed and implemented in order to circumvent these safeguards. Further, the protections under HIPAA and attorney-client privilege, along with New York's insulation of litigation financing disclosures, rendered the scheme unable to be detected through the use of ordinary due diligence. Any payments made were after Plaintiff had engaged in reasonable due diligence and were made in reasonably justified reliance.

436. Plaintiff at no time knew or had reason to know in the exercise of due diligence or reasonable care that the Count III Defendants were engaged in misrepresentations, omissions, and fraudulent conduct.

437. As a direct and proximate cause of the Count III Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct by the Count III Defendants, Plaintiff has been damaged. Plaintiff's damages include, but are not necessarily limited to, settlement payments, administration costs, investigative and defense costs paid by Plaintiff to the Count IV Defendants or caused by the Count III Defendants.

438. Because the Count III Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiff is entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff demands judgment against the Count IV Defendants, and each of them, jointly and severally, for:

a. An award of Plaintiff's actual and consequential damages to be established at trial;

b. Plaintiff's costs, including, but not limited to, investigative costs incurred in the detection of the Count III Defendants' illegal conduct;

c. Punitive damages to be established at trial; and,

d. Such other relief as the Court deems just and proper.

**COUNT IV**
**Aiding and Abetting Fraud**

**(As Against All Defendants)**

439. Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

440. All Defendants named herein had actual knowledge of the Fraud Scheme, and the common law fraud as set forth in Count III.

441. As set forth in detail, *supra*, and in the charts set forth under Counts I and II, each Defendant engaged in overt acts in furtherance of the fraud, or otherwise provided substantial assistance to advance such fraud's commission.

442. But for the substantial assistance of each Defendant, such Fraud Scheme would not have been possible.

443. As a direct and proximate cause of the Defendants' aiding and abetting of the Fraud Scheme, Plaintiff has been damaged as set forth in Count III.

444.    Because the Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiff is entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff demands judgment against all Defendants, and each of them, jointly and severally, for:

> a.    An award of Plaintiff's actual and consequential damages to be established at trial;
>
> b.    Plaintiff's costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct;
>
> c.    Punitive damages to be established at trial; and,
>
> d.    Such other relief as the Court deems just and proper.

### COUNT V
### Unjust Enrichment

**Against Legal Service Defendants and Medical Provider Defendants ("Count V Defendants")**

445.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

446.    As described above, the Count V Defendants conspired to induce Plaintiff to make or expend numerous and substantial payments to them or others.

447.    The Count V Defendants were never eligible to make claims or seek reimbursement under New York law because, at all relevant times, the accidents, injuries and treatment were fraudulent.

448.    When Plaintiff paid the Count V Defendants and others resulting from the Fraud Scheme, Plaintiff reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count V Defendants, or those persons working

under their control, made concerning the Count V Defendants' eligibility to make claims or seek reimbursement under New York law.

449.    Each and every payment that Plaintiff made or was caused to make to the Count V Defendants and others during the course of the Fraud Scheme constitutes a benefit that the Count V Defendants sought and voluntarily accepted.

450.    Throughout the course of their scheme, the Count V Defendants wrongfully obtained from Plaintiff benefit payments as a direct and proximate result of the unlawful conduct detailed above.

451.    Retention of those benefits by the Count V Defendants would violate fundamental principles of justice, equity, and good conscience.

**WHEREFORE**, Plaintiff demands judgment against the Count V Defendants, and each of them, jointly and severally, for:

      a.    An award of Plaintiff's actual and consequential damages to be established at trial; and

      b.    Such other relief as the Court deems just and proper.

**COUNT VI**
**General Business Law § 349**

**As Against Legal Service and Medical Provider Defendants (**
**"Count VI Defendants"))**

452.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

453.    New York State General Business Law ("GBL") § 349 provides that (a) "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful," and (h) "any person who has been injured by

reason of any violation of this section may bring an action… to recover his actual damages... [and t]he Court may award reasonable attorney's fees to a prevailing plaintiff."

454.    It is well-established virtually all commercial activity which involves goods or services rendered to public consumers, including legal and medical services, and providing loans and/or advances, are subject to the provisions of GBL § 349.

455.    It is equally well-established that a deceptive practice need not reach the level of common-law fraud to be actionable under § 349, intent to defraud and justifiable reliance are not elements of a statutory claim, and GBL § 349 is not subject to heightened pleading standards.

456.    As set throughout this Complaint, *supra*, each of the Count VI Defendants have engaged in deceptive acts and practices in the conduct of their businesses; particularly, in the furtherance of the Fraud Scheme.

457.    GBL § 349 provides that any party which has been injured by such deceptive acts and practices may recover their actual damages thereto, and the Court may award reasonable attorney's fees to a prevailing plaintiff.

458.    The alleged conduct of Defendants as set forth above and herein has dramatic and widespread effects on consumers extending far beyond the direct damages caused by the deceptive acts and practices alleged herein. These deceptive acts and practices, and the Fraud Scheme itself, has a broader impact on consumers at large.

459.    The Fraud Scheme, and its various permutations amongst similar schemes and overlapping actors, have an impact locally – clogged Court dockets, needless investigative, legal, other claims and defense-related spend, and fraudulently obtained settlements and awards  - and nationally, wrongfully driving up the cost of legitimate insurance business operations, resulting in

needlessly escalating premiums to the ultimate consumers of liability insurance and the cost of healthcare (*i.e., _everyone_*).

460.     This phenomenon and its effects have begun to attract media attention. New York Post, June 16, 2024: [MS-13, Russian mobsters use migrants in elaborate injury scam — even getting spinal surgery to pull it off](#) ("Insurance insiders claim losses have tripled since the pandemic, with payouts so massive they're driving up the cost of living for all New Yorkers… The scams are ballooning costs for insurance, housing, construction, food, utilities, and basic living expenses"); ABC News, October 4, 2024: [7 On Your Side investigation finds dozens of injury lawsuits from people living in same apartment buildings](#) ("We have a system that allows for fraudulent claims, leads to million dollars settlements and it raises the cost of insurance premiums across the board," Brian Sampson, president of the Empire State Chapter of the Associated Builders & Contractors, said. "We need to find a way to get it to stop."); ABC News, March 17, 2024: [Construction workers in NY faking falls on sites part of larger fraud scheme, lawsuit claims](#) ("'These fraudulent acts have emerged as widespread insurance scams which lead to inflated costs in construction and housing throughout New York State,' said Assemblyman David Weprin.").

461.     The deceptive trade practices of the Count VI Defendants – *i.e.,* the Fraud Scheme – occurred and is continuing to occur in New York, Count VI Defendants maintain a business presence in New York, and the effects are felt by consumers at large in New York.

462.     Under these circumstances, an entity such as Plaintiff has standing to pursue claims for violations of GBL § 349. Count VI Defendants are liable to Plaintiff for compensatory damages and the attorneys' fees incurred in bringing and prosecuting this Action.

**WHEREFORE**, Plaintiff demands judgment against Count VI Defendants for:

    a.      An award of Plaintiff's actual damages to be established at trial;

    b.      Plaintiff's attorneys' fees incurred in the preparation and prosecution of this Action; and,

    c.      Such other relief as the Court deems just and proper.

## VII. JURY TRIAL DEMAND

463. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims.

Dated: November 20, 2025

Respectfully submitted,

**THE WILLIS LAW GROUP, PLLC**

By: _/s/ William J. Clay_ _____
    **WILLIAM J. CLAY**
    **DANIEL A. JOHNSTON**
    **MICHAEL A. GRAVES**
    **AARON E. MEYER**
    1985 Forest Lane
    Garland, Texas 75042
    Telephone:  214-736-9433
    Facsimile:  214-736-9994
    Service Email: service@thewillislawgroup.com

    ***ATTORNEYS FOR THE PLAINTIFF***
    **UNION MUTUAL FIRE INSURANCE COMPANY**